**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

PEGASYSTEMS INC.,

      *Plaintiff,*

  v.

APPIAN CORPORATION,

      *Defendant.*

Civil Action No.:  23-cv-11776

**COMPLAINT**

1.      Pegasystems Inc. ("Pegasystems") files this complaint to address ongoing misrepresentations and deliberately malicious statements made by Appian Corporation ("Appian").  For a number of years, Pegasystems and Appian have been involved in ongoing litigation.  Not content to let the legal process play out, Appian has spent the past year misrepresenting aspects of certain court proceedings to try to harm Pegasystems in the marketplace.  Pegasystems seeks equitable relief and damages for defamation, commercial disparagement, and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(b).

2.      In particular, Appian's personnel, including one of its cofounders and one of its board members, made statements asserting or suggesting that Pegasystems had been found guilty of a felony criminal offense for violating the Virginia Computer Crimes Act ("VCCA"), and that as a result, Pegasystems would have to disclose a felony conviction in government contracting, which would prevent Pegasystems from working with the federal government and related

agencies.  These statements were false and defamatory.  In the litigation between Appian and Pegasystems, a Virginia jury found that Pegasystems had violated the *civil* (not criminal) provisions of the VCCA, and awarded only $1.00 in damages, indicating that the asserted violation was inconsequential.  Appian's misrepresentations have been made with full knowledge of their falsity, maliciously, and with ill intent to harm Pegasystems.  Indeed, upon information and belief, Appian has repeatedly resorted to misrepresenting the facts of the parties' litigation in an attempt to gain an unfair commercial advantage.

3.      Similarly, Appian officials have made statements asserting that Pegasystems employees used false identities to obtain access to Appian information and trial versions of Appian's software, which were then used for competitive purposes, and that, "Mr. Trefler himself [Pegasystems' founder and CEO] admitted to using an alias … to obtain access to Appian information."  This statement is false and misleading, particularly insofar as the two statements were deliberately juxtaposed to suggest that Mr. Trefler accessed Appian's software. The undisputed evidence at trial demonstrated that Mr. Trefler never accessed any of Appian's software and did not access any free trials.  Again, Appian's goal is to cast aspersions on Pegasystems' founder in order to gain an unfair competitive advantage.  These misrepresentations were made to media outlets, in Appian's marketing, and to the parties' customers.

4.      The brazen nature of Appian's misinformation campaign is even more stunning when one considers the reality that the individual directly responsible for the alleged misappropriation in the Virginia case was fired by Pegasystems and then hired by Appian as its head of market intelligence and strategy.  As a result, when Appian warns customers and prospective customers to be wary of Pegasystems because "Pegasystems employees" once

engaged in alleged misdeeds, it is actually referring to an individual that Appian currently employs as one of its executives.

5.     These misrepresentations and others are part of Appian's ongoing effort over the course of more than a year to use false statements regarding the continuing litigation between the parties to overcome the deficiencies in Appian's products in the market, to defame Pegasystems, and to compete unfairly.  Pegasystems has exercised forbearance, sending multiple letters and notices demanding that Appian cease its pattern of deceit and unfair business practices, but to no avail.  Indeed, rather than agreeing to cease its conduct, Appian increased its efforts to spread misinformation through actual advertising campaigns.  As a result, Pegasystems has no choice but to seek redress from the Court.

## PARTIES

6.     Plaintiff Pegasystems is a public corporation that develops, markets, licenses, and supports software applications for marketing, sales, customer service, and operations. Pegasystems' products include software for business process management.  Pegasystems is incorporated in Massachusetts and maintains its headquarters in Cambridge, Massachusetts.

7.     Defendant Appian is a public corporation that also develops business process management products.  Appian is a direct competitor in a portion of Pegasystems' business. Appian is incorporated in Delaware and maintains its headquarters in Reston, Virginia.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 because this matter involves violations of the Lanham Act.  This court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.  This Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because

there is complete diversity between the Plaintiff and the Defendant and the amount in controversy exceeds $75,000.

9. This Court has personal jurisdiction over Defendant Appian, which does business in Massachusetts and maintains an office in Boston, Massachusetts. This matter also arises from Appian's publication of false and misleading statements in marketing materials and other communications to third parties, including to individuals and entities in Massachusetts, that caused injury to Pegasystems in Massachusetts, and the parties have previously engaged in litigation in Massachusetts related to Appian's unfair business practices.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTS

### *Pegasystems*

11. Pegasystems was founded in 1983 in Cambridge, Massachusetts. The company is still headquartered in Cambridge today and employs over 5,000 people worldwide.

12. Pegasystems develops, markets, licenses, and supports enterprise software applications that help organizations transform the way they engage with their customers and process and complete work across their enterprise. Its cloud-architected portfolio of customer engagement and digital process automation applications leverages artificial intelligence, case management, and robotic automation technology, empowering businesses to quickly design, extend, and scale their enterprise applications to meet strategic business needs.

13. Pegasystems' products and services are used by Global 3000 organizations and government agencies across the globe.

14.     Pegasystems' applications and platform intersect with several software markets, including business process management ("BPM"), part of the digital process automation ("DPA") market.

### *Appian*

15.     Pegasystems has numerous BPM competitors.  Appian is one, though it does not compete with Pegasystems' other products.  Appian applies a fundamentally different BPM approach designed for different customer needs.  Among other things, Pegasystems prioritizes scalability, while Appian prioritizes speed and ease of app development.

### *The Virginia Litigation*

16.     In 2020, Appian brought litigation against Pegasystems in Virginia state court. While five claims were initially pled, only two of them ultimately survived to be tried to a jury: one alleging a civil violation of the VCCA, and one alleging theft of trade secrets under the Virginia Uniform Trade Secret Act ("VUTSA").

17.     The trade-secret claim asserted in the case was based on alleged activities that Pegasystems' then head of competitive intelligence, John Petronio, directed and participated in from 2012 to 2014.  His goal was to review how Appian's BPM platform performed, from the perspective of one of the tens of thousands of non-Appian developers who used the platform to create apps.  Through a third-party staffing agency, Petronio found a developer named Youyong Zou to demonstrate Appian's platform.

18.     Zou was not an Appian employee and had no special access to Appian confidential information.  He worked for a separate company that licensed Appian's platform. Like tens of thousands of developers at other companies, Zou had access to use the Appian platform and related user manuals.  But Zou had no access to Appian's source code—the detailed

instructions that enable a program to function and reveal how to replicate it.  Petronio asked Zou to demonstrate building apps with Appian's software.  Zou shared only the ordinary, user observable, readily available aspects of Appian's software, and some published documentation— things that every Appian developer or partner working at any of Appian's many customers could see.  All told, Zou spent 200 hours consulting over two-and-a-half years and received $23,608.

19.     In 2015, Pegasystems fired Petronio for performance-related issues.  Appian hired him the next year, first as a consultant and then as its senior director of market intelligence and strategy.  In 2020, Petronio told Appian about Zou.  Appian did not fire Petronio for what it now vilifies as "espionage."  It gave him a raise.  Then Appian sued Pegasystems.

20.     Appian based its VUTSA claim on Petronio's activities with Zou.  Appian's theory was that its platform's capabilities and information in the published documentation and demonstrations Zou shared with Pegasystems were trade secrets.

21.     Appian based its VCCA claims on a separate set of facts from a later timeframe.  Specifically, Appian contended that Pegasystems accessed Appian's system without authorization because employees used assumed identities to access free trials of its software that it otherwise offered to the public.

22.     Despite bearing the word "Crimes" in its name, the VCCA has two components: criminal and civil.

23.     First, the VCCA contains a series of criminal provisions that prohibit, among other things, the use of a computer or computer network to commit embezzlement or larceny, forgery in the transmission of "spam" email, and unauthorized trespass into computer systems or data.  *See* Va. Code §§ 18.2-152.3 to -152.7:2.

24.     Pegasystems has never been charged with a criminal violation of the VCCA.

25.     Second, the VCCA provides a civil cause of action for plaintiffs who claim to be harmed so that they can seek compensation for that harm.  *See* Va. Code § 18.2-152.12.

26.     The Virginia jury found that Pegasystems had violated the VCCA's civil provisions but, as to the alleged harm to Appian, awarded Appian only $1 in nominal damages.

27.     The jury's finding that Pegasystems violated the VCCA does not constitute a determination that Pegasystems committed a crime under Virginia law.

28.     There has never been any allegation, claim, or finding that Pegasystems committed a crime—much less a felony.

29.     Pegasystems did not appeal the civil verdict under the VCCA.  This litigation choice does not constitute a concession that Pegasystems committed a violation of that statute. Defendants may choose not to appeal a verdict on a particular claim for any number of reasons, including because (a) the size of the verdict on that claim does not warrant an appeal, (b) it is advantageous to focus the appellate courts on other components of the case, (c) the evidence was particularly lacking as to other claims, or (d) the trial court's errors were particularly glaring as to other claims.

30.     In this instance, the $1 verdict on the VCCA claim stands as confirmation that any alleged violation was of little or no consequence.

31.     Based on gross errors in evidentiary rulings and legally indefensible jury instructions, the Virginia jury also found that Pegasystems had misappropriated trade secrets in violation of the VUTSA.  It awarded Appian $2,036,860,045.00 from Pegasystems under that claim.  Pegasystems has appealed the VUTSA verdict on several grounds.

32.     First, Appian failed to prove that the alleged trade secrets were trade secrets at all. Appian failed to take reasonable measures to maintain the secrecy of its information, including by disclosing its purportedly secret information to others without requiring confidentiality.

33.     Second, Appian failed to identify the alleged trade secrets with sufficient particularity.  By instead pointing to broad, ill-defined categories of information, Appian obstructed Pegasystems' defense and made it impossible for the jury to assess accurately the existence and value of the alleged trade secrets.

34.     Third, the trial court erred by preventing Pegasystems from showing that Appian disclosed its purportedly secret information to tens of thousands of people through its online forum and free trials.  The trial court similarly erred by instructing the jury that the number of people with such access was irrelevant to Appian's VUTSA claim.

35.     Fourth, the trial court erred by preventing Pegasystems from showing the jury Pegasystems' own software that predated the work with Zou, which would have allowed the jury to assess accurately whether Pegasystems in fact copied any of Appian's features.

36.     Fifth, contrary to the text of the VUTSA, the trial court erred by instructing the jury that Appian did not need to prove that its damages were caused by Pegasystems' alleged misappropriation.  Instead, the jury was essentially told to presume that misappropriation caused the allegedly unjust enrichment, and the burden was shifted to Pegasystems to disprove that causation.  This error was particularly problematic because Appian sought (and was awarded) revenue from an eight-year period notwithstanding that those profits could not be tied to the alleged improper activity.

37.     Sixth, the trial court erred by preventing Pegasystems from showing the jury evidence that would have demonstrated that more than half of Pegasystems' revenue was derived

from products and services other than Pegasystems' business process management (BPM)

product—the only product alleged to contain misappropriated features.

38.     Prominent *amici curiae* filed briefs in the Virginia Court of Appeals, which

support Pegasystems' arguments.  First, the American Intellectual Property Law Association

explained that the trial court's damages instruction "improper[ly]" "excused [Appian] from

proving in the first instance a basic element of its claim."

39.     Second, two distinguished legal scholars, Mark Gergen and Pamela Samuelson of

the University of California's Berkeley School of Law, explained that the trial court's damages

instruction was "deeply flawed" because "it would be absurd to presume that the presence of …

infringing material caused [Pegasystems'] sale[s]" without requiring that Appian actually prove

that causation.

40.     That appeal has been fully briefed but the Virginia appeals court has not yet acted

on the appeal.

### *Appian's False and Misleading Statements*

41.     The jury issued its verdict in May 2022, and Appian immediately began making

false and misleading statements to third parties about the litigation and the verdict.

42.     On May 10, 2022, Appian issued a press release that claimed that Alan Trefler,

Pegasystems' CEO used an alias "to access Appian information."  The press release suggests that

numerous Pegasystems employees used aliases to access Appian's software, including Mr.

Trefler, stating that, "[e]ven a Pega intern gained improper access to Appian software, but unlike

the CEO, at least he used his own name."

43.     Mr. Trefler never accessed Appian's software.  As a result, the statements are

false or misleading, causing reputational harm and damage to Pegasystems' customer relations

and ability to generate business.  Upon information and belief, these statements were made with knowledge that they were false and misleading, and with specific ill-will and malice toward Pegasystems.

44.     Also on May 10, 2022, Appian officials were quoted in The Register making false and misleading statements.  Specifically, the article states, "Appian … said it 'presented undisputed evidence that Pegasystems employees used false identities to obtain access to Appian information and trial versions of Appian's software, which were then used for competitive purposes.'  Mr Trefler himself [the Pegasystems CEO] admitted to using an alias, 'Albert Skii' to obtain access to Appian information,' Appian added."

45.     This article was published online and accessible in Massachusetts.

46.     This statement falsely and/or misleadingly suggests that Alan Trefler used an alias to access Appian's software.  Mr. Trefler never accessed Appian's software.  As a result, the statement is false or misleading, causing reputational harm and damage to Pegasystems' customer relations and ability to generate business.  Upon information and belief, these statements were made with knowledge that they were false and misleading, and with specific ill-will and malice toward Pegasystems.

47.     On May 12, 2022, Jack Biddle, a member of the Appian Board of Directors sent emails to several people associated with Pegasystems' investor relations, including ICR Inc., a third-party investor relations firm, referring to the civil litigation between Appian and Pegasystems, and stating that, "The VCCA finding of fact for a dollar is a Class 5 felony.  Normally that's disbarment [sic] from selling to government," and "The $1 award concerns me on the VCCA. That is a class 5 Felony in Virginia."  When Mr. Biddle sent these emails, he did

not disclose that he was a member of Appian's Board of Directors and instead merely indicated that he was a Pegasystems' shareholder.

48.     This statement is false and misleading.  The litigation between Appian and Pegasystems is a civil lawsuit and has never involved criminal charges.  The assertion that Pegasystems committed a Class 5 felony that normally would trigger debarment is false and misleading and intended to cause harm to Pegasystems.

49.     In fact, directly following the rendering of the verdict in Virginia in May, Pegasystems executives notified many of Pegasystems' clients of the nature of the claims made against the company, as well as the nature of the verdict and appeal.  Clients notified included government agencies—including agencies involved in law enforcement, like the Department of Justice, and these clients, including government agencies, continued to do business with Pegasystems.

50.     Mr. Biddle's false and misleading statements were intended to inflict harm on Pegasystems' reputation and its customer relations and ability to generate business.  Upon information and belief, these statements were made with knowledge that they were false and misleading, and with specific ill-will and malice toward Pegasystems.

51.     On November 3, 2022, during an Appian earnings call, Matthew Calkins, Appian's Founder, CEO and President said, when asked to comment about "the size of the ruling" that the jury had awarded he claimed, "[I]t's not just a lawsuit.  It's a verdict.  It's a final judgment at this point because the judge entered it this past quarter.  Pegasystems violated the Computer Crimes Act, right, full stop."

52.     Mr. Calkins went on to state, "I don't know what this means for their customers prospects, their partners, even their employees."  Upon information and belief, Appian intended

for Mr. Calkin's statements to harm Pegasystems' reputation, and to unsettle Pegasystems' employees, including those residing in Massachusetts.  Upon information and belief, this misinformation campaign was also coordinated with an effort to convince Pegasystems' employees—including those located in Massachusetts, where Pegasystems is headquartered—to consider leaving Pegasystems and potentially join Appian.

53.     These statements are false and misleading because they ignore the fact that the verdict that related to the monetary award under the VUTSA (which is what he was asked about) is—and was, as of that date—under appeal.  In that context, the suggestion that the verdict was final, "full stop," when the $2 billion award he was asked about was appealed, is false and misleading.  In addition, they misleadingly suggest that Pegasystems has been convicted of a criminal violation, which is false.

54.     When this is combined with Mr. Biddle's prior suggestion that the "criminal" violation would prevent Pegasystems from servicing government contracts, this is particularly false and misleading and has harmed Pegasystems' reputation and its customer relations and ability to generate business.  Upon information and belief, these statements were made with knowledge that they were false and misleading and with specific ill-will and malice toward Pegasystems.

55.     On November 16, 2022, Marc Wilson, Appian's Chief Partner Officer and Co-Founder, gave an interview with Le Monde during which he claimed that "some partners and clients would already view Pegasystems as a toxic vendor."  This comment was further published in an article run in Le Monde on November 17, 2022.

56.     This article was published online and accessible in Massachusetts.

57.    This statement is misleading because, upon information and belief, no Pegasystems clients have actually said that they view Pegasystems as a "toxic vender."  Upon information and belief, this characterization was invented by Appian and is therefore false and misleading and has harmed Pegasystems's reputation and its customer relations and ability to generate business.

58.    Upon information and belief, this statement was made with knowledge that they were false and misleading and with specific ill-will and malice toward Pegasystems.

59.    On November 17, 2022, in an interview with The Motley Fool, Mr. Wilson again said that Appian is hearing from partners and customers that Pegasystems is becoming a "toxic vendor."  Mr. Wilson also indicated that Pegasystems will also have to disclose that it violated the Virginia Computer Crimes Act in public sector bids, which is likely to hamper its ability to work with the federal government and other such entities.

60.    These statements are false and misleading because, upon information and belief, no Pegasystems clients have actually indicated that they view Pegasystems as a "toxic vender." Upon information and belief, this characterization was invented by Appian in order to harm Pegasystems' reputation and customer relations.  In addition, the statements suggest that Pegasystems has been convicted of a criminal violation that would, according to Appian, prevent Pegasystems from servicing government contracts, which is false.

61.    These false and misleading statements inflicted harm on Pegasystems' reputation, its relationships with customers, and its ability to generate business.

62.    Upon information and belief, these statements were made with knowledge that they were false and misleading and with specific ill-will and malice toward Pegasystems.

63.     On April 4, 2023, Bill Ziegert, Appian's Strategic Client Director, emailed numerous individuals at AbbVie (a Pegasystems client), including the General Counsel and Chief Ethics Officer, stating that Pegasystems had engaged in a "potential violation of AbbVie's Supplier Code of Conduct."  The email linked to an Appian website that contains numerous misstatements about the lawsuit, including a false statement that Pegasystems' CEO used aliases to gain access to Appian's software.

64.     This statement is false because Pegasystems has not engaged in any activity that would violate AbbVie's Supplier Code of Conduct.  Appian's statement was made to cause direct harm to Pegasystems with respect to its relationship with its client, AbbVie.  In addition, the Appian website to which the email referred and linked contains numerous false and misleading misstatements of fact, including the statement that Pegasystems's CEO used an alias to access Appian's software.  This statement is false, as the undisputed evidence at trial demonstrated that Mr. Trefler never accessed any of Appian's software and did not access any free trials.

65.     This statement is especially egregious because much of the activities that Appian points to as allegedly at odds with AbbVie's Supplier Code of Conduct were actually overseen in 2012 through 2014 by the individual who is now one of *Appian's* executives.

66.     Appian's hypocrisy goes further still.  On information and belief, Appian has hired third party consultants to provide it with demonstrations of Pegasystems' software.

67.     This statement is therefore false and misleading and has harmed Pegasystems' reputation and its customer relations and ability to generate business.

68.     Upon information and belief, this statement was made with knowledge that it was false and misleading, and with specific ill-will and malice toward Pegasystems.

69.     More recently, Appian escalated its efforts and sensationalized the tone of its misinformation campaign when it began running an advertising campaign on LinkedIn and other social media services suggesting that there had been "Breaking News" in the litigation and falsely and misleadingly juxtaposing the statement that Appian had been awarded $2.1 billion with the assertion that Pegasystems had not appealed the verdict that it had violated the Virginia Computer Crimes Act—clearly intending to mislead readers into believing that Pegasystems had not appealed the $2.1 billion award.  Upon information and belief, Appian timed this advertising campaign to roughly coincide with Pegasystems' PegaWorld event in June to maximize the impact.  It further misrepresents that this is a "NEW ISSUE."



70.     A similar Appian advertising campaign, launched more recently on LinkedIn and other social media services, states that the verdict, which was entered more than sixteen months

ago and has been fully briefed on appeal, is "Breaking News."  It also states that "Pegasystems Does Not Appeal Violation of Virginia Computer Crimes Act."



71.     The advertisement then links to the same Appian website that contains numerous misleading statements about the lawsuit, including a repetition of the "Breaking News" headline, and a statement that Pegasystems' CEO used aliases to gain access to Appian's software.

72.     These statements are false and misleading because the juxtaposition of the claim that "APPIAN WINS $2.1B VS. PEGA" with the additional statement that "PEGA DOESN'T APPEAL VIRGINIA COMPUTER CRIMES ACT VERDICT," suggests that Pegasystems has not appealed the $2.1 billion verdict.  This is false and misleading.

73.     These statements are also false and misleading because the characterization of the verdict as "Breaking News" suggests that there has been some additional recent ruling, such as a decision on appeal, beyond the verdict that was rendered more than a year ago.  In fact, there

have been no material developments in the past year, except that Pegasystems has vigorously pursued its appeal.

74.     In addition, they misleadingly suggest that Pegasystems' litigation decision not to appeal the VCCA claim somehow constitutes a concession of criminal liability and intentionally conceals the fact that Pegasystems did appeal the trade secret ruling.

75.     Upon information and belief, Appian has run or is running these or similar advertisements on various social media platforms, including LinkedIn and Facebook.

76.     The website to which the advertisements link contains false and misleading statements of fact, including the statement that Pegasystems' CEO used an alias to access Appian's software.  This statement is false, as the undisputed evidence at trial demonstrated that Mr. Trefler never accessed any of Appian's software and did not access any free trials.

77.     These statements are therefore false and misleading and have harmed Pegasystems' reputation and its customer relations and ability to generate business.

78.     Upon information and belief, these statements were made with knowledge that they were false and misleading, and with specific ill-will and malice toward Pegasystems.

79.     Upon information and belief, Appian intended for these advertisements to harm Pegasystems' reputation, including to unsettle Pegasystems' employees, including those residing in Massachusetts.

80.     Upon information and belief, Appian personnel have repeated and embellished upon these statements to additional customers and potential customers as part of an ongoing pattern of behavior aimed at harming Pegasystems' business.

81.     Indeed, this pattern of activity demonstrating Appian's ill-will and improper motive began even before the verdict was rendered.

82.     Pegasystems has repeatedly written Appian to point out the false and misleading nature of its statements and its advertising and has demanded that Appian cease and desist from such activity.  For example, on June 24, 2022, the Vice President, Chief Commercial Officer & General Counsel of Pegasystems, Matthew Cushing, sent a letter to Appian's General Counsel, Christopher Winters, notifying Mr. Winters that "Appian personnel have been stating that Pegasystems was convicted of a crime" despite the fact that the lawsuit brought by Appian was strictly civil in nature.  Mr. Cushing notified Mr. Winters that "a member of Appian's board of directors" had "falsely stated that the jury's verdict … 'is a class 5 felony.'"  Mr. Cushing's letter specifically directed Mr. Winters to "instruct Appian's personnel and members of its Board of Directors to immediately cease and desist stating or otherwise insinuating that Pegasystems was convicted of a crime."

83.     Mr. Cushing followed up on that correspondence by letter dated July 15, 2022, again demanding that Appian instruct its employees and board members refrain from the defamatory conduct.

84.     On February 23, 2023, Mr. Cushing sent Mr. Winters another letter further notifying him that Appian had made false claims that Pegasystems was a "toxic vendor" and continued to parrot false statements to the effect that Pegasystems had been found guilty of a criminal conviction and requesting that such inappropriate behaviour cease.

85.     On April 25, 2023 and July 11, 2023, attorneys for Pegasystems followed up with letters alerting Appian to false and misleading statements that Appian and its agents were continuing to make, but to no avail.

86.     Rather than address the misconduct set out in Pegasystems' letters and warnings, Appian has escalated its efforts with sensationalized misstatements in ads on social media and

elsewhere to mislead Pegasystems customers and prospective customers and cause injury to Pegasystems.

87.     Upon information and belief, unless enjoined from continuing these actions, Appian will continue to take statements made in litigation out of context and to misrepresent the litigation's procedural posture out of context in a deliberate effort to mislead customers and prospective customers.

**COUNT I**
**(Defamation)**

88.     Pegasystems repeats and incorporates all other paragraphs of the Complaint as if fully set forth herein.

89.     Appian published statements to third parties regarding Pegasystems.

90.     Those statements were damaging to Pegasystems' reputation in the community.

91.     The statements Appian made were false and/or misleading.

92.     The statements Appian made were made with actual malice insofar as Appian knew that the statements were false or acted with reckless disregard with respect to the truth or falsity of the statements.

93.     The statements Appian made were made with actual malice insofar as they were made with ill-will and an intent to cause harm to Pegasystems.

94.     The statements Appian made have caused economic loss to Pegasystems.

95.     The statements Appian made imputed the commission of a crime by Pegasystems and accused Pegasystems of misdeeds in connection with Pegasystems' business.

**COUNT II**
**(Trade Libel)**

96.     Pegasystems repeats and incorporates all other paragraphs of the Complaint as if fully set forth herein.

97.     Appian published false statements to third persons and the public.

98.     Defendants' false statements concerned Pegasystems products or services and included statements falsely representing the nature of Pegasystems goods and services.

99.     Defendants knew the statements were false or acted with reckless disregard as to their truth or falsity.

100.    Pecuniary harm to Pegasystems' interests resulting from these false statements was intended and foreseeable by Defendants.

101.    The false statements have resulted in special damages in the form of pecuniary loss.

### COUNT III
**(Lanham Act 15 U.S.C. § 1125(a) Violation)**

102.    Pegasystems repeats and incorporates all other paragraphs of the Complaint as if fully set forth herein.

103.    Section 43 of the Lanham Act prohibits the use of any communication "in commercial advertising or promotion [that] misrepresents the nature, characteristics, qualities, or geographic origin of ... goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).

104.    In publishing, promoting and distributing false and misleading statements and misrepresentations to customers and prospective customers, including by way of its LinkedIn advertising and direct communications with customers, Appian made false and misleading representations of fact in commercial promotions or advertising, which misrepresent the nature, characteristics and qualities of Appian and Pegasystems goods and services in violation of Section 43(a)(1)(B) of the Lanham Act.  15 U.S.C. §1125(a)(1)(B).

105.     These statements actually deceived or had a tendency to deceive a substantial segment of Appian's audience, as well as Appian and Pegasystems customers and potential customers.

106.     Customers have informed Pegasystems that Appian has distributed or drawn their attention to the false and misleading statements in its advertising and promotions.  These customers have been confused or deceived by the false and misleading statements in Appian's advertising and promotions, damaging Pegasystems' goodwill and jeopardizing millions of dollars in potential future revenue.

107.     The deception caused by these statements is likely to influence customer purchasing decisions and has caused or is likely to cause damage to Pegasystems.

## REQUEST FOR RELIEF

WHEREFORE, Pegasystems requests relief as follows:

108.     Enter judgment in favor of Pegasystems on all counts;

109.     Enter a permanent injunction, including an order restraining Appian and their officers, directors, employees, agents, affiliates, successors, assigns, and all those in privity or acting in concert with them from making false and/or defamatory statements about Pegasystems to third parties, including regarding the Virginia state court litigation between the parties; requiring Appian to issue statements to each third party retracting the false and/or defamatory statements made about Pegasystems; requiring Appian to publish a corrective statement; and restraining Appian from making similar false and misleading statements about Pegasystems in the future;

110.    Enter an order directing the destruction of all advertising materials containing false and/or defamatory statements relating to Pegasystems in Appian's possession, custody, or control, including on the Internet, pursuant to at least 15 U.S.C. § 1118;

111.    Require an accounting of profits by Appian;

112.    Order disgorgement and award Pegasystems Appian's profits, Pegasystems' actual damages (whether economic or noneconomic), treble damages, exemplary damages, nominal damages, costs, prejudgment and post judgment interest, and reasonable attorneys' fees pursuant to at least 15 U.S.C. §§ 1125(a), 1116, and/or 1117;

113.    Award Pegasystems monetary damages needed to employ corrective advertising to counter the false or misleading representations or descriptions of fact regarding Pegasystems in Appian's advertising, in the amount equivalent to Appian's prior advertising spend relating to its false or misleading representations or descriptions of fact about Pegasystems;

114.    Grant such other and further relief as is just and proper.

Respectfully submitted,

PEGASYSTEMS INC.

By its attorneys,


  /s/ R. David Hosp
R. David Hosp (BBO No. 634091)
Mark S. Puzella (BBO No. 644850)
Caroline K. Simons (BBO No. 680827)

ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, Massachusetts 02116
Tel: (617) 880-1800
Fax: (617) 880-1801
dhosp@orrick.com
mpuzella@orrick.com
csimons@orrick.com