UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEGASYSTEMS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 23-11776-LTS |
| | ) |
| APPIAN CORPORATION, | ) |
| | ) |
| Defendant. | ) |

ORDER ON PENDING MOTIONS (DOC. NOS. 82, 87, 101, 107)

October 8, 2024

SOROKIN, J.

Plaintiff Pegasystems Inc. ("Pega") has sued defendant Appian Corporation, and Appian
has counter-sued, on the basis of alleged false statements each party has made relating to
separate and ongoing litigation between the two in Virginia state court ("the Virginia Case").[1]
Pending before the Court are four motions: (1) Pega's Partial Motion to Dismiss Counterclaims,
Doc. No. 101;[2] (2) Appian's Motion to Compel, Doc. No. 82; (3) Pega's Motion to Compel,
Doc. No. 87; and (4) Appian's Motion to Strike, Doc. No. 107.  For the reasons below, Pega's
Partial Motion to Dismiss is ALLOWED IN PART and DENIED IN PART, Appian's Motion to
Compel is ALLOWED IN PART and DENIED IN PART, Pega's Motion to Compel is
DENIED, and Appian's Motion to Strike is ALLOWED IN PART and DENIED IN PART.

---

[1] Appian Corp. v. Pegasystems Inc., Case No. CL-2020-07216 (Va. Cir. Ct. 2022).
[2] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing
system ("ECF"); pincites are to the page numbers in the ECF header.

I.   BACKGROUND

    A.   Facts

The following recitation of the facts is taken from those allegations upon which Pega's Amended Complaint, Doc. No. 17, and Appian's Counterclaims and Answer, Doc. No. 44, agree.  Pega and Appian are competitors in the Business Process Management ("BPM") software industry.  Doc. No. 17 ¶ 16; Doc. No. 44 ¶¶ 15–16.  In 2020, Appian initiated the Virginia Case against Pega, alleging, inter alia, violations of the Virginia Computer Crimes Act ("VCCA") and misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act ("VUTSA").  Doc. No. 17 ¶ 17; Doc. No. 44 ¶ 23.  Ultimately, in May 2022, Appian prevailed on those two claims after a seven-week jury trial.  Doc. No. 17 ¶ 26; Doc. No. 44 ¶ 38.  The jury awarded Appian one dollar in nominal damages on the VCCA claim and over two billion dollars in compensatory damages on the VUTSA claim.  Doc. No. 17 ¶¶ 26, 30; Doc. No. 44 ¶¶ 38–39.  Pega appealed the VUTSA award.  Doc. No. 17 ¶ 30; Doc. No. 44 ¶ 45.  On July 30, 2024— during the pendency of this case—the Virginia Court of Appeals reversed and vacated the VUTSA verdict then ordered a new trial on that claim, citing errors in the jury instructions and certain evidentiary rulings.  Doc. No. 95 at 4; Doc. No. 97 at 5.[3]

The instant action arises from the parties' alleged conduct following the jury verdict in the Virginia Case.  Pega alleges that, following the jury verdict, Appian or its employees made various false or misleading statements about the verdict and its meaning.  Doc. No. 17 ¶ 40.  In

---

[3] This appellate decision, Pegasystems Inc. v. Appian Corp., 904 S.E.2d 247 (Va. Ct. App. 2024), was rendered after Pega's Amended Complaint and Appian's Counterclaims and Answer were filed, and it is not considered in the Court's analysis of Pega's Motion to Dismiss.  Still, it is relevant to the parties' arguments with respect to Appian's Motion to Compel, and the parties do not dispute the basic fact of the ruling in their motion papers.

2

turn, Appian alleges that Pega and its employees have themselves made false or misleading statements misrepresenting the Virginia Case and defaming Appian.  Doc. No. 44 ¶ 46.

      B.   <u>Procedural Posture</u>

Pega initiated this suit on August 2, 2023, based on Appian's alleged post-verdict statements, asserting claims for defamation, trade libel, and violation of the Lanham Act, 15 U.S.C. § 1125(a).  After Pega later filed an Amended Complaint, Doc. No. 17, Appian moved to dismiss for failure to state a claim, Doc. No. 19, but the Court denied the motion, Doc. No. 32. Thereafter, Appian filed its Counterclaims and Answer, Doc. No. 44, asserting counterclaims for defamation, trade libel, violation of the Lanham Act, violation of Chapter 93A of the Massachusetts General Laws ("Chapter 93A"), and declaratory judgment.  In response, Pega moved, in April 2024, for a more definite statement under Federal Rule of Civil Procedure 12(e) and to strike part of Appian's Counterclaims under Rule 12(f) ("the April Motion").  Doc. No. 56.  On August 1, 2024, the Court entered an order which stated, in relevant part:

> The Motion for More Definite Statement (Doc. No. 56) is DENIED in light of the clarification already provided by the defendant, which the Court deems binding. See Doc. No. 67 at 7-9, 17; Doc. No. 69 at 3-4.  A responsive pleading to the Counterclaims shall be filed within fourteen days.

Doc. No. 93.

Pega has now moved to dismiss Appian's trade libel, Lanham Act, and Chapter 93A counterclaims as well as to strike the declaratory-judgment counterclaim.  Doc. No. 101.

Meanwhile, the parties have also begun discovery, with each serving its first set of requests for production ("RFPs") and interrogatories on the other in February 2024.  Doc. No. 83-1 at 10; Doc. No. 88 at 5.  That process has led to three additional disputes.  First, Appian has filed a Motion to Compel, Doc. No. 82, claiming that Pega's responses to certain of its RFPs and interrogatories are deficient.  Second, Pega has also filed a Motion to Compel, Doc. No. 87,

finding deficiency in Appian's responses to two of its RFPs.  Third, Appian has filed a Motion to Strike, Doc. No. 107, targeting both the Reply Brief, Doc. No. 103, and an affidavit with exhibits, Doc. No. 104, filed by Pega in support of its Motion to Compel on the ground that those papers refer to and include a document covered by the confidentiality provision of a mediation agreement between the parties.  The Court held a hearing on these three discovery motions on September 18, 2024 ("the Motion Hearing").  All four motions—Pega's Motion to Dismiss and the three discovery motions—are now ripe, and the Court addresses each in turn.

II.   DISCUSSION

A.   Pega's Partial Motion to Dismiss Counterclaims[4]

Pega's Partial Motion to Dismiss Counterclaims, Doc. No. 101, has two parts.  The first part ("the Motion to Dismiss") seeks to dismiss Appian's counterclaims for trade libel, violation of the Lanham Act, and violation of Chapter 93A for failure to state a claim upon which relief can be granted under Rule 12(b)(6).  The second part ("the Motion to Strike") seeks to strike Appian's counterclaim for declaratory judgment and its supporting factual predicate as extraneous, unnecessary, and duplicative under Rule 12(f).

1.   *Preliminary Procedural Issue*

As a threshold matter, the Court considers whether Pega's Motion is procedurally barred, as Appian contends.  See Doc. No. 121 at 14–17.  Under Federal Rule of Civil Procedure 12(g), "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2).  Rule 12(h)(2), in turn, provides that "[f]ailure to state a claim upon which relief can be granted . . . may be raised" in a

---

[4] Although this motion was the third of the four to be filed, the Court addresses it first because its resolution impacts the Court's analysis on the other three motions.

Rule 7(a) pleading, by a Rule 12(c) motion for judgment on the pleadings, or at trial.  Fed. R. Civ. P. 12(h)(2)(A)–(C).  Because of this exception, a district court may exercise its discretion to decide on the merits a Rule 12(b)(6) motion which violates Rule 12(g) where the moving party could nonetheless raise the same argument at a later stage of the litigation, such as in a Rule 12(c) motion.  Alves v. Daly, No. CV 12-10935, 2013 WL 1330010, at *6 (D. Mass. Mar. 29, 2013); SalioGen Therapeutics, Inc. v. DNA TwoPointO Inc., No. CV 21-10525, 2022 WL 20138601, at *4 (D. Mass. Mar. 25, 2022).

Here, Pega has violated Rule 12(g).  Pega's April Motion constituted a Rule 12 motion covered by Rule 12(g).  See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1388 (3d ed. 1988) ("[A] litigant moving to strike or for a more definite statement should be barred from making a second preliminary motion based on any Rule 12 defense that he reasonably was capable of asserting with the initial motion.").  Pega could have, at the time of its April Motion, raised its current arguments to dismiss and to strike.  Pega's current arguments are not based upon any clarification resulting from the Court's resolution of the April Motion.  Doc. No. 93.  Rather, Pega seeks dismissal on the grounds that "none of the Statements" Appian complains of is sufficient to support any of the trade libel, Lanham Act, or Chapter 93A counterclaims.  Doc. No. 102 at 7 (emphasis in original).  Similarly, Pega seeks to strike the declaratory-judgment counterclaim on the ground that it merely seeks the inverse of Pega's Complaint.  Doc. No. 102 at 25.  Pega was reasonably capable of making both arguments at the time of its April Motion.  As such, Rule 12(g) would normally bar Pega's current motion.

Nonetheless, the Court will proceed to the merits of the Motion to Dismiss and the Motion to Strike.  As to the former, the Court does so in the interest of judicial efficiency, since Pega could simply raise its failure-to-state-a-claim argument on a subsequent Rule 12(c) motion.

Case 1:23-cv-11776-LTS   Document 125   Filed 10/08/24   Page 6 of 28

See Fed. R. Civ. P. 12(h)(2)(B).  As to the latter, the Court proceeds out of an abundance of caution and a desire to clarify its earlier order, Doc. No. 93, on the April Motion.[5]

### 2. *The Motion to Dismiss*

Pega seeks to dismiss three of Appian's counterclaims on the grounds that Appian's allegations fail with respect to at least one necessary element on each counterclaim.  "When confronted with a motion to dismiss a counterclaim, the court accepts as true all well-pleaded facts in the counterclaim, draws all reasonable inferences in favor of the counterclaimant, and looks to whether, 'under any theory,' the allegations of the counterclaim 'are sufficient to state a cause of action[.]'"  Dubliner, Inc. v. E. Coast Tavern Grp., Inc., 706 F. Supp. 3d 181, 189 (D. Mass. 2023) (quoting Brandt v. Advanced Cell Tech., Inc., 349 F. Supp. 2d 54, 57 (D. Mass. 2003)).  Appian's counterclaims survive under this standard for much the same reason Pega's claims survived Appian's Motion to Dismiss.  See Doc. No. 32.

As to the trade-libel counterclaim, Pega argues that "none of the Statements disparage Appian's products, services or commercial activities."  Doc. No. 102 at 7 (emphasis omitted). Under Massachusetts law, though, the "of and concerning" element of a trade-libel claim requires only either: (1) "that the defendant intended the words to refer to the plaintiff and that they were so understood"; or (2) "that persons could reasonably interpret the defendant's words to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood."  Advanced Tech. Corp. v. Instron, Inc., 66 F. Supp. 3d 263, 271 (D. Mass. 2014) (quoting HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 766 (Mass. 2013)).  Here, the Counterclaims allege several statements that directly refer to Appian.  See, e.g., Doc. No. 44 ¶¶

---

[5] Appian also contends that the Court ordered Pega to file a "responsive pleading," Doc. No. 93, which a Rule 12 motion is not, Doc. No. 121.  This does not change the analysis.  Pega could still make its arguments to dismiss in a responsive pleading, Fed. R. Civ. P. 12(h)(2)(A), and the Court would still reach the Motion to Strike for the reasons stated above.

6

55, 57, 97–98, 106.  The Counterclaims plausibly allege that other statements, such as those relating to the Virginia Case, were intended to refer to Appian.  See, e.g., id. ¶¶ 77–78, 86.  To the extent Pega argues these statements do not "disparage" Appian's products or services, Doc. No. 102 at 15–16, that is an issue of fact not fit for resolution at this stage.  However, there is one set of statements that fail on the trade-libel counterclaim.  Appian fails to plausibly allege the statements contained in Pega's code of conduct, Doc. No. 44 ¶¶ 118–19, were intended to refer to Appian or could reasonably be interpreted as referring to Appian.  See id. ¶¶ 127–28 (alleging only that Pega's code of conduct was seen by customers of both companies and would be "material to customers choosing between" them).  As such, Pega's Motion to Dismiss, Doc. No. 101, as to Appian's trade-libel counterclaim is ALLOWED with respect to Appian's allegations regarding Pega's code of conduct[6] and DENIED with respect to the rest of Appian's allegations.

As to the Lanham Act counterclaim, Pega argues that "none of the Statements constitute commercial advertising relating to the nature, qualities, or characteristics of a product."  Doc. No. 102 at 7 (emphasis omitted).  However, the Lanham Act covers statements relating to the speaker's "or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B) (emphasis added).  Appian plausibly alleges that each statement at issue relates to the commercial activities of either Pega or Appian.  See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1271–72 (10th Cir. 2000) ("Although Congress did not define the term 'commercial activities' in the Act, the plain language meaning of that term encompasses 'commercial transactions' or all activities surrounding the peculiar 'commerce' of a company, defined as 'the

---

[6] This extends only to those statements allegedly appearing in Pega's code of conduct itself, Doc. No. 44 ¶¶ 118–19, and not to similar statements allegedly posted on Pega's Microsite, id. ¶ 120. Moreover, the allegations regarding Pega's code of conduct survive under Appian's Lanham Act and Chapter 93A claims.

exchange or buying and selling of commodities.'" (quoting Webster's Third New International Dictionary 456 (unabr. 1993))). Additionally, Pega argues that two of the statements alleged by Appian—the statements to individual customers, Doc. No. 44 ¶¶ 98, 106—fail to support a Lanham Act claim because neither statement was made "in commercial advertising." Doc. No. 102 at 13–14. This contention concerns a factual dispute as to the dissemination of the statements that the Court cannot address at this stage. Thus, Pega's Motion to Dismiss, Doc. No. 101, as to Appian's Lanham Act counterclaim is DENIED.

Finally, as to the counterclaim under Chapter 93A, Pega first argues that "none of the Statements are actionable." Doc. No. 102 at 7 (emphasis omitted). In essence, Pega contends that, "because a unanimous appellate court has issued a decision consistent with Pega's advocacy for its legal position," Pega's statements concerning that legal position cannot support a Chapter 93A claim. Id. at 21. This argument would require the Court to look beyond the pleadings and the documents attached thereto, a step the Court declines to take at this time. But see Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009) ("We may consider not only the complaint but also 'facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice.'" (quoting Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005))). Pega next argues that, with respect to the two statements to individual customers, Doc. No. 44 ¶¶ 98, 106, "the alleged conduct occurred primarily and substantially outside Massachusetts." Doc. No. 102 at 7 (emphasis omitted). But Appian plausibly alleges that the origins of these statements were in Massachusetts, Doc. No. 44 ¶¶ 101, 112, and the determination of whether conduct occurred "primarily and substantially within" Massachusetts, as required by Mass. Gen. Laws ch. 93A § 11, is one of fact not fit for resolution at this stage. See Armstrong v. White Winston Select Asset Funds, LLC, 648 F. Supp. 3d 230, 270 (D. Mass.

2022) ("The determination cannot be reduced to any precise formula but rather requires a fact intensive and unique inquiry for each case." (quotation marks omitted)).  Pega's Motion to Dismiss, Doc. No. 101, as to Appian's Chapter 93A claim is DENIED.

> 3.   *The Motion to Strike*

Pega seeks to strike both Appian's declaratory-judgment counterclaim and the allegations underlying that counterclaim contained in paragraphs 130 to 262.  Pega previously sought to strike the same paragraphs in its April Motion.  Doc. No. 56.  As such, the Court now addresses Pega's arguments to strike contained in both its April Motion and the present Motion to Strike.

Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Although a court has "considerable discretion" under Rule 12(f), <u>Alvarado–Morales v. Digit. Equip. Corp.</u>, 843 F.2d 613, 618 (1st Cir. 1988), striking material is "disfavored in practice," <u>Manning v. Bos. Med. Ctr. Corp.</u>, 725 F.3d 34, 59 (1st Cir. 2013).  In particular, "the Court must bear in mind that such motions are rarely granted absent a showing of prejudice to the moving party." <u>Leader v. Harvard Univ. Bd. of Overseers</u>, No. CV 16-10254, 2017 WL 1064160, at *1 (D. Mass. Mar. 17, 2017).  Importantly, the moving party "bear[s] the burden of showing that the allegations should be struck under Rule 12(f)." <u>Alston v. Town of Brookline</u>, 321 F.R.D. 41, 43 (D. Mass. 2017).

In its April Motion, Pega argued that paragraphs 130 to 262 of Appian's Counterclaims and Answer improperly include "argument and evidentiary matter."  Doc. No. 56 at 12.  In its present Motion to Strike, Pega contends that Appian's declaratory-judgment counterclaim simply seeks the inverse of Pega's claims.  Doc. No. 102 at 25.  Both arguments fail for the same reason: Pega has failed to show that it will be prejudiced unless the contested material is struck. For that reason, that portion of Pega's April Motion, Doc. No. 56, seeking to strike paragraphs

130 to 262 of Appian's Counterclaims and Answer is DENIED, and Pega's current Motion to Strike, Doc. No. 101, is also DENIED.

To summarize, Pega's Partial Motion to Dismiss Counterclaims, Doc. No. 101, is ALLOWED IN PART and DENIED IN PART.  It is allowed only to the extent that the portion of Appian's trade-libel counterclaim that rests on allegations regarding Pega's code of conduct, Doc. No. 44 ¶¶ 118–19, is dismissed.  Otherwise, the challenged Appian counterclaims survive—including the rest of Appian's trade-libel counterclaim and those portions of Appian's Lanham Act and Chapter 93A claims which rest on the allegations regarding Pega's code of conduct.  Finally, neither Appian's declaratory-judgment counterclaim nor the underlying allegations contained in paragraphs 130 to 262 of Appian's Counterclaims and Answer will be struck.

   B.   Appian's Motion to Compel

In the parties' first discovery dispute, Appian seeks to compel discovery from Pega pursuant to Rule 37.  Under Rule 37, "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection."  Fed. R. Civ. P. 37(a)(3)(B).  Generally, a party is entitled to discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Thus, on a motion to compel, the moving party bears the initial burden of showing that the requested discovery meets the above relevance requirement.  Roy v. FedEx Ground Package Sys., Inc., 675 F. Supp. 3d 140, 144 (D. Mass. 2023).  If the moving party makes that showing, the burden then shifts to the non-moving party to show that the requested discovery is otherwise improper.  Id.  Here, the parties identify essentially five discovery disputes spread across several of Appian's RFPs and interrogatories.  The Court addresses each dispute separately.

1. *Interrogatory No. 9*

First, Appian seeks to compel Pega to supplement its answer to Appian's Interrogatory

No. 9, on the ground that Pega's answer is evasive and incomplete.  See Fed. R. Civ. P. 37(a)(4)

("For the purposes of [a motion to compel], an evasive or incomplete disclosure, answer, or

response must be treated as a failure to disclose, answer, or respond.").

> Interrogatory No. 9 requests that Pega:
>
> [d]escribe in detail how You intend to pay the existing judgment of more than $2 billion in the Virginia Litigation if and when it comes due, including Your anticipated source(s) of funding and manner of raising the necessary funds, and the anticipated impact of making such a payment on Your solvency and ability to continue business.

Doc. No. 84-3 at 9.

> Pega's response reads, in relevant part:
>
> Pega has the financial strength to pay the judgment if it ever becomes necessary, including through a combination of one or more of cash, convertible debt, and/or other financing, the sources and manner of which, and the impact of which on Pega, will necessarily depend on timing factors that are unknown to Pega at this time, including the timing of a decision on the pending appeal of the Virginia Litigation, the timing of Appian's response to such an outcome, including any further appeals, and the timing of any remand trial.

Doc. No. 84-14 at 17.

Nothing more is required at the present time.  Interrogatory No. 9 seeks Pega's present

intent.  Pega's answer, though short, provides just that.  In light of the speculative nature of "if

and when" the judgment in the Virginia Case may come due, Pega's answer that the exact

"sources and manner" of payment depends on still-unknown factors suffices.[7]  In any event,

Pega bears an ongoing duty to supplement its answer.  See Fed. R. Civ. P. 26(e).

Appian's Motion to Compel, Doc. No. 82, as to Interrogatory No. 9 is DENIED.

---

[7] Indeed, at the present time, given the recent appellate decision in the Virginia Litigation, Pega faces no existing judgment award.  See Pegasystems Inc., 904 S.E.2d at 248.

2.   *Request For Production No. 49*

The parties' next discovery dispute centers on whether Pega must produce documents

responsive to Appian's RFP 49 beyond those Pega has already committed to produce in response

to RFP 48.

Appian's RFPs 48 and 49 read as follows:

REQUEST NO. 48: All documents . . . relating to Pega's ability or inability to pay
a potential judgment in the Virginia Litigation, including but not limited to by
issuing convertible debt, or to the impact of paying a potential judgment in the
Virginia Litigation on Pega's ability to remain solvent or to continue operating.

REQUEST NO. 49: All documents relating to the impact on Alan Trefler's
controlling interest in Pega of any of Your contemplated methodologies for paying
the judgment in the Virginia Litigation.

Doc. No. 84-1 at 16.

Pega's response "objects to [RFP 49] to the extent it is duplicative of [RFP] 48" and

states that, "[o]ther than documents produced in response to [RFP] 48, Pega will not search for or

produce additional documents in response to" RFP 49.  Doc. No. 84-2 at 50.

Appian contends that RFP 49 seeks documents relevant to the truth of Pega's alleged

statements about having the "financial strength" to pay the judgment in the Virginia Case.  Doc.

No. 83-1 at 14.  For that purpose, Pega's commitment to produce documents responsive to RFP

48 is sufficient.  This commitment includes "information relating to potential changes to the

equity holdings of Pega's CEO" Alan Trefler.  Doc. No. 95 at 9.  At the Motion Hearing, the

Court posed the hypothetical of an internal Pega report on methods by which Pega could pay the

judgment in the Virginia Case and an email from Trefler responding that he was unwilling to sell

the required number of his own shares.  Counsel for Pega confirmed that, subject to privilege and

work-product protection, Pega would produce such a hypothetical email in response to RFP 48.

Therefore, documents responsive to RFP 49 would be largely duplicative of those responsive to RFP 48.

To the extent Appian seeks, by RFP 49, to discover additional documents, such as a hypothetical email from Trefler stating that he would not sell additional shares, untethered to any communications about the Virginia Case, those documents would not be relevant and proportional to the needs of the case.  The alleged statements at issue concern Pega's ability to pay the judgment, not its willingness to do so.  That Trefler might have hypothetically stated, unrelated to the Virginia Case, that he would not sell his shares does not mean that he could not do so in order to pay the judgment.  In light of what Appian will obtain in response to RFP 48, then, any additional documents responsive to RFP 49 would not be relevant or proportional to the needs of the case.

Appian's Motion to Compel, Doc. No. 82, as to RFP 49 is DENIED.

3.   *Dispute as to Attorney-Client Privilege and Work-Product Protection*

Appian and Pega dispute whether the attorney-client privilege or the work-product doctrine apply to any information encompassed by Appian's Interrogatories No. 3 and 6 or RFP 13.  Interrogatory No. 3 and RFP 13 seek information and documents relating to Pega's dealings with a public-relations firm by the name of ICR Inc. ("ICR").  Doc. No. 84-1 at 10; Doc. No. 84-3 at 7–9.  Interrogatory No. 6 seeks information relating to the authors of Pega's Microsite, which includes employees of another public-relations firm by the name of Edelman.  Doc. No. 84-3 at 8; Doc. No. 83-1 at 15.  Pega objects to each of the two interrogatories "to the extent it calls for the identification of, or discussion of, communications or documents that are protected by the attorney-client privilege, work-product doctrine, and any other applicable privilege or immunity."  Doc. No. 84-14 at 11–12, 15.  Similarly, Pega objects to the RFP "to the extent it

13

calls for disclosure of documents protected by the attorney-client privilege, work-product doctrine or other applicable privilege or immunity."  Doc. No. 84-2 at 18.

Where one party withholds discovery material on the grounds of attorney-client privilege or work-product protection, that party bears the burden of showing that the privilege applies. Vicor Corp. v. Vigilant Ins. Co., 674 F.3d 1, 17 (1st Cir. 2012).  The withholding party must also compile a privilege log that "describe[s] the nature of the documents . . . not produced or disclosed . . . in a manner that . . . will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).

Here, however, Pega has not withheld any information or documents.  Pega has objected to Appian's discovery requests to the extent that privileged or protected material is sought.  But Pega has not stated that it is currently withholding material on either basis.  Moreover, the Court is not persuaded at this time that the attorney-client privilege and the work-product doctrine could never apply to any of the information or documents sought by Interrogatories No. 3 and 6 and RFP 13.  See, e.g., Bozorgi v. Cassava Scis., Inc., No. 24-MC-91041, 2024 WL 2874636, at *4–5 (D. Mass. May 9, 2024) (finding attorney-client privilege and work-product protection applied to documents created by and shared with public-relations experts where their expertise was sought by attorneys, was in furtherance of legal goals, and "was integral to the attorneys' provision of effective legal advice").  Of course, to the extent any privilege or protection is claimed in the future, the Court will scrutinize such claims as is appropriate.  See Bozorgi, 2024 WL 2874636, at *4 n.5 (collecting cases in which attorney-client privilege or work-product protection did not extend to public-relations firms).  The parties should not take this as an invitation to claim the privilege beyond its confines.

14

Appian's Motion to Compel, Doc. No. 82, as to Interrogatories No. 3 and 6 and RFP 13 is DENIED WITHOUT PREJUDICE to renewal in response to an assertion of the attorney-client privilege or the work-product doctrine by Pega in the future.

### 4. *Dispute as to the Term "Virginia Litigation"*

Appian, in its Interrogatory No. 3 and RFPs 11, 14, 16 to 20, 24, 33 to 38, and 51, seeks various information related to the "Virginia Litigation," which Appian describes as:

> the dispute initiated by Appian against Pega captioned as <u>Appian Corporation v.</u> <u>Pegasystems Inc., et al.</u>, Case No. CL-2020-07216 in the Circuit Court of Fairfax County, Virginia, and the subsequent proceedings, including but not limited to discovery, the plea-in-bar trial, the jury merits trial, the jury verdict, the final judgment order, and the appeal.

Doc. No. 84-1 at 3; Doc. No. 84-3 at 4.

Pega, in response, objects that the term "Virginia Litigation" is overbroad in that it encompasses "the entire dispute between the parties" rather than just "the outcome of the litigation," which the alleged statements at issue concern. Doc. No. 95 at 17–18. Pega instead proposes to either narrow the definition of the term "Virginia Litigation" or replace it with the term "Virginia Verdict," depending on the disputed request. Doc. No. 96-2.

As an initial matter, the parties represent that they have resolved their disputes as to Interrogatory No. 3 and RFPs 11 and 33 to 38. As such, Appian's Motion to Compel, Doc. No. 82, as to Interrogatory No. 3 and RFPs 11 and 33 to 38 is DENIED AS MOOT.

As to RFPs 14 and 16, Appian seeks communications between Pega and any government-affiliated customers "relating to Pega's violation of the [VCCA] as established in the Virginia Litigation" and documents relating to whether Pega's "conduct in the Virginia Litigation" might result in Pega's disbarment from government contracting. Doc. No. 84-1 at 10. Appian argues that responsive documents would be relevant to the statement by Jack Biddle, a member of the Appian Board of Directors, that "[t]he VCCA finding of fact for a dollar is a class 5 felony.

15

Normally that's disbarment from selling to government."  Doc. No. 17 ¶ 52; Doc. No. 84-23 at

7–9.  That statement, however, relates to the "finding"—i.e., the outcome— of the Virginia Case,

rather than to its broader proceedings.  As such, the term "Virginia Verdict" and the limitations

Pega proposes suffice to produce documents relevant to Biddle's statement and proportional to

the needs of the case under RFPs 14 and 16.  To the extent the term "Virginia Litigation" would

produce additional documents, its use would render RFPs 14 and 16 overbroad and would

require the production of documents not proportional to the needs of the case.  Appian's Motion

to Compel, Doc. No. 82, as to RFPs 14 and 16 is DENIED.

In contrast, RFP 17 seeks "[a]ll documents relating to any Customers' or Potential

Customers' concerns or misgivings about Your behavior . . . or about continuing to do business

with You, as a result of or in relation to the Virginia Litigation."  Doc. No. 84-1 at 10.  The use

of "Virginia Litigation" here, Appian argues, would produce documents relevant to the issue of

damages on Pega's claims that Appian made false and defamatory statements about Pega and its

CEO Trefler.  Doc. No. 84-23 at 9–10.  That is, the defamatory sting would be reduced to the

extent such customer concerns arose from revelations in the course of those proceedings rather

than from Appian's alleged statements.  The Court agrees that the broader scope of the term

"Virginia Litigation" would appropriately produce relevant documents given that, for Pega to

succeed on at least one of its claims, it must prove that it suffered damage because of Appian's

alleged statements, rather than because of factors extraneous to those statements.  See, e.g.,

HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 775 (Mass. 2013) (affirming grant of summary judgment

against plaintiff claiming trade libel where plaintiff "has not eliminated other causes for [its]

pecuniary loss" and "has not established that its purported pecuniary loss necessarily resulted

from the publication of the article"). Appian's Motion to Compel, Doc. No. 82, as to RFP 17 is ALLOWED.

Next, RFPs 18 to 20 generally seek documents relating to "whether any of Pega's conduct as disclosed in the Virginia Litigation" violated Pega's code of conduct or any of its customers' supplier codes of conduct. Doc. No. 84-1 at 10–11. Appian argues that such documents would be relevant to the truth of Appian's alleged statement that Pega had "engaged in a 'potential violation of AbbVie's Supplier Code of Conduct,'" Doc. No. 17 ¶ 85, and to Appian's counterclaims regarding Pega's violation of its own code of conduct, Doc. No. 44 ¶¶ 117–29. Doc. No. 84-23 at 11–13. Again, the Court agrees that the more inclusive "Virginia Litigation" is appropriate. Conduct not necessarily included in the outcome of the Virginia Case but revealed during the course of its proceedings could support the truth of Appian's alleged statement regarding AbbVie's code of conduct, as it could Appian's counterclaims. Appian's Motion to Compel, Doc. No. 82, as to RFPs 18 to 20 is ALLOWED.

As to RFP 24, Appian seeks "[a]ll documents relating to Your disclosures to or communications with Your investors relating to any actual, potential or contemplated loss associated with the Virginia Litigation." Doc. No. 84-1 at 11. Appian maintains that RFP 24 is relevant to Pega's alleged statements regarding its ability to pay the judgment in the Virginia Case and "[l]imiting this request to the 'Virginia Verdict' would allow Pega to withhold responsive documents generated prior to May 9, 2022, when the Virginia Verdict was issued." Doc. No. 84-23 at 14. Pega responds that the statements at issue "relate to Pega's ability to pay the now-reversed $2 billion verdict." Doc. No. 96-2 at 8. However, Pega may have created documents prior to the verdict which analyzed its ability to pay hypothetical judgments, which would be relevant to the truth or falsity of its later statements that it had the ability to pay the

17

actual judgment.  Accordingly, Appian's Motion to Compel, Doc. No. 82, as to RFP 24 is ALLOWED.

Finally, Appian's RFP 51 seeks "[a]ll documents relating to any communications between You and the Office of the Superintendent of Financial Institutions of the Government of Canada relating to the Virginia Litigation."  Doc. No. 84-1 at 16.  As with RFPs 14 and 16, Appian ties the relevance of RFP 51 to Biddle's statement regarding Pega's potential disbarment from government contracting due to the VCCA finding.  Doc. No. 84-23 at 25.  And as with RFPs 14 and 16, Pega's proposed limitations would suffice to produce relevant documents, such that Appian's definition of "Virginia Litigation," as applied to RFP 51, is overbroad.  Appian's Motion to Compel, Doc. No. 82, as to RFP 51 is DENIED.

### 5.    *Request For Production No. 25*

Appian's RFP 25 seeks to treat as a document custodian or repository to be searched "[a]ll documents that You have produced to the plaintiffs in the case captioned as City of Fort Lauderdale Police and Firefighters' Retirement System v. Pegasystems, Inc., et al., 1:22-cv-11220-WGY (D. Mass.)."  Doc. No. 83-1 at 24–25.  Appian claims documents produced in the City of Fort Lauderdale case are relevant to its counterclaims grounded in Pega's code of conduct because City of Fort Lauderdale also dealt with Pega's code of conduct.  However, this request duplicates RFPs 19, 42, 43, and 50, which also seek documents relating to Pega's alleged violations of its own code of conduct.  See Doc. No. 84-1 at 10, 14–16.  RFP 25 is also overly broad and unduly burdensome.  Nothing suggests in this case that such "cloned discovery" is a better way to proceed than Appian directly seeking responsive documents from searches of custodians likely to possess them.  See, e.g., King Cnty. v. Merrill Lynch & Co., No. C10-1156, 2011 WL 3438491, at *3 (W.D. Wash. Aug. 5, 2011) ("'[C]loned discovery,' requesting all documents produced or received during other litigation or investigations, is irrelevant and

immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the subject case." (quoting <u>Midwest Gas Servs., Inc. v. Ind. Gas Co.</u>, IP99–0690–C–Y/G, 2000 WL 760700, at *1 (S.D. Ind. Mar.7, 2000))).  Appian's Motion to Compel, Doc. No. 82, as to RFP 25 is DENIED.

       C.   <u>Pega's Motion to Compel</u>

In its Motion to Compel, Pega seeks a court order, pursuant to Rule 37, requiring Appian to produce documents responsive to Pega's RFPs 17 and 18.  Pega's RFPs 17 and 18 read as follows:

> REQUEST FOR PRODUCTION NO. 17: Any and all Communications, Documents, and Things relating to the likelihood that Pegasystems will have to pay any portion of the Virginia Verdict.

> REQUEST FOR PRODUCTION NO. 18: Any and all Documents, Communications, and Things relating to Appian's judgment preservation insurance policy relating to the Virginia Verdict.

Doc. No. 90-1 at 10–11.

Appian has refused to produce documents "specifically in response" to these two RFPs. Doc. No. 90-2 at 18–19.  The parties' dispute centers on two issues: (1) whether responsive documents would be relevant to this case; and (2) if so, whether such documents would be protected by the attorney-client privilege or work-product doctrine.

As stated above, <u>see</u> <u>supra</u> Section II.B., on a motion to compel discovery, the moving party must first show that the requested discovery is relevant to the case.  <u>Roy</u>, 675 F. Supp. 3d at 144.  If the moving party makes that showing, the burden then shifts to the non-moving party to show that the requested discovery is otherwise improper.  <u>Id.</u>

Here, Pega argues that documents responsive to RFPs 17 and 18 would be relevant to statements made by Appian that allegedly falsely represented "that the $2 billion verdict was immediately due and that being forced to pay the full sum would threaten Pega's solvency and

viability." Doc. No. 88 at 1. Such documents, Pega contends, would serve as evidence of "Appian's knowledge of the falsity of its statements" and "its ill will and malice toward Pega when it made them." Doc. No. 88 at 6. Pega further argues that responsive documents would be relevant to Appian's counterclaims regarding alleged statements made by Pega about its ability to pay the judgment in the Virginia Case. Doc. No. 88 at 9.

The requests would not necessarily produce documents showing the foregoing. For example, documents merely discussing the effect on Pega's solvency of paying two billion dollars are not responsive to RFP 17; they do not concern the "likelihood" that Pega will have to pay the Virginia Verdict. Nor would responsive documents be relevant to Pega's statements about its ability to pay as alleged in Appian's counterclaims. After all, the judgment-preservation policy, as it has been represented to this Court, insures against a reduction in the judgment on appeal, not against Pega's inability to pay the judgment. Doc. No. 90-3 at 3. The requests are also overbroad, sweeping in far more documents than the purposes Pega advances for the requests. For example, many of the insurance negotiation documents are irrelevant to the present litigation.

Finally, Appian has conceded, as it must, that, in response to other RFPs, it will produce documents "reflecting each of the Challenged Appian Statements [from the Amended Complaint] (as well as any substantially similar statements), and documents reflecting their creation, veracity, and dissemination." Doc. No. 99 at 13. Appian has further recognized that Pega is entitled to discovery as regards "the identity of the person who made the statements" and "that person's understanding of the relevant facts." Id. In light of the foregoing, particularly the last commitment, RFPs 17 and 18 are largely duplicative, and, to the extent they would produce

some responsive, non-duplicative documents, production of those documents would be disproportionate in scope and burden to the needs of the case.

Because Pega has failed to meet its burden of showing that the requested discovery is relevant to the case and because the Court also finds other grounds for the impropriety of these requests, the Court need not reach the parties' dispute over attorney-client privilege and work-product doctrine.  Pega's Motion to Compel, Doc. No. 87, is DENIED.

     D.     Appian's Motion to Strike[8]

Appian seeks to strike both Pega's Reply Brief in support of its Motion to Compel, Doc. No. 103, and the accompanying Declaration of Caroline K. Simons ("Simons Declaration"), Doc. No. 104, with its attached exhibits, Doc. Nos. 104-1 to -2.  Doc. No. 107.  Exhibit A ("Calkins Letter" or "Letter") to the Simons Declaration is a letter, dated May 31, 2023, from Appian CEO Matthew Calkins to Pega CEO Alan Trefler.  Doc. No. 104-1.  Exhibit B ("IAM Article") is an article from the website of IAM Trade Secrets, which includes quotes from Appian general counsel about Appian's judgment preservation insurance.  Doc. No. 104-2. Appian maintains that these papers are or contain confidential matter that should be struck from the public record.

As an initial matter, the Court notes the basis of its power to strike these materials. Technically, a motion to strike, as delineated in Rule 12(f), may only be directed toward pleadings.  Fed. R. Civ. P. 12(f).  Pega's Reply Brief, the Simons Declaration, and the attached exhibits are not pleadings.  See Fed. R. Civ. P. 7(a) (defining pleadings).  However, "courts have

---

[8] The Court has considered whether to seal some or all of its ruling on Appian's Motion to Strike, especially in light of the fact that the Court ultimately allows the motion.  However, the Court does not do so because: (1) Appian did not seek to seal the challenged documents; (2) no party has requested that the Court seal any part of its order on Appian's Motion to Strike; and (3) the challenged documents have been public for over one month now.

inherent power to strike inappropriate materials such as confidential mediation and settlement

information that are improperly part of the public record." <u>Jones v. Metro. Life Ins. Co.</u>, No. C-

08-03971, 2010 WL 4055928, at *6 (N.D. Cal. Oct. 15, 2010).  While Appian does not state—

and Pega does not dispute—the procedural basis of its Motion to Strike, the Court construes the

Motion as invoking this inherent power.  See <u>id.</u> (collecting cases in which courts struck material

"reflecting procedural impropriety"); <u>see also</u> <u>DeLeo v. Jones</u>, No. 2:21-CV-00226, 2024 WL

1258420, at *3 (D. Me. Mar. 25, 2024) (striking paragraphs from a statement of material facts on

summary judgment on the ground that the statements pertained to "mediation proceedings [that]

were confidential pursuant to Massachusetts statute").

As to the merits of Appian's Motion to Strike, the Calkins Letter is the crux of the issue.

The Calkins letter starts by stating:

> I've asked Appian to investigate a mediation with Pegasystems regarding our legal
> dispute [i.e., the Virginia Case].  I chose to enquire now because Appian is about
> to enter into an agreement, after which no settlement discussions will make sense.
> So, if we are ever to consider it, now would be the time."

Doc. No. 104-1 at 2.

The Letter then reveals that the "agreement" referred to is one in which Appian will buy

"insurance against the judgment," and it goes on to disclose the general terms of the insurance

policy.  <u>Id.</u>  Appian argues that the letter is subject to the confidentiality provision of an

agreement ("the Mediation Agreement") to mediate between the parties such that its disclosure

in the Reply Brief and as an attached exhibit violated the Mediation Agreement.  Doc. No. 107 at

1.  Pega asserts that such disclosure was not improper because the Mediation Agreement's

confidentiality provision does not cover the Calkins Letter, and, even if it did, Appian has

waived its protections by publicly disclosing the substance of the Calkins Letter.  Doc. No. 113-1

at 6–10.

Although the Calkins Letter's proposal for mediation is dated May 31, 2023, Pega and Appian had actually been in discussions to mediate since May 23, 2023.  Doc. No. 109-3 at 2. On that date, counsel for each party jointly contacted Jonathan Marks, of MarksADR LLC, about mediating the dispute underlying the Virginia Litigation.  Doc. No. 109-3 at 2.  The next day, May 24, Marks provided the parties with information about the proposed mediation process, as well as a draft of the Mediation Agreement.  Doc. No. 109-4 at 3.  Between May 24 and June 2, the parties negotiated the terms of the Mediation Agreement.  Doc. No. 119-3 at 2–6.  In the process, Pega suggested, via email, adding language to the Mediation Agreement's confidentiality provision to include under its coverage the "process leading up to this Agreement."  Doc. No. 119-3 at 6.  Counsel for Appian responded that "[i]t is not clear to me why you are seeking to add that or how it sits alongside the current language that covers the same ground."  Doc. No. 119-3 at 5.  After a few more exchanges, Pega sent to Appian a red-line edit of the Mediation Agreement which did not include the "process leading up to this Agreement" language.  Doc. No. 119 at 2–3.

Meanwhile, on May 31, 2023, Appian general counsel sent to Pega general counsel the Calkins Letter, with the note: "I trust that you will deliver it to Alan and the rest of your mediation team."  Doc. No. 109-2 at 2.  Two hours later, outside counsel for Appian forwarded the email containing the Calkins Letter to Marks, as the mediator, with the barebones note: "Jonathan: As discussed."  Doc. No. 119-2 at 3–4.  No one else was copied on that email.  Doc. No. 119-2 at 3–4.  Marks responded, in part, "[t]hanks very much for facilitating and for sending this."  Id. at 3.  Appian, in its Reply Brief, avers that the Calkins Letter was sent to Pega "at the mediator's urging" and "because the mediator wanted Pega to have more information about the insurance policy."  Doc. No. 119-7 at 2.  Appian also avers that, "[u]pon information and belief,

the mediator then discussed the insurance policy with Pega's counsel at length." Doc. No. 119-7 at 2. However, there is nothing in the record to confirm that Marks prompted Appian to write or send the Calkins Letter or that Marks discussed the Calkins Letter with Pega or its counsel afterward.

The parties signed the final Mediation Agreement in early June—Pega on June 2, Appian on June 5. Doc. No. 109-1 at 4. To that point, according to the Mediation Agreement's schedule, Marks had met separately over Zoom with counsel for each party and with counsel and client representatives for each party, but no in-person mediation sessions with both parties present had occurred. Doc. No. 109-1 at 5. By the evening of June 5, though, it had become apparent that mediation would bear no fruit. That night, Marks emailed counsel for Pega and Appian to, essentially, terminate the mediation process in light of irreconcilable differences in the two parties' positions on settlement. Doc. No. 109-6 at 3–4.

Afterward, on June 7, counsel for Appian sent a letter to counsel for Pega, seeking written confirmation that Pega would abide by the Mediation Agreement's confidentiality provision. Doc. No. 109-6 at 5–6. In response, counsel for Pega inquired, "[w]hat is Appian's position on Matt's letter to Alan last week? It refers to the mediation and was written in anticipation of the mediation. Does Appian commit to keeping it confidential?" Doc. No. 109-7 at 3–4. Counsel for Appian responded that "Appian will treat that letter as confidential and has no intention of releasing it publicly." Doc. No. 109-7 at 2.

Although the parties did not finalize the Mediation Agreement until June 5, its header states that it is "[e]ffective as of May 24, 2023." Doc. No. 109-1 at 2. The pertinent portions of its confidentiality provision provide:

> All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation . . . are confidential and off-the-record and are not subject

to disclosure in discovery or in any judicial or administrative proceeding to the fullest extent permitted under Va. Code § 8.01-581.22 or other applicable law, except to the extent set forth in . . . Va. Code § 8.01-581.22 or other applicable law. Such offers, promises, conduct, and statements will not be disclosed to third parties, except persons associated with the participants in the process . . . and are privileged and inadmissible for any purpose . . . . If this matter does not settle in mediation, . . . no Party may provide any details or otherwise disclose what happened in the mediation. Nor may a Party refer to or rely on offers, promises, conduct or statements made during the mediation in court submissions . . . . However, evidence previously disclosed or known to a Party, or that is otherwise admissible or discoverable, shall not be rendered confidential, inadmissible or not discoverable solely as a result of its use in the mediation.

Id. at 2–3.

Virginia Code section 8.01-581.22, referenced in the above language, governs

confidentiality in mediation agreements under Virginia law.  It reads, as relevant here:

Any communication made in or in connection with the mediation, which relates to the controversy being mediated, including screening, intake, and scheduling a mediation, whether made to the mediator, mediation program staff, to a party, or to any other person, is confidential.

Confidential materials and communications are not subject to disclosure in discovery or in any judicial or administrative proceeding except . . . statements, memoranda, materials and other tangible evidence, otherwise subject to discovery, which were not prepared specifically for use in and actually used in the mediation . . . .

Va. Code § 8.01-581.22.

The Court finds that the Calkins Letter is subject to the Mediation Agreement's

confidentiality provision.  The Letter proposed mediation, was intended for Pega's mediation

team, and was shared with the mediator, all within the context of ongoing negotiations over the

terms of a prospective mediation.  According to the Mediation Agreement's schedule, Marks had

already met ex parte with counsel for each party by the time the Calkins Letter was sent on May

31, and he was set to meet with representatives that day or the next.  Doc. No. 109-1 at 5.

Further, although the Calkins Letter was sent before the parties signed the Mediation Agreement,

the Mediation Agreement was effective as of May 24, one week before the Calkins Letter was

25

sent.  These details suffice to qualify the Calkins Letter as a "statement . . . made in the course of the mediation" under the Mediation Agreement, Doc. No. 109-1 at 2–3, as well as a "communication made in or in connection with the mediation" under the incorporated Virginia law, Va. Code § 8.01-581.22.  The Court therefore finds that the Calkins Letter was subject to the Mediation Agreement's confidentiality provision.

The Court also finds that the Calkins Letter does not fall within the exception to such confidentiality under Virginia Law.  The Mediation Agreement holds "statements . . . made in the course of the mediation" confidential "except to the extent set forth in . . . Va. Code § 8.01-581.22."  Doc. No. 109-1 at 2–3.  Virginia Code section 8.01-581.22 provides an exception to mediation confidentiality for "statements . . . otherwise subject to discovery, which were not prepared specifically for use in and actually used in the mediation."  Va. Code § 8.01-581.22.  Here, the Calkins Letter was intended for Pega's mediation team and was shared with the mediator Marks while mediation meetings were ongoing.  This context serves to remove the Calkins Letter from section 8.01-581.22's exception to mediation confidentiality.

Finally, Appian has not waived the protections of the confidentiality provision.  Pega reasons that, even if the confidentiality provision does cover the Calkins Letter, Appian has waived its protections by publicly disclosing the same details of its judgment preservation insurance that are contained in the Letter.  Doc. No. 113-1 at 10–11; see also Doc. No. 104-2.  Appian responds that the confidentiality provision's protections, grounded in contract and statute rather than privilege law, are not subject to waiver.  Doc. No. 119-7 at 6; but see RegScan, Inc. v. Bureau of Nat. Affs., Inc., No. 1:11CV1129, 2012 WL 2994075, at *5 (E.D. Va. July 19, 2012) (finding waiver of section 8.01-581.22's confidentiality protections).  Even assuming—without finding—that the relevant protections are waivable, a full waiver of the Letter's confidentiality

has not occurred.  On the record before the Court, Appian has not—at least prior to Pega's filing of the material at issue—disclosed publicly that it proposed mediation to Pega, that it informed Pega of its judgment preservation insurance prior to finalizing the policy, or that it sent any such communication at all.  In short, Appian did not disclose the fact of the Letter and all of its material contents, and the Letter remains confidential as a result.

For these reasons, Pega's Reply Brief, Doc. No. 103, the Simons Declaration, Doc. No. 104, the Calkins Letter, Doc. No. 104-1, and the IAM Article, Doc. No. 104-2, will be struck from the record and sealed on the docket.  The Court ORDERS Pega to file a redacted version of its Reply Brief, with any portions referring to the Calkins Letter blacked out.  Pega may, if it so chooses, file a new version of the Simons Declaration and the IAM Article, without the Calkins Letter and with all references to the Calkins Letter removed.  Appian's Motion to Strike, Doc. No. 107, is ALLOWED to the extent described above and otherwise DENIED.[9]

## III.   CONCLUSION

For the above reasons, the Court enters the following rulings:

1. Pega's Partial Motion to Dismiss, Doc. No. 101, is ALLOWED IN PART and DENIED IN PART.  The motion is allowed to the extent that the portion of Appian's trade-libel counterclaim that rests on allegations regarding Pega's code of conduct, Doc. No. 44 ¶¶ 118–19, is dismissed; otherwise, the motion is denied.

2. Appian's Motion to Compel, Doc. No. 82, is ALLOWED IN PART and DENIED IN PART.  With respect to Interrogatory No. 9, the motion is denied.  With

---

[9] Appian asserts that, "in view of the deliberate conduct and misrepresentations involved, the Court may deem it appropriate to take further steps."  Doc. No. 119-7 at 6.  The Court declines to do so.  Although the Court finds that the Calkins Letter was covered by the Mediation Agreement's confidentiality provision, its filing in this case was not egregious if for no other reason than that most of the substance of the Letter had been disclosed publicly by Appian by the time Pega filed the Letter in this case.

respect to RFP 49, the motion is denied.  With respect to the dispute as to attorney-client privilege and work-product protection in response to Interrogatories No. 3 and 6 and RFP 13, the motion is denied without prejudice. With respect to the dispute over the term "Virginia Litigation," the motion is: denied as moot as to Interrogatory No. 3 and RFPs 11 and 33 to 38; denied as to RFPs 14 and 16; allowed as to RFP 17; allowed as to RFPs 18 to 20; allowed as to RFP 24; and denied as to RFP 51.  Finally, with respect to RFP 25, the motion is denied.

3. Pega's Motion to Compel, Doc. No. 87, is DENIED.

4. Appian's Motion to Strike, Doc. No. 107, is ALLOWED IN PART and DENIED IN PART.  The challenged documents, Doc. Nos. 103, 104, and 104-1 to -2, will be struck from the record and sealed on the docket.  Pega shall re-file its Reply Brief, with any portions referring to the Calkins Letter redacted.  To the extent the motion seeks any additional relief, that request is denied.

If any discovery disputes arise in this litigation going forward, the parties are ordered to file a joint statement, to include, in succinct form: (1) the movant's request; (2) the non-movant's request; (3) the movant's argument; and (4) the non-movant's argument.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge