UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEGAYSTEMS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 23-11776-LTS |
| | ) |
| APPIAN CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER ON MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS (DOC. NO. 133)

March 10, 2025

SOROKIN, J.

Pegasystems Inc. ("Pega") has sued Appian Corporation on the basis of alleged false

statements Appian has made relating to separate and ongoing litigation between the two in

Virginia state court (the "Virginia Litigation").  Pending before the Court is Appian's Motion for

Partial Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Doc. No.

133.[1]  For the reasons that follow, that Motion is ALLOWED IN PART and DENIED IN PART.

I.     BACKGROUND[2]

In 2020, Appian initiated the Virginia Litigation against Pega, alleging, inter alia,

violations of the Virginia Computer Crimes Act ("VCCA") and misappropriation of trade secrets

under the Virginia Uniform Trade Secrets Act ("VUTSA").  Doc. No. 17 ¶ 17.  Appian prevailed

---

[1] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing
system ("ECF"); pincites are to the page numbers in the ECF header or to the paragraph numbers
used by the document in question.

[2] The Court draws the following facts from the Amended Complaint and Pega's Answer to
Appian's counterclaims, viewed in the light most favorable to Pega.  See Zipperer v. Raytheon
Co., 493 F.3d 50, 53 (1st Cir. 2007).

on those two claims in May, 2022, after a seven-week jury trial.  Id. ¶ 26.  The jury's verdict (the "Virginia Verdict") awarded Appian one dollar in nominal damages on the VCCA claim and over $2 billion in compensatory damages on the VUTSA claim.  Id. ¶¶ 26, 30.  Pega appealed the verdict with respect to the VUTSA claim but not the VCCA claim.  Id. ¶ 30.  During the pendency of the instant case, the Virginia Court of Appeals reversed and vacated the VUTSA verdict.  Doc. No. 131 ¶ 2.  Appian has appealed that ruling to the Virginia Supreme Court, where it remains pending at the moment.  Doc. No. 134 at 9 n.5.[3]

The instant case arises from statements that Appian has allegedly made regarding the Virginia Litigation.  Pega's Amended Complaint asserts claims for defamation (Count I), trade libel (Count II), and false advertising in violation of the Lanham Act, 25 U.S.C. § 1125(a) (Count III), based on seven such statements (the "Challenged Statements").  Doc. No. 17.  Appian moved to dismiss the Amended Complaint in its entirety pursuant to Rule 12(b)(6).  Doc. No. 19.  The Court denied that motion.  Doc. No. 32.  Appian subsequently filed its Answer and Counterclaims.  Doc. No. 44.  As relevant here, Appian has asserted a counterclaim (Count V) seeking a declaration that "Appian did not defame Pega, commit trade libel, or violate the Lanham Act, as pled in the Amended Complaint."  Id. ¶ 308.  In response, Pega filed its Answer to Appian's Counterclaims.  Doc. No. 131.  Now, Appian seeks entry of judgment on Counts I, II, and III of Pega's Amended Complaint and Count V of Appian's Counterclaims with respect to six of the seven Challenged Statements (the "12(c) Statements").[4]

---

[3] Appian's appeal was not mentioned in the pleadings.  The Court includes it as a fact here for completeness but does not rely on that fact in ruling on the present Motion.
[4] Appian does not seek judgment on the seventh Challenged Statement at this time.

II.    LEGAL STANDARD

"The standard of review of a motion for judgment on the pleadings under [Rule] 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)." Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007).  However, "[a] Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54–55 (1st Cir. 2006).[5]  In evaluating the pleadings, the Court must "view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences in [their] favor." Zipperer, 493 F.3d at 53.  To survive a Rule 12(c) motion, "a complaint must contain factual allegations that 'raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true.'" Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 555 (2007)).

III.    DISCUSSION

A.    Law of the Case

At the outset, Pega argues that Appian's Motion must be denied under the law-of-the-case doctrine because the Court previously denied Appian's Rule 12(b)(6) motion to dismiss. The Court disagrees.  The law-of-the-case doctrine "precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided." Cohen v. Brown Univ., 101 F.3d 155, 167 (1st Cir. 1996).  Nevertheless, "[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." Perez-Ruiz v. Crespo-Guillen, 25 F.3d 40, 42 (1st Cir. 1994).  Besides, Appian's present Motion is distinct from its Rule 12(b)(6) motion.  In ruling on the Rule 12(b)(6)

---

[5] In addition to the pleadings, the Court may also consider "documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006).

motion, the Court found Appian's legal challenges to Pega's claims premature because the Court could consider at that point only the allegations within Pega's Amended Complaint. The Court did not definitively reject Appian's arguments for all future stages of the case. Now, at this stage, the Court can consider documents outside Pega's Amended Complaint. As such, the Court proceeds to consider Appian's Motion on the merits.

      B.    <u>Pega's Count I: Defamation</u>

Appian principally contends that it is entitled to partial judgment on the pleadings as to Pega's defamation claim because the 12(c) Statements are substantially true. To state a claim for defamation under Massachusetts law, a plaintiff must allege, <u>inter alia</u>, that the challenged statement is materially false. <u>Kilnapp Enters., Inc. v. Mass. State Auto. Dealers Ass'n</u>, 47 N.E.3d 31, 38 (Mass. 2016); <u>see also</u> <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 27 (1st Cir. 2009) (listing elements of defamation and noting that the question of whether a statement is false is distinct from the question of whether a statement could be understood to have a defamatory meaning).

A "statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." <u>Kilnapp Enters.</u>, 47 N.E.3d at 38 (quotations omitted) (quoting <u>Masson v. New Yorker Mag., Inc.</u>, 501 U.S. 496, 516–17 (1991)). Massachusetts courts generally do not recognize claims of falsity implied from true statements. Rodney A. Smolla, <u>Law of Defamation</u> § 4:19 (2d ed. 2024); <u>see also</u> <u>Mihalik v. Duprey</u>, 417 N.E.2d 1238, 1241 (Mass. App. Ct. 1981) (finding falsity of newspaper riddle made up of truthful clues about plaintiff "ha[d] not been established merely because in the aggregate [the clues] have an insinuating overtone"). However, the truth or falsity of a statement cannot be judged by its isolated components. Instead, falsity must be determined "by reference to the communication in its entirety and the context in which it was published, as well as '[t]he

4

emotions, prejudices and intolerance of mankind.'" Barhoum v. NYP Holdings, Inc., No. SUCV201302062, 2014 WL 2504533, at *5 (Mass. Super. Mar. 10, 2014) (alteration in original) (quoting Ingalls v. Hastings & Sons Pub. Co., 22 N.E.2d 657, 659 (Mass. 1939)). And, at this stage, the Court is considering only whether the allegations and admissions contained in the pleadings, with all reasonable inferences drawn in Pega's favor, plausibly establish that each 12(c) Statement was false when made. Whether a reasonable jury could find differently is a question not before the Court at present.

In an exception to this requirement of falsity, "[b]y statute, Massachusetts permits a plaintiff to recover for a truthful defamatory statement published in writing (or its equivalent) with actual malice." White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 n.4 (Mass. 2004) (citing Mass. Gen. Laws ch. 231, § 92). The Massachusetts Supreme Judicial Court has held that this exception cannot be constitutionally applied to statements on matters of public concern, though. Shaari v. Harvard Student Agencies, Inc., 691 N.E.2d 925, 929 (Mass. 1998). A matter of public concern is one which can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983). Whether a statement addresses a matter of public concern is "determined by the content, form, and context of [the] statement." Id. at 147–48. Simply put, assuming all other elements of defamation are satisfied, a plaintiff may recover for a truthful defamatory statement only if the statement does not address a matter of public concern and was made with actual malice; otherwise, the plaintiff must establish the statement's falsity.

In this case, based on the pleadings, that "actual malice" exception does not apply. That is so because each 12(c) Statement addresses a matter of public concern: the Virginia Litigation. That is, each one focuses on a contentious lawsuit between two large companies that resulted in a

judgment of over $2 billion.  That lawsuit can fairly be considered a concern to the community

and, therefore, a matter of public concern.[6]  That being so, as to Pega's defamation claim, each

12(c) Statement can survive only if the pleadings show it is false.  That showing has been made

with respect to five of the 12(c) Statements.  Only one statement fails as to the element of falsity.

The Court addresses each of the 12(c) Statements in turn.

1.    *The Calkins Statement*

Appian CEO Matt Calkin made the first 12(c) Statement (the "Calkins Statement")

during an earnings call on November 3, 2022.  In response to a question about the Virginia

Verdict, he said:

> [I]t's not just a lawsuit.  It's a verdict.  It's a final judgment at this point because
> the judge entered it this past quarter.  Pegasystems violated the Computer Crimes
> Act, right, full stop. . . .   I don't know what this means for their customers['] 
> prospects, their partners, even their employees.

Doc. No. 17 ¶ 63; see also Doc. No. 44 ¶ 211.  Pega alleges the Calkins Statement was false

because it "implied that Pegasystems presently owed Appian the full sum of over $2 billion."

Doc. No. 17 ¶ 66.

As part of its Counterclaims, Appian alleges that, later on the same earnings call, Calkins

stated:

> Pega is not obliged to pay anything right now.  They are at liberty instead to contest
> the verdict.  Now, the verdict has been entered and the final judgment has been

---

[6] In its papers, Pega does not argue that the Virginia Litigation is not a matter of public concern.
Rather, it first contends incorrectly that Appian waived its argument regarding matters of public
concern, then asserts that "a determination whether a statement is one of public concern is
unsuitable for disposition on a Rule 12(c) motion."  Doc. No. 161 at 2.  But courts routinely
make the "public concern" determination at the even-earlier Rule 12(b) stage.  See, e.g., Mullane
v. Breaking Media, Inc., 433 F. Supp. 3d 102, 111 (D. Mass. 2020) (finding challenged statement
addressed matter of public concern, and therefore "actual malice" exception did not apply, on
Rule 12(b)(6) motion) aff'd, No. 20-1061, 2021 WL 3027150 (1st Cir. Feb. 26, 2021).  Cf.
Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 132–34 (1st Cir. 1997) (refusing to
make "public concern" determination at appellate level, after trial, because district court had not
developed record, and remanding for district court to make determination).

entered.  And their arguments were heard and rejected by the judge.  And interest is now accruing at the rate of about $122 million per year.  So, they are at liberty to draw this out if they wish, and it appears they do wish.  But there is a consequence to that.

Doc. No. 44 ¶ 213.  In answering that paragraph of the Counterclaims, Pega states that it "lacks knowledge or information sufficient to confirm the truth of the allegations . . . and therefore denies such allegations.  [Pega] refers to the transcript regarding its contents."  Doc. No. 131 ¶ 213.  Pega thereby incorporated the transcript into the pleadings.  Appian produced a copy of the transcript as an exhibit in support of the present Motion, Doc. No. 135-3, and Pega has not contested that copy's authenticity.  The Court therefore considers the transcript.

In that light, the Calkins Statement cannot support a defamation claim.  Each sentence in the challenged statement was substantially true.  And, in context, the statement as a whole was substantially true.  The Virginia Verdict had been entered as a final judgment, and it included a finding that Pega violated the VCCA.  The Calkins Statement itself contained no direct assertion that the Virginia Verdict was due at the time of the earnings call.  Nor can it be read in the context of the entire communication as conveying as much, especially given Calkins's later clarification in the course of the same question-and-answer session.  The effect of the Calkins Statement on a listener did not differ from that which the truth would have had.

Because the Calkins Statement was a true statement on a matter of public concern, the Motion is ALLOWED as to Count I with respect to the Calkins Statement.

2.  *The Zeigert Email*

According to the Amended Complaint, "[o]n April 4, 2023, Bill Ziegert, Appian's Strategic Client Director, emailed numerous individuals at AbbVie (a Pegasystems client), including the General Counsel and Chief Ethics Officer, stating that Pegasystems had engaged in a 'potential violation of AbbVie's Supplier Code of Conduct.'"  Doc. No. 17 ¶ 85; see also Doc.

7

No. 44 ¶ 251.  This email (the "Zeigert Email") contained a link to an Appian website "contain[ing] numerous false and misleading misstatements of fact, including the statement that [Pega's] CEO used an alias to access Appian's software."  Doc. No. 17 ¶ 86.  Drawing all inferences in Pega's favor, the pleadings adequately allege that Pega's CEO, Alan Trefler, did not use an alias to access Appian's software.  See id. ¶ 42 ("Trefler only accessed—by way of Appian's mailing list—publicly disseminated marketing materials.").  The inclusion of the link in the Zeigert Email conveyed the message that Pega violated AbbVie's Suppler Code of Conduct because, at least in part, Trefler accessed Appian's software.  That suffices to render the Zeigert Email false for purposes of the present Motion.  The Motion is therefore DENIED as to Count I with respect to the Zeigert Email.

        3.    *The Trefler Statement*

On May 10, 2022, Pega alleges, Appian issued a press release containing a statement (the "Trefler Statement") that conveyed the message that "Alan Trefler, Pegasystems' CEO, used an alias 'to obtain access to Appian information,'" and that "Mr. Trefler, among other Pegasystems employees, used 'false identities' to obtain access to Appian's software."  Doc. No. 17 ¶ 41.  As explained in the previous section, the assertion that Trefler accessed Appian software was false based on the pleadings.  See Doc. No. 17 ¶ 42.

In its Counterclaims, Appian alleges that the full Trefler Statement read: "Mr. Trefler himself admitted to using an alias, 'Albert Skii' to obtain access to Appian information."  Doc. No. 44 ¶ 136.[7]  Drawing all inferences in Pega's favor, this version of the Trefler Statement was also plausibly false. The natural, literal reading of the sentence would be that Trefler, by a fake

---

[7] In the corresponding paragraph of its Answer, Pega "denies the allegations in Paragraph 136 of the Counterclaims" and "refers to Appian's press release and The Register article regarding their contents."  Doc. No. 131 ¶ 136.

name, viewed non-public material produced by Appian.  But, as explained, the pleadings
establish only that Trefler received publicly available marketing materials from Appian.  That
suffices at this stage.  The Motion is DENIED as to Count I with respect to the Trefler Statement.

       4.    *The Intern Statement*

It is undisputed that, at some point in 2022, Appian published the following statement on
a section of its website: "Even a Pega intern gained improper access to Appian software, but
unlike the CEO, at least he used his real name."  Doc. No. 17 ¶ 48; Doc. No. 44 ¶ 137.  This
statement (the "Intern Statement"), read literally and with all inferences drawn in Pega's favor,
conveyed the claim that Pega's CEO, Trefler, used a fake name to gain improper access to
Appian software.  The Intern Statement was therefore false for the same reasons as the Zeigert
Email and the Trefler Statement.  The Motion is DENIED as to Count I with respect to the Intern
Statement.

       5.    *The LinkedIn Posts*

Next, the Amended Complaint alleges that, around summer 2023, Appian posted a series
of statements on LinkedIn and other social media sites (the "LinkedIn Posts").  Pega includes
images of a pair of these posts in its Amended Complaint.  Doc. No. 17 ¶¶ 94–95.  One shows a
mock newspaper front page titled "BREAKING NEWS" with the heading, "APPIAN WINS
2.1B VERDICT OVER PEGA," and the subheading, "PEGA DOES NOT APPEAL
VIOLATION OF VIRGINIA COMPUTER CRIMES ACT."  Id. ¶ 94.  The other shows a mock
news broadcast, with "APPIAN WINS $2.1B VS. PEGA" in large font over an anchor's
shoulder and a "BREAKING NEWS" banner below declaring, "PEGA DOESN'T APPEAL
VIRGINIA COMPUTER CRIMES ACT VERDICT."  Id. ¶ 95.

Each LinkedIn Post, read as a whole and according to the pleading standards applicable
at this stage of the case, made a false statement of fact.  The primary two constituent sentences of

each post were substantially true: Appian had won a verdict of roughly $2.1 billion over Pega, and Pega had not appealed the VCCA verdict. But the Court must consider each post as a whole to determine what statement was communicated before examining whether any such statement was false.

Consider the example of two people, Alice and Bob, in a room. A third, Charlie, enters the room and shoots Bob in the arm, producing a non-fatal flesh wound, then leaves. A fourth person, David, subsequently comes in, kills Bob, and leaves. When police arrive on the scene, Alice, unprompted, says, "Bob was murdered. Charlie shot him." Each sentence of that statement is true: Bob had been murdered, and Charlie had shot him. But taken together and read literally, the sentences make the false statement that Charlie murdered Bob by shooting him.

Drawing all reasonable inferences in Pega's favor, the case is similar here. By juxtaposing "APPIAN WINS $2.1B VS. PEGA" and "PEGA DOESN'T APPEAL VIRGINIA COMPUTER CRIMES ACT VERDICT" without context, Appian plausibly made the statement that Pega had not appealed the $2.1 billion verdict. Put in the context of a mock newspaper front page or news broadcast with the label "BREAKING NEWS," the posts further stated that the verdict was a recent development that was immediately due. That statement, of course, was false. The verdict was rendered about one year before the LinkedIn Posts were made, Pega had appealed the verdict in part, and the judgment was not presently due.

In this way, the LinkedIn Posts made a concrete, false assertion of fact. Contrast this with Noonan v. Staples, Inc., where, after firing the plaintiff for violating company travel-and-expense-report policies, an executive vice president sent an email to all North American employees informing them of the plaintiff's termination and stating the grounds therefor. 556 F.3d at 23–24. The First Circuit, applying Massachusetts defamation law, rejected the plaintiff's

argument that, though the email's component statements were true, "reasonable recipients could have read other passages in the e-mail and, viewing the e-mail in its totality, drawn the inference that he arrogantly regarded Staples's policies as subject to his personal whim and committed some sort of grave misconduct." Id. at 27.  That reading required "look[ing] beyond the letter of the e-mail" to the context: "the e-mail's reference to an 'investigation,' the recent experience with the firing and later indictment of [another employee] for stealing money from the company, and the fact that Staples took the drastic step of terminating [plaintiff] instead of merely reprimanding him or delaying the relevant reimbursements." Id. at 26–27.  Instead, the Circuit rejected "a rule whereby even an objectively true statement can give rise to a libel claim if reasonable readers might infer from it other, untrue characteristics of the plaintiff or conduct by him." Id. at 27.

Here, by comparison, the Court need not look beyond the letter of the LinkedIn Posts.  No context is needed.  No inferences are required.  And the claim made by the LinkedIn Posts, as alleged by Pega, is not of some amorphous, unspecified misconduct.  Cf. Mihalik, 417 N.E.2d at 1241 (finding no falsity in part because "the aggregate implications of the [statements] seem to us to be too vague and uncertain, and too fragile in impact, . . . particularly when each [statement] viewed alone is consistent with the truth").  On their face, at this stage, the posts asserted that Pega had not appealed the $2.1 billion verdict referenced.  That was a concrete statement, which Pega has plausibly alleged could be read without knowledge of the parties' past dealings, other parties' misconduct, or any other information extraneous to the posts.  And that statement was false, as pled.  The Motion is DENIED as to Count I with respect to the LinkedIn Posts.

6.    *The Biddle Emails*

On May 12, 2022, Jack Biddle, a Pega shareholder and a member of the Appian Board of Directors, sent emails to Pega's investor-relations email address.  The first email stated: "The VCCA finding of fact for a dollar is a class 5 felony.  Normally that's disbarment from selling to government."  Doc. No. 17 ¶ 52; Doc. No. 44 ¶ 228.  A second email stated: "The Jury's finding for a dollar was that Pega committed a class 5 felony.  The award was $1.  The finding of fact was felony."  Doc. No. 44 ¶¶ 229–30; Doc. No. 131 ¶¶ 229–30.  In another email that included third parties Garo Toomajanian and Ralph Linn from an investor-relations firm hired by Pega, Biddle wrote, "The $1 award concerns me on the VCCA.  That is a class 5 Felony in Virginia."  Doc. No. 17 ¶ 53; Doc. No. 44 ¶ 235.

Drawing all inferences in Pega's favor, each email was substantially false.  Read literally, each asserted that Pega was convicted of a felony in the Virginia Litigation.  Although Pega was found to have committed a violation of the VCCA, that finding occurred in a civil case with a lower burden of proof than that required for conviction of a felony in a criminal case.  Based on the pleadings, then, Appian's challenge to the falsity of the Biddle Emails does not warrant judgment at this time.

Appian raises a second challenge to the Biddle Emails, though, contending that they also fail on the element of publication.  On this, Appian is also incorrect.  The element of publication requires that, to state a claim for defamation, a plaintiff must allege that "the defendant communicate[d] the defamatory statement to a third party."  White, 809 N.E.2d at 1036.  Here, the Amended Complaint alleges that Biddle sent the last email to third parties Toomajanian and Linn.  Doc. No. 17 ¶ 53.  While Appian's Counterclaims assert that Biddle "was not the person who made the initial decision to include" Toomajanian and Linn on the emails, Doc. No. 44 ¶ 238, Pega's Answer denies that assertion, Doc. No. 131 ¶ 238.  Accepting Pega's pleaded facts

12

as true, that is enough for publication at this stage.  The Motion is DENIED as to Count I with respect to the Biddle Emails.

### 7.   *Count I Conclusion*

For the reasons explained above, as to Count I, the Motion for Partial Judgment on the Pleadings is ALLOWED with respect to the Calkins Statement and DENIED with respect to the Zeigert Email, the Trefler Statement, the Intern Statement, the LinkedIn Posts, and the Biddle Emails.

### C.   Pega's Count II: Trade Libel

Count II asserts a claim for trade libel.  The parties offer no arguments on Count II independent of their Count I contentions, and Massachusetts courts apply the same legal regime to trade libel as to defamation.  HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 762 (Mass. 2013).  The Court's analysis on Count II therefore tracks its reasoning on Count I.  As to Count II, the Motion is ALLOWED with respect to the Calkins Statement and DENIED with respect to the the rest of the 12(c) Statements.

### D.   Pega's Count III: False Advertising

Count III, for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), differs somewhat from Counts I and II, but the results are the same.  In order to state a claim for Lanham Act false advertising, a plaintiff must allege, in relevant part, "a false or misleading description of fact or representation of fact by the defendant" which "actually deceives or has the tendency to deceive a substantial segment of its audience."  Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 33 n.6 (1st Cir. 2000).  Here, Appian's arguments focus on the literal truth and consumer deception of the 12(c) Statements.  Appian does not challenge any of the other elements of Pega's Lanham Act claim at this time.

With respect to the Zeigert Email, the Trefler Statement, the Intern Statement, the LinkedIn Posts, and the Biddle Emails, Pega's false-advertising claim survives for the same reason its defamation claim does. Each of these statements contained literal falsehoods, thereby satisfying the false-or-misleading element under the Lanham Act. Because these statements were literally false, Pega need not allege or prove actual consumer deception. Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002). As such, these five sets of statements survive Appian's Motion.

The Calkins Statement, though, does not satisfy the false-or-misleading requirement. That statements was not false, within the meaning of the Lanham Act. To be so, a statement must be "false on its face," Clorox, 228 F.33d at 33, and, as explained in the Court's defamation analysis supra, the Calkins Statement did not meet that standard.

It was not misleading, either. A misleading statement, under the Lanham Act, is one which is "literally true or ambiguous but likely to mislead and confuse customers." Id. A plaintiff alleging false advertising based on a misleading statement "has the burden of proving that a substantial portion of the audience for that [statement] was actually misled." Id. at 36. Pega's pleadings do not meet its burden to allege plausibly such deception. The Amended Complaint contains no allegations of consumer deception tied to the Calkins Statement at all. See Azurity Pharms., Inc. v. Edge Pharma, LLC, 45 F.4th 479, 498 (1st Cir. 2022) (affirming dismissal of misleading-advertising claim where complaint "makes no allegations that explain how, or why, the Registration Statements could mislead an audience about [defendant's] conduct with respect to [defendant's compliance with particular statutory provision] specifically"). Pega's only specific allegations of consumer deception are that "Appian pitched KBR Inc. ('KBR'), a former [Pega] customer," "Appian repeated many of these false statements to KBR,"

and "[a]s a result of these false, misleading, and defamatory statements, KBR opted to switch to Appian's offerings." Doc. No. 17 ¶ 115. This allegation does not sweep in the Calkins Statement, which was made to a general audience on an earnings call rather than in direct outreach to KBR.

Finally, Pega argues that a failure to allege consumer deception is not fatal to its Lanham Act claim because "Pega has alleged that Appian intended to mislead." Doc. No. 142-1 at 16. It is true that "if there is proof that a defendant intentionally set out to deceive or mislead consumers, a presumption arises that customers in fact have been deceived." Cashmere & Camel Hair Mfrs. Inst., 284 F.3d at 316. Pega's allegations with respect to the Calkins Statement do not give rise to that presumption, though. Pega's allegations of Appian's intent to mislead only possibly reach the Trefler Statement, Doc. No. 17 ¶ 48, the Intern Statement, id., the Biddle Emails, id. ¶¶ 56, 60, and the LinkedIn Posts, id. ¶ 131.[8] Pega's allegations of intent with respect to the Calkins Statement focus on Appian's intent to unsettle Pega's employees and damage Pega's reputation. Id. ¶¶ 65, 98. Pega cannot invoke a presumption of consumer deception because it has not alleged that, in making the Calkins Statement, Appian specifically intended to mislead consumers.

As the pleadings do not show that the Calkins Statement was literally false, actually deceived consumers, or was made with the intent to deceive consumers, the Motion is ALLOWED as to Count III with respect to that statement. Otherwise, the Motion is DENIED as to Count III.

---

[8] The Court expresses no opinion as to whether these allegations would suffice to invoke the presumption with respect to any statements other than the Calkins Statement.

        E.    <u>Appian's Count V: Declaratory Judgment Counterclaim</u>

The Parties do not independently argue Appian's declaratory judgment counterclaim.
Therefore, the Motion is ALLOWED as to Appian's Count V with respect to the Calkins
Statement only and DENIED otherwise.

IV.    <u>CONCLUSION</u>

For the reasons above, Appian's Motion for Partial Judgment on the Pleadings is
ALLOWED IN PART and DENIED IN PART.  The Court hereby enters judgment for Appian as
to Counts I, II, and III of Pega's Amended Complaint and Count V of Appian's Counterclaims to
the extent each is based on the Calkins Statement.

SO ORDERED.


  /s/ Leo T. Sorokin
United States District Judge

16