UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEGASYSTEMS INC., Plaintiff and Counterclaim-Defendant, v. APPIAN CORPORATION, Defendant and Counterclaim-Plaintiff. | Civil No. 23-11776-LTS |

MEMORANDUM AND ORDER ON MOTIONS IN LIMINE
(DOC. NOS. 811, 814, 817, 819, 822, 823, 828, 831) AND MOTION TO
EXCLUDE PORTIONS OF DR. GIANTURCO'S OPINIONS (DOC. NO. 878)

October 21, 2026

SOROKIN, J.

Pega and Appian collectively bring eight motions in limine seeking to exclude the other's expert opinions and testimony. The parties have fully briefed each motion, and neither party requests an evidentiary hearing. The Court applies the familiar standards governing the admissibility of expert testimony under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Pega also moves to exclude portions of one expert's testimony as inconsistent with the Court's prior order permitting expert substitution. Before addressing all of these motions, the Court first discusses an issue that cuts across many of the expert reports.

Traditionally, expert testimony involves an expert identifying a principle based upon their knowledge, skill, or experience, stating facts which they assume or are aware of based on the record in the case, and then applying their expertise to that set of facts. For example, an expert

might state the principle that purchasers of enterprise software are "acutely sensitive to issues relating to vendor integrity, regulatory compliance, and adherence to codes of conduct." Doc. No. 813-1 at 35. The expert might then recite various facts in the record, such as the fact that a Pega employee "obtained access to Appian's free trials by using the email domain for his wife's business, Organic Living and Wellness," and by falsely representing that he "wanted access as an independent consultant, working with beauty industry customers." Id. at 78 (citation modified). Then, the expert might opine that these facts would generally be of interest to buyers of enterprise software because they raise concerns about vendor integrity or adherence to codes of conduct.

What an expert cannot do, however, is intrude on the jury's role as fact finder. Daubert "confines opinion testimony by witnesses with specialized knowledge to the areas within which their experience and training has endowed them with expertise." United States v. Sampson, No. 01-cr-101384-LTS, 2016 WL 11726919, at *15 (D. Mass. Sep. 2, 2016). This means that experts cannot "offer opinions on . . . how to resolve purely factual questions at issue." Id. By the same token, experts also cannot opine on "conclusions [they] believe[] jurors should draw from certain facts." Id. at *26. Nor can experts merely serve as a vessel for counsel's closing arguments. See United States v. Llerenas, 743 F. App'x 86, 89 (9th Cir. 2018) ("Expert testimony is not merely a vessel for [a party] to get expert endorsement of its closing argument."). To the extent that these issues arise with individual expert reports or testimony, the Court will address those concerns in the course of trial. This global issue aside, the Court now turns to the contested expert motions.

## I. PEGA'S MOTION TO EXCLUDE MARSHALL (DOC. NO. 811) AND APPIAN'S MOTION TO EXCLUDE MCGAHEE (DOC. NO. 831)

The Court begins with the two experts for whom a hearing is necessary and already scheduled: Dr. Marshall and Dr. McGahee. Both experts opine about the harm caused by the various challenged statements in this case. The Court has concerns with both experts' conclusions in this regard.

Start with Marshall. He begins by describing the enterprise software procurement process and discussing factors that he believes generally influence this process. See Doc. No. 813-1 at 32–37. He then assesses how the challenged statements in the case fit into this procurement framework. Id. at 38–92. Having done so, he proceeds to identify ninety-five sales opportunities which he believed were competitive between the parties based on the factual record, his experience, and his expertise. See id. at 92–96. Broadly speaking, Marshall is qualified to offer these opinions, all of which are properly the subject of expert testimony. Most of Pega's challenges on these points concern the weight of the opinions rather than their admissibility.[1]

But Marshall then concludes that the procurement decisions in the ninety-five competitive opportunities were "reasonably likely to have been influenced" by the challenged Pega statements ("CPS"). Id. at 96. Marshall does not explain what he means by "influenced" or whether any influence was material. Nor does he provide a basis for this conclusion beyond his prior assessment that the CPS would generally be topics of interest in a procurement process. Notably, he does not seem to base his opinion upon a review of any of the actual procurement decisions at issue. Given the dearth of evidence about the procurement processes for the ninety-

[1] To the extent that Marshall opines in his report on the state of mind of other persons, Appian concedes that it will not elicit such testimony. See Doc. No. 850-1 at 24.

five competitive opportunities, the Court has serious concerns about the foundation for Marshall's conclusion that the CPS influenced those opportunities.

McGahee's effort to determine the damages caused by the challenged Appian statements ("CAS") raises similar questions. He asserts that, "by early 2023, the market would have been aware of the May 2022 Virginia litigation verdict." Doc. No. 833-2 at 117 (citation modified). As a result, he concludes that any slowdown in Pega's annual contract value after Q1 2023 could "reasonably be attributed to continued and increasing dissemination of the CAS as opposed to the Virginia litigation verdict itself." Id. (citation modified). But McGahee acknowledges elsewhere in his report that "the sales cycle" for "enterprise application software" is "often long, complex, and competitive." Id. at 15.

In this context, the Court questions whether McGahee's conclusion regarding the duration of the verdict's effects is economic analysis at all, and whether it is therefore even properly within his sphere of expertise. Moreover, the Court is concerned by McGahee's apparent failure to engage with any number of other potential causes of Pega's slowed growth, such as macroeconomic factors, the verdict itself, other competitors' statements rather than those made by Appian, or Pega's own actions. The primary basis for McGahee's conclusion that the CAS caused Pega's slowed growth rate—temporal proximity—is rarely enough to establish causation in other legal contexts.[2] See, e.g., Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 25 (1st Cir. 2014) ("[T]emporal proximity is merely one factor relevant to causation."); see also

[2] To the extent that Appian separately challenges McGahee's corrective-advertising opinion, Appian's motion is DENIED. Appian's challenges to McGahee's use of Appian's CAS-related spending as a proxy for corrective advertising—and his calculation of that figure—go to weight rather than admissibility, albeit just barely so.

Brown v. Corsini, 657 F. Supp. 2d 296, 305 (D. Mass. 2009) ("[T]emporal proximity is not sufficient alone to prove retaliatory motive.").

By separate order, the Court has scheduled a hearing for Thursday, October 29, 2026, at 10:30 AM. See Doc. No. 885. The parties should be prepared to discuss the Court's concerns and show cause as to why the flagged portions of these opinions should not be excluded on these bases. No hearing is required as to the remaining challenged experts. The Court resolves those motions below.

## II. APPIAN'S MOTION TO EXCLUDE PEARLSON (DOC. NO. 814)

Dr. Pearlson has sufficient experience and expertise to opine about the enterprise software procurement process. Her critique of Marshall's opinion appropriately draws upon that expertise and the salient factors driving the procurement process which she identifies.

Pearlson also criticizes Marshall's conclusions regarding the ninety-five competitive opportunities. As discussed above, the Court has yet to decide whether the entirety of Marshall's analysis in this respect is admissible. To the extent Marshall's analysis is admissible, however, Pearlson's critique of that analysis is also admissible. Pearlson has a sufficient research and industry background to assess Marshall's methodology and resulting opinions. Her analysis will assist the jury's evaluation of Marshall's opinions. Appian's challenges here all go to weight rather than admissibility.

Appian's Motion to Exclude Pearlson, Doc. No. 814, is therefore DENIED.

## III. APPIAN'S MOTION TO EXCLUDE BUTLER (DOC. NO. 817)

Appian's challenges to Butler's survey, including whether the survey targeted the appropriate population, largely go to the weight—not admissibility—of her testimony. One of Appian's challenges is different and merits further discussion. Butler concludes that Appian's social media posts were "likely to mislead a significant and substantial proportion of viewers and

cause them to believe" various things about Pega. Doc. No. 845-6 at 8; see also id. at 27 ("These results demonstrate that substantial and significant shares of the relevant population are misled by Appian's messaging related to its litigation with Pega."). The Court has concerns about the admissibility and fit of this conclusion, because Butler's survey did not test whether respondents believed Appian's posts or were misled by them. Rather, her survey merely asked questions about what the posts "communicate[d]." See id. at 15–18. Moreover, except for Pega's defamation claims, the jury will be measuring the effects of the CAS on persons who are engaged in the lengthy and complex procurement process described by both parties' experts. This is a factual context much removed from answering questions on a survey in isolation. These concerns—which the Court will address in the pre-trial phase or in response to objections at trial—bear on the appropriate scope of Butler's testimony as opposed to whether she can testify at all.

Appian's Motion to Exclude Butler, Doc. No. 814, is therefore DENIED.

## IV. APPIAN'S MOTION TO EXCLUDE ROBINSON (DOC. NO. 823)

Insofar as Appian challenges Robinson's opinions regarding the distinction between "information" and "software," Appian's Motion is DENIED. Robinson has sufficient experience to assess these terms. His opinions will help the jury evaluate Marshall's testimony in this regard, and Robinson can testify to this extent.

Robinson's remaining opinions do not provide the same assistance. Notably, Robinson's original report concerned whether Appian made reasonable efforts to protect trade secrets under the Virginia Uniform Trade Secrets Act ("VUTSA"). See Doc. No. 826-1. Pega previously asserted that Robinson's analysis was necessary to defend its statement that the Virginia litigation was "a trade secrets case with no trade secrets." Doc. No. 826-3 at 1. Robinson also provided a rebuttal report to Marshall's opinions concerning whether the information Zou

supplied was "widely available" or restricted and whether Appian's free trials were "publicly available." Doc. No. 826-2. Robinson's rebuttal was tied in large measure to his prior trade secrets report. The Court has since dismissed on summary judgment Appian's claims based on Pega's "no trade secrets" statements. See Doc. No. 804 at 80–82. Because this is not a trade secrets case, and because there are no longer any challenged statements concerning trade secrets, Appian's Motion is ALLOWED as to Robinson's original trade secrets report under Daubert as well as Federal Rules of Evidence 401, 403, and 702.

With respect to Robinson's rebuttal report, Pega attempts to recast Robinson's opinions regarding the surviving "widely available" and "publicly available" statements as merely "two sides of the same coin" with his trade secrets opinions and expertise. See Doc. No. 853-1 at 9. The Court disagrees. Just because something is not properly protected as a trade secret does not make it widely or publicly available. A simple and somewhat facetious example makes the point. The eating habits of Pega's CEO or his cell phone number are likely not protected as trade secrets, yet they are also likely not "widely" or "publicly" available.

Even if Pega was right that these statements were two sides of the same coin, interpreting the plain language of the "widely available," "publicly available," and restriction statements simply is not the stuff of expert testimony. These terms are not technical. Robinson's opinions concerning these terms do not meaningfully draw upon "scientific, technical or other specialized expertise." Fed. R. Evid. 702(a). Rather, they are mere lawyer argument offered through an expert and do not "help the trier of fact to understand the evidence or to determine a fact in issue." Id. Moreover, these issues are most clearly presented via regular fact evidence.

Appian's Motion is therefore ALLOWED as to Robinson's rebuttal report insofar as it discusses the meaning of the "widely available," "publicly available," and restriction statements.[3]

## V. PEGA'S MOTIONS TO EXCLUDE GIANTURCO (DOC. NOS. 819, 878)

Pega brings two motions concerning Dr. Gianturco's opinions and testimony. First, Pega brings a motion in limine to exclude his testimony under Federal Rule of Evidence 702. Doc. No. 819. Second, Pega moves under Federal Rules of Civil Procedure 16 and 37 to exclude portions of Gianturco's opinions that are inconsistent with the Court's substitution order following Dr. Cole's death. Doc. No. 878.

Appian offers Gianturco's opinions and testimony as rebuttal to Robinson's report concerning whether Appian made reasonable efforts to protect trade secrets under the VUTSA. Gianturco has sufficient expertise to assess Robinson's report, and Pega's challenges to his assessment largely go to weight rather than admissibility. But, given the Court's decision to exclude all of Robinson's opinions except for his discussion of the terms "information" and "software," the Court also excludes Gianturco's rebuttal opinions and testimony. Gianturco does not address Robinson's rebuttal report, let alone the only remaining portion that report, so his opinions and testimony are no longer relevant under Federal Rule of Evidence 401.

Pega's Motion in Limine, Doc. No. 819, is therefore ALLOWED, and Pega's Motion to Exclude Portions of Gianturco's Opinions under Federal Rules of Civil Procedure 16 and 37, Doc. No. 878, is DENIED AS MOOT.

---

[3] To the extent that other experts opine on how to interpret these terms, those opinions are also inadmissible and should not be elicited at trial.

## VI. PEGA'S MOTION TO EXCLUDE VANDERHART (DOC. NO. 822)

Dr. Vanderhart's opinions and testimony concern Appian's claims for disgorgement under the Lanham Act. At summary judgment, the Court ruled out Appian's $2 billion disgorgement theory because the Vanderhart report on which it was based relied upon "speculation and improbable inferences." Doc. No. 804 at 93. Pega moves to exclude these opinions, Doc. No. 824 at 8, and Appian agrees not to offer them at trial, Doc. No. 858-1 at 5 n.1. Thus, Pega's Motion is ALLOWED as to Vanderhart's $2 billion disgorgement opinions.

As to her $109 million disgorgement and lost profits opinions, Vanderhart merely performs an accounting analysis. Vanderhart offers no opinions as to causation or liability. See Doc. No. 827-2 at 6–7. Rather, she assumes—based on Dr. Marshall's opinions—that the CPS caused Appian to lose out on the ninety-five competitive opportunities. See id. at 33–34. From this basis, Vanderhart offers her accounting opinions as to damages. To the extent that Pega challenges these underlying assumptions, those challenges lie elsewhere, including with Pega's still-pending motion to exclude Dr. Marshall's opinions.[4] Otherwise, damages experts can permissibly assume various bases for their calculations as long as those assumptions are "reasonable" and "consistent with the evidence available to them." Packgen v. Berry Plastics Corp., 847 F.3d 80, 88 (1st Cir. 2017). The fact that Vanderhart has assumed causation and liability here does not relieve Appian of its burden to prove either.

Pega's Motion is therefore DENIED except as to Vanderhart's $2 billion disgorgement opinions. Vanderhart may testify consistent with this ruling.

---

[4] If the assumptions underlying Vanderhart's opinions are excluded, Pega may revisit the admissibility of her opinions at that time.

## VII. APPIAN'S MOTION TO EXCLUDE DRUM (DOC. NO. 828)

Drum opines that Pega had the "financial strength" to pay the $2 billion judgment in the Virginia litigation, whether in 2022 when rendered or several years later upon the conclusion of the appeals process. See Doc. No. 830-2 at 8. Drum had a sufficient basis for this conclusion, including his assessment that "Pega would have been able to pay the Virginia litigation trial judgment through a combination of debt and equity financing or debt financing alone." Id. (citation modified). Appian's challenges to this conclusion, like the fact that Drum did not investigate whether lenders would have in fact made any necessary loans, go to the weight of his opinions rather than their admissibility.

Appian also challenges Drum's opinions regarding "Pega's GAAP accounting treatment and Deloitte's audit opinions." Doc. No. 829-1 at 20. This is a proper subject of expert opinion, and Appian does not challenge the sufficiency or methodology underlying these opinions. Whether the underlying evidence or opinions are relevant or cumulative are matters for a trial motion in limine or objection, not a Daubert motion to exclude expert testimony.

Appian's Motion to Exclude the Opinions and Testimony of John C. Drum is therefore DENIED. Drum may testify consistent with this ruling.

## VIII. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

Pega's Motion to Exclude Marshall, Doc. No. 811, is DENIED as to his discussion of the enterprise software procurement process, how the challenged statements might fit into that process, and his identification of the ninety-five competitive opportunities. Pega's Motion otherwise remains under advisement pending the Court's hearing on October 29, 2026.

Appian's Motion to Exclude McGahee, Doc. No. 831, is DENIED as to his corrective-advertising opinion. Appian's motion otherwise remains under advisement pending the Court's hearing on October 29, 2026.

Appian's Motion to Exclude Pearlson, Doc. No. 814, is DENIED.

Appian's Motion to Exclude Butler, Doc. No. 817, is DENIED.

Appian's Motion to Exclude Robinson, Doc. No. 823, is DENIED as to his opinions regarding the distinction between "information" and "software," but is otherwise ALLOWED.

Pega's Motion to Exclude Gianturco, Doc. No. 819, is ALLOWED.

Pega's Motion to Exclude Portions of Gianturco's Opinions, Doc. No. 878, is DENIED AS MOOT.

Pega's Motion to Exclude Vanderhart, Doc. No. 822, is ALLOWED as to the $2 billion disgorgement opinions but is otherwise DENIED.

Appian's Motion to Exclude Drum, Doc. No. 828, is DENIED.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge