UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PEGASYSTEMS INC.,<br><br>Plaintiff and<br>Counterclaim-Defendant,<br><br>v.<br><br>APPIAN CORPORATION,<br><br>Defendant and<br>Counterclaim-Plaintiff. | ) | Civil No. 23-11776-LTS |

MEMORANDUM AND ORDER ON MARSHALL MOTION IN LIMINE
(DOC. NO. 811) AND MCGAHEE MOTION IN LIMINE (DOC. NO. 831)

November 4, 2026

SOROKIN, J.

Pega and Appian brought eight motions in limine seeking to exclude the other's expert opinions and testimony. In a previous order, the Court resolved all but two of these motions: Pega's Motion to Exclude Dr. Marshall and Appian's Motion to Exclude Dr. McGahee. Doc. No. 889. The Court explained that it had concerns about the admissibility of portions of those experts' opinions, both of which attempt to quantify the harm caused by the various challenged statements in this case. See id. at 3–5. As a result, the Court scheduled a hearing for each party to show cause as to why such portions of the parties' respective expert opinions should not be excluded. Doc. No. 885. After extensive argument, the Court now resolves the remaining motions in limine. The Court starts with Pega's Motion to Exclude Marshall before turning to Appian's Motion to Exclude McGahee.

## I. PEGA'S MOTION TO EXCLUDE MARSHALL (DOC. NO. 811)

In its prior Order, the Court explained that Marshall could permissibly opine on "the enterprise software procurement process" and "factors that he believes generally influence this process." Doc. No. 889 at 3. The Court concluded that he was also qualified to "assess how the challenged statements in this case" might have factored into the procurement process. Id. (citation modified). And the Court determined that he could "identify ninety-five sales opportunities which he believed were competitive between the parties." Id. But the Court expressed concern about his subsequent conclusion that "the procurement decisions in the ninety-five competitive opportunities were 'reasonably likely to have been influenced' by the challenged Pega statements ('CPS')." Id. (quoting Doc. No. 813-1 at 96). As the Court noted in its order, Marshall's report did not explain what he meant by "influenced" or whether any influence was material. Id. Nor did he "seem to base his opinion upon a review of any of the actual procurement decisions at issue." Id.

However, Marshall clarified in his deposition that he understood "influence" to mean that something is "just one of many factors" which affect an outcome. Doc. No. 813-4 at 161. He explained that "influence" is not the same as a "causal relationship" between a factor and an outcome. Id. Moreover, he conceded that his report did not "provide any evidence" that "purchasing decisions were actually influenced by" the CPS for any of the ninety-five competitive opportunities. Id. at 417.

In light of these caveats, the Court concludes that Marshall has a sufficient basis for his opinion that the procurement decisions for the ninety-five opportunities were "reasonably likely to have been influenced" by the CPS. Doc. No. 813-1 at 96. The factual record, his experience, and his expertise permit him to opine that it is "reasonably likely" that the CPS were "just one of many factors" which played a role in these procurement decisions. Marshall has an adequate

foundation for this conclusion even if his report did not provide any evidence that "purchasing decisions were actually influenced by" the CPS. Doc. No. 813-4 at 417.

Pega's Motion to Exclude Marshall, Doc. No. 811, is therefore DENIED.

One issue related to Marshall's opinions remains. Another one of Appian's experts, Dr. Vanderhart, appeared to assume—based on Marshall's opinions—that the CPS caused Appian to lose out on the ninety-five competitive opportunities. See Doc. No. 827-2 at 33–34; see also id. at 42 (describing Appian's claim that deceptive nature of CPS "caused or is likely to cause damages to Appian"). From this foundation, Vanderhart performed, in essence, an accounting analysis which concluded that Appian was entitled to $109 million in disgorgement connected to these opportunities. See id. at 46–47. In its Motion to Exclude Vanderhart, Pega challenged the basis for this opinion, arguing that she had failed to demonstrate that the CPS "caused actual injury" or that the parties "were in direct competition for each of the ninety-five opportunities." Doc. No. 824-1 at 8–9 (citation modified). The Court rejected this challenge in its prior order, because "damages experts can permissibly assume various bases for their calculations as long as those assumptions are 'reasonable' and 'consistent with the evidence available to them.'" Doc. No. 889 at 9 (quoting Packgen v. Berry Plastics Corp., 847 F.3d 80, 88 (1st Cir. 2017)). To the extent that Pega challenged the assumptions underlying Vanderhart's opinions, the Court concluded that "those challenges [lay] elsewhere, including with Pega's" then-pending "motion to exclude Dr. Marshall's opinions." Id. But the Court noted that the admissibility of Vanderhart's opinions could be revisited "[i]f the assumptions underlying [her] opinions [were] excluded." Id. at 9 n.4.

The Court has now resolved the remainder of Pega's Motion to Exclude Marshall. Though the Court has not excluded Marshall's opinions, his testimony makes clear that he does

not opine on whether the CPS caused Appian to lose out on the ninety-five competitive opportunities. Doc. No. 813-4 at 161. Rather, he merely asserts that the CPS were reasonably likely to have been "one of many factors" which played a role in the procurement decisions for these opportunities. Id. Despite the qualified nature of Marshall's "influence" statement underlying Vanderhart's report, however, the Court declines to exclude Vanderhart at this time. Her opinions are still admissible for two reasons. If—as Appian asserted at the show-cause hearing—causation is not necessary for an award of disgorged profits, then the fact that Marshall's opinion is an insufficient basis from which to assume causation has no impact on Vanderhart's accounting. Conversely, if Appian must establish causation, it asserts that it can prove causation through fact witnesses for all or some of the ninety-five opportunities underlying Vanderhart's opinion. If Appian does so, her opinion is admissible to the extent that her accounting concerns opportunities for which other evidence supplies a reasonable basis to establish causation and other aspects of liability. In either case, of course, Pega is free to challenge either the assertion that causation is not necessary for an award of disgorged profits or Appian's efforts to establish causation if such a showing is required to sustain Vanderhart's accounting of damages.

## II. APPIAN'S MOTION TO EXCLUDE MCGAHEE (DOC. NO. 831)

McGahee's report seeks to "quantify the economic harm that Pega suffered as a result of the" challenged Appian statements ("CAS"). Doc. No. 833-2 at 30. In doing so, he divides this harm into four categories, three of which Appian challenges: corrective advertising, increased costs, and lost profits. Id. at 31. In its prior order, the Court concluded that his corrective-advertising opinion was admissible, "albeit just barely so." Doc. No. 889 at 4 n.2. But the Court had reservations about his increased-costs and lost-profits opinions. See id. at 4–5.

For both of these opinions, McGahee conducts a "before and after" analysis to determine how much the CAS harmed Pega. See Doc. No. 833-2 at 108, 135. Specifically, he asserts that, "around early 2023, Appian began to renew and amplify the dissemination of the CAS." Id. at 117, 141. He therefore divides his analysis into the period before and after this alleged increase in CAS, which he defines as the end of Q1 2023. Id. For purposes of this Order, the Court accepts the premise that Appian began to renew and amplify the dissemination of the CAS around this time and that the end of Q1 2023 is an appropriate cut-off date as a result. Appian's challenges on this point are—at this stage—about weight rather than admissibility.

McGahee then "assumes that, but for the Virginia litigation verdict and the dissemination of the CAS," Pega's annual contract value ("ACV") growth—and cost of incremental ACV—would have continued on the same trajectory. Id. at 114, 117, 138–39, 141 (citation modified). In other words, he assumes that only two things could have caused a change in the trajectory of Pega's ACV growth or cost of incremental ACV after Q1 2023: the Virginia verdict and the CAS. The Court also takes this to be true for the moment, though it will revisit this assumption shortly.

For the changes in Pega's ACV growth and cost of incremental ACV to represent the harm caused by the CAS, McGahee must—at the very least—demonstrate that these changes were not caused by the Virginia verdict. In an effort to do so, he asserts that, "by early 2023, the market would have been aware of the May 2022 Virginia verdict," so any additional changes "can reasonably be attributed to continued and increasing dissemination of the CAS as opposed to the Virginia verdict itself." Id. at 117, 141 (citation modified).

McGahee does not adequately explain why this would be so, and, as noted in its prior order, the Court has serious questions about this assumption. See Doc. No. 889 at 4–5. For one,

it is not clear that this conclusion is "even properly within" his "sphere of expertise." Id. at 4. McGahee is an economist. Doc. No. 833-2 at 6. He has no specific expertise with respect to the enterprise software industry, the relationship between litigation and a company's finances, or any other matter which might permit him to opine as to how long the Virginia verdict would affect Pega. To be sure, he could have used his economic expertise to, for instance, model the effect of large judgments on a company's finances and use that more generalized study to predict—with some foundation—how long the Virginia verdict might impact Pega in particular. But he did not do so. Nor did he make any other effort to establish a basis—economic or otherwise—for this assumption. The Court is left with his ipse dixit assertion that, "by early 2023, the market would have been aware of the May 2022 Virginia verdict." Id. at 117, 141 (citation modified). That is not enough under either Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), or the Federal Rules of Evidence. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

McGahee's qualifications aside, there is reason to doubt that Pega's finances would quickly reflect the Virginia verdict. As the Court flagged in its previous order, McGahee—like other experts in this case—acknowledges that the "the sales cycle" for "enterprise application software" is "often long, complex, and competitive." Doc. No. 889 at 4 (quoting Doc. No. 833-2 at 15); see also Doc. No. 813-1 at 32 (Appian expert Marshall describing enterprise software procurement process as "a structured, multi-stage evaluation process that can span three months to a year—and in some cases longer"); Doc. No. 816-3 at 14 (Pega expert Pearlson describing choice "to purchase a new enterprise software solution" as typically involving "a thorough, lengthy, and competitive purchasing process"). According to McGahee's own report, "twelve to twenty-four months is the typical duration of a sales cycle" for Pega's enterprise application software. Doc. No. 833-2 at 15 (citation modified). Under these circumstances, and absent a

necessary foundation, there is insufficient support for his assertion that the Virginia verdict would cease affecting Pega's ACV growth or cost of incremental ACV entirely in less than a year's time.

But even if the Court accepts McGahee's account of the Virginia verdict's impact, large holes remain in his lost-profits and increased-costs analyses. In evaluating proposed expert testimony, the Court must consider whether the expert "adequately accounts for obvious alternative explanations." Packgen, 847 F.3d at 87 (citation modified). As noted above, McGahee necessarily assumed that only two factors could have caused a change in the trajectory of Pega's ACV growth or cost of incremental ACV: the Virginia verdict and the CAS. He offers no basis grounded in economic analysis for this assumption, nor does he explain why it is defensible. Among other omitted variables, McGahee does not consider currency fluctuations, other competitors' statements rather than those made by Appian, Pega's own actions, or any number of other macroeconomic factors entirely unrelated to the CAS. For its part, Pega projected lower ACV growth in 2023 on account of uncertainty in the "general economic climate" and its decision to focus on existing customers rather than pursuing new ones. See Doc. No. 833-1 at 4. McGahee acknowledges neither factor in his analysis. Nor does McGahee account for the possibility that the CAS may have had an impact on purchasing decisions not because of their allegedly deceptive nature, but because they simply reminded potential customers of the existence of a large judgment against Pega. Absent any effort to engage with these or other factors, McGahee's conclusion that the changes he identifies "can reasonably be attributed to continued and increasing dissemination of the CAS" is without support and must be excluded. Doc. No. 833-2 at 117, 141 (citation modified).

One other issue concerning McGahee's opinions requires clarification. At the show-cause hearing, Pega insisted that McGahee does not—and need not—establish causation at all. Rather, Pega asserted that McGahee's role—like Vanderhart for Appian—was merely to provide an accounting of damages, whereas Pega will establish causation through "fact witnesses." See Doc. No. 909 at 89–90. In this respect, it is important to distinguish between two different types of causation relevant to McGahee's opinion.

First, there is the showing of causation which is required as an element of Pega's claims against Appian. For instance, with respect to Pega's Lanham Act claims, Pega must demonstrate that: (1) Appian made a false or misleading description or representation of fact in a commercial advertisement about its own or another's product; (2) the misrepresentation was likely to influence the purchasing decision; (3) the misrepresentation actually deceived or had the tendency to deceive a substantial segment of its audience; (4) Appian placed the false or misleading statement in interstate commerce; and (5) Pega was injured as a result of the misrepresentation. Cashmere & Camel Hair Mfrs. Int. v. Saks Fifth Ave., 284 F.3d 302, 310–11 (1st Cir. 2002). The final element is a showing of causation. With regards to this type of causation, Pega is correct that it may rely on fact witnesses to establish this element (or any other element) of its claims. So, too, may McGahee assume—as a foundation for his opinions—that Pega will be able to establish this or other elements necessary for liability as long as there is a "reasonable" basis for doing so. Packgen, 847 F.3d at 88. Simply put, "an expert is not required to establish every element of a claim to be admissible." Cohen v. Bos. Sci. Corp., No. 1:20-CV-00943-PB, 2024 WL 1287648, at *10 (D.N.H. Mar. 26, 2024).

Second, however, there is the showing of causation necessary to draw a link between the CAS and the changes in Pega's ACV growth or cost of incremental ACV which McGahee

identifies. To the extent Pega asserts that McGahee does not attempt to establish this type of causation, the Court disagrees. For one, this cannot be reconciled with his own report. Indeed, he expressly states his "opinion that there is economic evidence of a causal connection between the CAS and economic harm to Pega," which he quantifies in the form of corrective advertising, increased costs, lost profits, and reputational harm. Doc. No. 833-2 at 31. This makes good sense, of course, because McGahee's opinions have any value at all only if he can establish a causal connection between the harms he purports to identify and the CAS. Otherwise, the mere fact that Pega's ACV growth or cost of incremental ACV changed—without any connection to the CAS—tells the jury little to nothing at all.

Importantly, establishing the first form of causation—and all the other elements necessary to establish liability for the CAS—does not establish the second form of causation. In other words, assuming that the CAS harmed Pega still does not answer the question at the core of McGahee's report: how much did the CAS harm Pega? McGahee's effort to put a dollar amount on this figure only succeeds if he can demonstrate that the number he calculates has—at the very least—some relationship with the CAS. McGahee has not done so with respect to his lost-profits and increased-costs opinions.

Appian's Motion to Exclude McGahee, Doc. No. 831, is therefore ALLOWED as to McGahee's lost-profits and increased-costs opinions.[1]

## III. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

Pega's Motion to Exclude Marshall, Doc. No. 811, is DENIED.

[1] Consistent with the Court's prior order, Doc. No. 889, McGahee can testify as to his corrective-advertising and reputational-harm opinions. To the extent that Appian challenged his corrective-advertising opinion on the grounds that it risked "double-counting" with his increased-cost opinion, Doc. No. 832-1 at 22, this concern is now moot.

Appian's Motion to Exclude McGahee, Doc. No. 831, is ALLOWED as to McGahee's lost-profits and increased-costs opinions but is otherwise DENIED.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge