**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

PEGASYSTEMS INC.,

*Plaintiff/Counterclaim-Defendant*,

v.

APPIAN CORPORATION,

*Defendant/Counterclaim-Plaintiff*.

Civil Action No.: 23-cv-11776 (LTS)

Redacted Pending Sealing Motion
Motion to Seal Filed on November 10, 2026

**PLAINTIFF/COUNTERCLAIM-DEFENDANT PEGASYSTEMS INC.'S AND DEFENDANT/COUNTERCLAIM-PLAINTIFF APPIAN CORPORATION'S JOINT PRETRIAL MEMORANDUM**

# LIST OF EXHIBITS IN JOINT PRETRIAL ORDER


STATEMENT OF FACTS ESTABLISHED BY THE PLEADINGS, BY ADMISSIONS, OR BY STIPULATIONS

| | |
|---|---|
| Plaintiff | Exhibit 1 |

FACTUAL ISSUES IN DISPUTE

| | |
|---|---|
| Plaintiff | Exhibit 2 |
| Defendant | Exhibit 3 |

ISSUES OF LAW

| | |
|---|---|
| Plaintiff | Exhibit 4 |
| Defendant | Exhibit 5 |

WITNESSES

| | |
|---|---|
| Plaintiff | Exhibit 6 |
| Defendant | Exhibit 7 |

LIST OF UNCONTESTED EXHIBITS

| | |
|---|---|
| Joint | Exhibit 8 |

LIST OF EXHIBITS TO BE OFFERED AT TRIAL

| | |
|---|---|
| Plaintiff | Exhibit 9 |
| Plaintiff (Provisionally Designated) | Exhibit 10 |
| Defendant | Exhibit 11 |

# TABLE OF CONTENTS

**Page**


I. SUMMARY OF THE EVIDENCE ........ 1

A. Summary of the Evidence to be Offered by Plaintiff ........ 1

1. Plaintiff Pega Will Show that Defendant Appian Committed Defamation, Trade Libel, and False Advertising that Caused Pega $40 Million in Damages ........ 1

i. Defamation ........ 2

1. Appian's Social Media Ads ........ 2

2. Appian's PRP Presentations ........ 3

3. Appian's May 10, 2022 Press Release ........ 3

4. Appian's Microsite ........ 4

5. The Thompson Email ........ 5

ii. Trade Libel ........ 5

1. Appian's Social Media Ads ........ 6

2. Appian's PRP Presentations ........ 6

iii. False Advertising (Lanham Act) ........ 7

1. Appian's Social Media Ads ........ 7

2. Appian's PRP Presentations ........ 8

3. Appian's May 10, 2022 Press Release and Microsite ........ 8

2. Plaintiff Pega Will Show that Defendant Appian Cannot Meet Its Burden on Its Remaining Counterclaims (Lanham Act, Chapter 93A, Declaratory Judgment) ........ 9

i. Appian will fail to meet its burden to show Pega committed false advertising in violation of the Lanham Act ........ 9

1. Each of these statements is true and not misleading ........ 9

a. Mr. Petronio hired a contractor ........ 9

b. Mr. Petronio told Appian lawyers the story ........ 10

c. Appian's product was widely available ........ 10

d. A small number of Pega employees accessed public Appian free trials ........ 10

e. Pega has the financial strength to pay a judgment if it ever becomes necessary ........ 10

2. There is no evidence of actual consumer deception, materiality, or intent to deceive ........ 11

**TABLE OF CONTENTS**
(continued)

**Page**


3. There is no evidence Appian was injured by direct diversion of sales ... 11

ii. Appian cannot demonstrate a violation of Chapter 93A because Appian will fail to meet its burden to show Pega violated the Lanham Act ... 11

iii. Appian cannot demonstrate it is entitled to a declaratory judgment because Pega will prevail on its claims ... 12

B. Summary of the Evidence to be Offered by Defendant ... 12

II. STATEMENT OF FACTS ESTABLISHED BY THE PLEADINGS, BY ADMISSIONS, OR BY STIPULATIONS ... 15

A. Pega's Statement of Facts Established by the Pleadings, by Admissions, or by Stipulations ... 15

B. Appian's Statement of Facts Established by the Pleadings, by Admissions, or by Stipulations ... 16

III. FACTUAL ISSUES IN DISPUTE ... 16

IV. JURISDICTIONAL ISSUES ... 16

A. Pega's Statement on Jurisdictional Issues ... 16

B. Appian's Statement on Jurisdictional Issues ... 17

V. ISSUES RAISED BY PENDING MOTIONS ... 17

A. Pega's Issues Raised by Pending Motions ... 17

B. Appian's Issues Raised by Pending Motions ... 19

VI. ISSUES OF LAW ... 19

VII. AMENDMENTS TO THE PLEADINGS ... 20

A. Pega's Statement on Amendments to the Pleadings ... 20

B. Appian's Statement on Amendments to the Pleadings ... 20

VIII. MATTERS TO AID IN THE DISPOSITION OF THE CASE ... 20

Pega's Position ... 20

A. Trial Time and Presentation ... 20

B. Witnesses ... 21

C. Identification of Witnesses ... 22

D. Deposition Designations ... 23

E. Exhibits ... 25

**TABLE OF CONTENTS**
(continued)

**Page**


F. Identification of Exhibits and Demonstratives ... 29
1. Exhibits and Demonstratives for Opening Statements ... 29
2. Exhibits ... 29
3. Demonstratives and Summary Exhibits ... 30
4. Admissions Read Into the Record ... 32
5. Exhibits and Demonstratives for Closing Arguments ... 33
G. Identification of Deposition Testimony and Exhibits ... 33
H. Emails to the Court Containing Nightly Disputes ... 35
I. Resolution of Disputes ... 36
J. Set Up of Electronic Equipment ... 36
K. Confidentiality ... 37
L. Jury Notebooks ... 37
M. Witness Binders ... 38
N. Post-Trial Status Report and Motions ... 38
O. Other Stipulations ... 38
P. Court's Preference ... 39
Appian's Position ... 40
IX. LENGTH OF TRIAL ... 47
X. WITNESSES ... 47
XI. LIST OF UNCONTESTED EXHIBITS ... 47
XII. LIST OF EXHIBITS TO BE OFFERED AT TRIAL ... 47
XIII. REMAINING OBJECTIONS TO EVIDENCE ... 48

Pursuant to the Court's April 1, 2025 Order Setting Case for Trial (Doc. No. 195, ¶ 5) and Local Rule 16.5(d), Plaintiff/Counterclaim-Defendant Pegasystems Inc. ("Pega") and Defendant/Counterclaim-Plaintiff Appian Corporation ("Appian") (together, the "Parties") file this Joint Pretrial Memorandum in advance of the November 23, 2026 Final Pretrial Conference.

# I. SUMMARY OF THE EVIDENCE

## A. Summary of the Evidence to be Offered by Plaintiff

### 1. Plaintiff Pega Will Show that Defendant Appian Committed Defamation, Trade Libel, and False Advertising that Caused Pega $40 Million in Damages

1. Plaintiff Pega asserts three causes of action—defamation, trade libel, and false advertising—against Defendant Appian and seeks to recover approximately $41.7 million in damages in the form of lost profits, increased costs, and corrective advertising to compensate Pega for the harm it incurred as a result of Appian's defamatory, false, and misleading public statements about Pega and its products and services. Pega's claims are based on a series of statements in which Appian intentionally and misleadingly asserted or suggested that (1) Pega was found guilty of a crime in the Virginia Litigation, (2) Pega's "viability" was in question because Pega had to immediately pay Appian a $2.1 billion judgment as a result of the jury verdict in the Virginia Litigation, and (3) that Pega's Founder and CEO, Alan Trefler, had used aliases to gain improper access to Appian's software. The statements are as follows:

| No. | Category of Statement | Publication | Pega's Cause of Action |
|---|---|---|---|
| 1 | Viability Statements | • Four social media ads on Facebook and LinkedIn[1]<br>• A Pega Replacement Program ("PRP") Presentation sent to more than a dozen of Pega's customers or potential customers[2] | Defamation, Trade Libel, False Advertising |

[1] Doc. No. 804 at 25–28, 46–48, 98; PX_MA 0802; PX_MA 0803; PX_MA 0804; PX_MA 0805.
[2] Doc. No. 804 at 28–31; 98 (materially identical copies of the PRP Presentation was sent to AbbVie, JPMorgan Chase, and Leidos); PX_MA 3827; PX_MA 3828.

| | | | |
|---|---|---|---|
| 2 | Trefler Statements | • Appian's May 10, 2022 press release[3]<br>• Appian's microsite[4] | Defamation, False Advertising |
| 3 | Criminality Statement | • February 8, 2023 Email from Mr. Thompson[5] | Defamation |

Organized by cause of action, Pega's claims are based on the following statements:

| No. | Cause of Action | Publication |
|---|---|---|
| 1 | Defamation | • Social Media Ads (Viability)<br>• PRP Presentation (Viability)<br>• Press Release (Trefler statements)<br>• Microsite (Trefler statements)<br>• Thompson Email (Criminality) |
| 2 | Trade Libel | • Social Media Ads (Viability)<br>• PRP Presentation (Viability) |
| 3 | False Advertising | • Social Media Ads (Viability)<br>• PRP Presentation (Viability)<br>• Press Release (Trefler statements)<br>• Microsite (Trefler statements) |

Pega's evidence will establish that the circumstances surrounding Appian's making and publication of each statement meets all of the elements for each cause of action pleaded with respect to that statement.

**i. <u>Defamation</u>**

2. Pega's claim for defamation is premised on all three categories of statements and all the published statements at issue. The evidence will show that Appian published false statements of fact about Pega, that Appian published those false statements knowingly or with reckless disregard of their falsity, and that these false statements are actionable without proof of economic loss but that Pega suffered economic loss as a result of the false statements nonetheless.

***1. Appian's Social Media Ads***

3. Pega's evidence will show that, in the Summer of 2023, Appian created and paid for four different advertisements to be published on LinkedIn and Facebook that each falsely stated

[3] Doc. No. 804 at 31–34, 53–54, 98; PX_MA 1336.
[4] Doc. No. 804 at 31–34, 53–54, 98; PX_MA 0036.
[5] Doc. No. 804 at 12, 20–22, 98; PX_MA 2845.

that Pega had not appealed the $2.1 billion VUTSA verdict, that each falsely stated that Pega's decision not to appeal was "breaking news," and that each misleadingly suggested that Pega owed Appian $2.1 billion immediately. The Court has already found that the Social Media Ads falsely state that Pega had not appealed the $2.1 billion judgment. The evidence will show that when Appian caused these four advertisements to be published, Appian knew each of these statements were false and/or misleading. The evidence will show that Appian knew Pega had appealed the $2.1 billion verdict in September 2022 and knew that Pega did not and would not owe any amount to Appian for months if not years while the appeal process played out. The evidence will show that these four advertisements were designed to and did cause Pega pecuniary loss in the form of lost profits and increased costs.

**2. *Appian's PRP Presentations***

4. Pega's evidence will show that Appian published to more than a dozen of Pega's customers or potential customers PRP PowerPoint Presentations that stated "Pega to Pay Appian $2 Billion in Damages" and that "This is now a final verdict, not an ongoing lawsuit." The evidence will show that Appian knew these statements were false when they were made and when they were published. The evidence will show that Appian created and published these PRP Presentations months after it knew Pega had appealed the $2.1 billion verdict, knew that Pega did not and would not owe any amount to Appian for months if not years, and knew that the verdict was not final. The evidence will show that Appian published these statements in order to harm Pega by stealing Pega's customers. The evidence will show that Appian did harm Pega with the publication of these statements in the form of lost profits and increased costs.

**3. *Appian's May 10, 2022 Press Release***

5. Pega's evidence will show that Appian executives, PR professionals, and lawyers carefully drafted and published a press release about the Virginia Litigation that included the

statements that Appian "presented undisputed evidence that Pegasystems employees used false identities to obtain access to Appian information and trial versions of Appian's software, which were then used for competitive purposes" and that Pega's CEO, "Mr. [Alan] Trefler himself admitted to using an alias, 'Albert Skii' to obtain access to Appian information." The evidence will show that these statements (and others) together falsely state that Pega's CEO, Alan Trefler, personally used an alias to access Appian's software or confidential information. The evidence will show that Appian's press release was published to more than 100 million individuals. The evidence will also show that there is no dispute that Appian knew that the Virginia trial evidence did not show that Mr. Trefler personally used an alias to access Pega's software or confidential information and yet published the press release despite this knowledge. Pega's evidence will show that Appian intended that the statements in its press release to harm Pega and that the statements in Appian's press release did harm Pega in the form of lost profits and increased costs.

### 4. *Appian's Microsite*

6. Pega's evidence will show that, like the Appian press release, Appian executives, PR professionals, and lawyers carefully drafted and published a "microsite" on Appian's website that included the statements "'Albert Skii'… [i]s an alias used by Pega CEO Alan Trefler to access Appin information" and "This was not one employee gone rogue. From the top of the organization to the bottom, many inside Pega were doing it. Even a Pega intern gained improper access to Appian software, but unlike the CEO, at least he used his real name." The evidence will show that these statements (and others) together falsely state that Pega's CEO, Alan Trefler, personally used an alias to access Appian's software or confidential information. The evidence will show that Appian's microsite received over 52,000 page views and that individuals from more than 1,200 entities visited Appian's microsite, including many of Pega's customers and potential customers. As with the Press Release, the evidence will also show that there is no dispute that Appian knew

that the Virginia trial evidence did not show that Mr. Trefler personally used an alias to access Pega's software or confidential information and yet published the microsite despite this knowledge. Pega's evidence will show that Appian intended that the statements in its microsite to harm Pega and that the statements in Appian's microsite did harm Pega in the form of lost profits and increased costs.

**5. *The Thompson Email***

7. Pega's evidence will show that Mr. David Thompson, an Appian sales associate, wrongly suggested that Pega had been found guilty of criminal misconduct in an email solicitation to a Pega customer. The evidence will show that Mr. Thompson made these statements despite knowing the statement was false because Appian told all of its employees that the statement that Pega was found guilty of anything in the Virginia Litigation was false. The evidence will show that Mr. Thompson knowingly disregarded that Pega was not found guilty of any crime when he called Pega a criminal in his email in order to try to steal Pega's business. And, although evidence of loss is not required because calling Pega a criminal is defamation *per se*, the evidence will show that Pega suffered pecuniary loss in the form of increased costs and decreased profits.

**ii. <u>Trade Libel</u>**

8. Pega's claim for trade libel is premised on the viability category of statements, specifically Appian's Social Media Ads and PRP Presentations. The evidence will show that Appian published false statements to a third person of and concerning Pega's products or services with knowledge of the statements' falsity and/or with a reckless disregard of truth or falsity. The evidence will show that Appian intended the statements to cause pecuniary harm to Pega, that pecuniary harm was foreseeable, and that Pega did in fact suffer pecuniary loss as a result of Appian's false statements.

9. Because the elements of defamation and trade libel overlap, Pega sets forth below only the evidence that will support the elements unique to Pega's trade libel claim.

**1. *Appian's Social Media Ads***

10. Pega's evidence will show that Appian, its expert witness, and Pega's expert witness all acknowledge that the continued viability of Pega as an enterprise software provider is a component of the service that Pega provides. The evidence will show that Appian's false statements in its Social Media Ads that together misleadingly suggest Pega was required to immediately pay Appian a $2.1 billion judgment, misleadingly suggest that Pega was no longer viable and would cease to operate and cease to provide its products and services. Pega will show that it was foreseeable to Appian that publishing false statements to hundreds of thousands of people, including Pega's customers and potential customers, that Pega was no longer viable would cause Pega pecuniary harm. And the evidence will show Appian intended to cause Pega pecuniary harm by publishing the Social Media Ads. Pega's evidence will show with expert, documentary, and testimonial evidence that the Social Media Ads were a substantial factor in its customers' decisions to reduce or eliminate its contracts with Pega. Accordingly, Pega's evidence will show it suffered special damages and pecuniary loss in the form of lost profits.

**2. *Appian's PRP Presentations***

11. The same evidence will show that Appian's PRP Presentations—which similarly falsely and misleadingly assert Pega will no longer be viable as a result of having to immediately pay Appian a $2.1 billion judgment—concern Pega's products and services and that it was foreseeable and intended by Appian that the publication of the PRP Presentations would cause Pega pecuniary harm in the form of lost customers and lost business. Pega will show with expert, documentary, and testimonial evidence that the PRP Presentations were a substantial factor in its customers' decisions to reduce or eliminate its contracts with Pega, and forced Pega to spend a

significant amount of money on corrective advertising. Accordingly, Pega's evidence will show it suffered special damages and pecuniary loss in the form of lost profits.

### iii. <u>False Advertising (Lanham Act)</u>

12. Pega's false advertising Lanham Act claim is premised on the viability and Trefler categories of statements. The evidence will show that Appian published false or misleading representations of fact in interstate commercial advertising about Pega's product, that were likely to (and in fact did) influence Pega's customers and potential customers purchasing decisions. The evidence will show that Appian's misrepresentations had a tendency to and did in fact deceive a substantial segment of the population and that Pega was harmed by Appian's misrepresentations in the form of direct diversion of sales and by a lessening of goodwill.

13. Because the elements of false advertising overlaps with the elements of both defamation and trade libel, Pega sets forth below only the evidence that will support the elements unique to Pega's false advertising claim.

#### 1. *Appian's Social Media Ads*

14. Pega's evidence will show that Appian specifically developed criteria to target the Social Media Ads to Pega's customers or potential customers. Pega does not need to show actual consumer deception with respect to the Social Media Ads because the Court found that the ads falsely state that Pega had not appealed the $2 billion judgment. Pega's expert evidence will show, however, that the Ads had a tendency to deceive and did deceive consumers and that Appian intended the Ads to deceive consumers. Pega's evidence, including expert evidence, will show that the Social Meda Ads were a material factor in the recipients' purchasing decisions. And Pega's evidence will show that it suffered damages in the form of lost profits (diversion of sales), increased costs, corrective advertising costs, and lost goodwill.

### 2. *Appian's PRP Presentations*

15. Pega's evidence will similarly show that Appian's PRP Presentations were targeted to more than a dozen of Pega's key customers or potential customers. Pega similarly does not need to show actual consumer deception with respect to the PRP Presentations because Pega's evidence will show that the statements "Pega to Pay Appian $2 Billion in Damages" and "This is now a final verdict, not an ongoing lawsuit" are both literally false. Nevertheless, Pega's evidence will show that Appian knew these statements were false, intended for these statements to deceive, and that these statements had a tendency to deceive and did deceive the recipients. Pega's evidence, including expert evidence, will show that the PRP Presentations were a material factor in the recipients' purchasing decisions. And Pega's evidence will show that it suffered damages in the form of lost profits (diversion of sales), increased costs, corrective advertising costs, and lost goodwill.

### 3. *Appian's May 10, 2022 Press Release and Microsite*[6]

16. Pega's evidence will show that Appian's Press Release and Microsite was targeted to reach the individuals who make purchasing decisions at Pega's customers and potential customers. Because Pega's evidence will show that the statements concerning Mr. Trefler in Appian's Press Release and Microsite are literally false or false by necessary implication, Pega does not need to show actual consumer deception. Nevertheless, Pega's evidence will show that Appian knew these statements were false, intended for these statements to deceive, and that these statements had a tendency to deceive and did deceive the recipients. Pega's evidence, including expert evidence, will show that the statements on the Press Release and Microsite were material factors in the recipients' purchasing decisions. And Pega's evidence will show that it suffered

---

[6] Because Pega's evidence in support of its false advertising claim regarding Appian's Press Release and Microsite largely overlaps, Pega addresses them together.

damages in the form of lost profits (diversion of sales), increased costs, corrective advertising costs, and lost goodwill.

### 2. Plaintiff Pega Will Show that Defendant Appian Cannot Meet Its Burden on Its Remaining Counterclaims (Lanham Act, Chapter 93A, Declaratory Judgment).

17. Appian's remaining counterclaims are premised on five statements all from Pega's microsite: (1) that "John Petronio hired a part-time contractor through a staffing firm [and] guided and supervised the contractor"; (2) that "Mr. Petronio told Appian lawyers the story that became the basis for this case"; (3) that Appian's "product" was "widely available"; (4) that a "handful" or "small number of [Pega] employees accessed public Appian free trials that Appian wanted to keep closed to Pega"; and (5) that "Pega has the financial strength to pay a judgment if it ever becomes necessary." As set forth below, the evidence will show that Appian is unable to meet the required elements to demonstrate that any of these statements violate the Lanham Act or Chapter 93A.

#### i. <u>Appian will fail to meet its burden to show Pega committed false advertising in violation of the Lanham Act</u>.

##### 1. *Each of these statements is true and not misleading*.

##### a. Mr. Petronio hired a contractor.

18. The evidence will show this is true, and Appian does not contend otherwise. The evidence will show that it is true that Mr. Petronio hired a contractor from K Force. The evidence will show that it was Mr. Petronio's idea to hire a contractor and to conduct the competitive intelligence activities at issue. The evidence will show that Mr. Petronio bore primary responsibility for the alleged misconduct and had the only meaningful role in the conduct underlying the Virginia litigation. In the alternative, Pega will show that this was an opinion, not actionable under the Lanham Act.

**b. Mr. Petronio told Appian lawyers the story.**

19. The evidence will show this is true, and Appian does not contend otherwise. The evidence will show that it is true that Mr. Petronio had a meeting with Appian's lawyers where he told them the story that became the basis of the Virginia Litigation. In the alternative, Pega will show that this was an opinion, not actionable under the Lanham Act.

**c. Appian's product was widely available**.

20. The evidence will show this is true. Appian does not dispute that the evidence shows tens of thousands of users had access to Appian's product. Fact and expert evidence will show that Appian's product was widely accessible, not merely used by many customers. In the alternative, Pega will show that this was an opinion, not actionable under the Lanham Act.

**d. A small number of Pega employees accessed public Appian free trials**.

21. The evidence will show this is true. Appian does not dispute that the evidence shows that fewer than twelve Pega employees accessed Appian's trial. The evidence will show those trials were free. And the evidence will show that the trials were available to the public, including Pega employees. In the alternative, Pega will show that this was an opinion, not actionable under the Lanham Act.

**e. Pega has the financial strength to pay a judgment if it ever becomes necessary**.

22. The evidence will show Pega did not say it had the ability to pay the $2.1 billion judgment in cash on May 9, 2023, but merely that Pega had the ability to pay a judgment at whatever amount after all appeals were exhausted. The evidence, including expert evidence from both parties, will show that Pega did have the ability to pay a judgment of $2.1 billion in the short term without selling the company. The evidence will show that both parties knew Pega had no

obligation to pay any judgment in the short term. In the alternative, Pega will show that this was an opinion, not actionable under the Lanham Act.

**2. *There is no evidence of actual consumer deception, materiality, or intent to deceive*.**

23. The Court has recognized there is no evidence that any consumer, much less a substantial portion of the consuming public was deceived by any of these five statements. Similarly, there is no fact evidence that any statement was material or was likely to have materially influenced a consumer's purchasing decision. The expert evidence will show that these five statements are not likely to have materially influenced a consumer's purchasing decision. The evidence will also show that none of these statements were made with the intent to deceive as each states a true fact and, in context of Pega's nine-page microsite concerning its litigation positions, are not misleading.

**3. *There is no evidence Appian was injured by direct diversion of sales*.**

24. Because there is no evidence that any consumer was deceived by these statements, Appian will be unable to demonstrate that any of these statements resulted in a direct diversion of sales.

**ii. <u>Appian cannot demonstrate a violation of Chapter 93A because Appian will fail to meet its burden to show Pega violated the Lanham Act</u>.**

25. The Court found at summary judgment that Appian's 93A "counterclaim for false advertising must proceed, if at all, on an unfair methods of competition theory." Order 96. Additionally, the Court held that "Appian does not offer, to any meaningful degree, separate arguments in support of its Chapter 93A claim, and thus to the extent its other [Lanham Act] bases for relief fail, so does its Chapter 93A claim." Order at 97. As explained above, the evidence will demonstrate that Appian will be unable to meet each of the elements of its false advertising claim.

Additionally, the evidence will demonstrate that any statement constituted an extreme or egregious business wrong. Accordingly, the evidence will demonstrate that Appian cannot establish a violation of Chapter 93A.

**iii. <u>Appian cannot demonstrate it is entitled to a declaratory judgment because Pega will prevail on its claims</u>.**

26. Appian seeks declaratory judgment that it "did not defame Pega, commit trade libel, or violate the Lanham Act." Doc. No. 44 at 72. The Court held that "[j]udgment for Appian shall issue on its declaratory judgment counterclaim to the same extent judgment enters for Appian on Pega's affirmative claims." Doc. No. 804 at 56. As explained above, the evidence will demonstrate that Pega is entitled to judgment on each of its claims for defamation, trade libel, and false advertising. Accordingly, the evidence will show Appian is not entitled to declaratory judgment.

**B. Summary of the Evidence to be Offered by Defendant**

27. The evidence will show that Pega engaged in a years-long scheme to obtain Appian's confidential information through improper means, was held liable by a Virginia jury, and then—facing what it privately called an "existential" threat—deceived customers about what it had done. Doc. No. 693 ¶¶ 2, 74. The evidence will also show that the Appian statements Pega challenges were true, were not published with actual malice, and caused Pega no harm. On the other hand, the statements that Pega made were false and misleading, and benefited Pega and caused harm to Appian.

28. Beginning in 2012, Pega retained Youyong Zou, who had access to Appian's software for his work as an Appian developer working for a government contractor. Pega chose Zou because he was not "loyal" to Appian and Pega internally referred to him as "our spy." Doc. No. 693 ¶¶ 2, 5. Zou demonstrated Appian's software to Pega's senior leadership, including CEO

Alan Trefler, and Pega used what it learned to improve its own competing software and revise its sales materials. After Zou stopped working with Pega some years later, Pega employees obtained access to Appian trials through means such as fake personas and a fake company. Part of that work was done to respond to demands for information about Appian by Pega's CEO Alan Trefler.

29. Appian filed a lawsuit in Virginia after learning about Pega's conduct in 2020. That case came to trial in 2022. The Virginia jury found that Pega willfully and maliciously misappropriated Appian's trade secrets and violated the VCCA, a finding Pega did not appeal. Although the judgment was later vacated, both Virginia appellate courts rejected Pega's argument that Appian had no trade secrets.

30. Pega then built a microsite that it told customers "spell[ed] out exactly the facts." Doc. No. 693 ¶¶ 86–87. The microsite named John Petronio as the only Pega employee tied to Zou's work and called Appian's case his "story," though the work reached Pega's most senior executives. Doc. No. 696-180 (PEGA776_00008270) at -274. It also described Pega's access to Appian's "public" trials as the work of a "handful" of employees and Zou's information as "widely available," *id*. at -277–278, although Appian's terms barred competitors, many Pega employees acknowledge the difficulty of getting any access to Appian, and Pega's own counsel acknowledged the information was "not available to the general public." Doc. No. 693 ¶ 77.

31. Responding to an outpouring of customer concern after the verdict, Pega told customers that it "has the financial strength to pay a judgment if it ever becomes necessary" and "the financial strength to support, even in the worst case, Pega's business continuity." Doc. No. 693 ¶¶ 94, 523. Pega made that assurance before it had even considered how it might pay. When Pega finally analyzed its options weeks later, none came close: third-party debt, convertible debt, and a private placement each fell well short of the more than $2 billion judgment. Pega's financial

advisor later found "Limited Capacity to Cover Litigation," while Pega held only about $297.2 million in cash and marketable securities. Doc. No. 693 ¶¶ 491, 505. Appian's expert, Dr. Jennifer Vanderhart, will testify that Pega did not have the liquidity to pay the judgment and that it would have been difficult, if not impossible, for Pega to obtain $2 billion through debt.

32. As to Pega's claims, the Trefler Statements are true: Trefler admits using the alias "Albert Skii" to obtain Appian information and accessing Appian's software through Zou and Trefler's subordinates. Appian's social-media advertisements accurately reported the verdict and Pega's decision not to appeal the VCCA finding, and linked to a microsite disclosing Pega's pending appeal. As to the Thompson Email, the word guilty encompasses civil liability and Pega's own executives, including Trefler, used that word to describe the civil verdict. Regardless, Appian instructed its sales force not to use the word "guilty." Importantly, Pega did not suffer any serious financial loss as a result of the statement—a requirement of English law. Appian's expert, Mr. Garland, will testify that the VCCA verdict exposed Pega to a genuine risk of debarment from government contracting. No one responsible for these publications intended the implications Pega alleges or doubted their truth.

33. Appian's procurement expert, Dr. Richard Marshall, will testify that sophisticated enterprise buyers treat vendor compliance, integrity, financial viability, and leadership accountability as material, but that the Appian statements Pega challenges do not map onto those categories and that buyers engage in a deliberate evaluation process. Dr. Marshall will analyze Pega records to testify that Appian competed with Pega for ninety-five opportunities that Pega won, and that Pega's reassurances influenced those procurement decisions. Appian will also offer evidence that Pega contacted customers within those opportunities about the verdict, and that many of those customers first contacted Pega with concerns about its viability and ethics. Pega assuaged

those concerns through one-on-one meetings with its executives and sales teams and through written materials containing the Challenged Pega Statements, such as Pega's microsite and 8-K statements. The assurances worked: as an example, after Pega's reassurance, one customer responded that its "commitment with PEGA is now reinforced" and awarded several opportunities to Pega over Appian. Doc. No. 693 ¶¶ 523–524. Dr. Vanderhart will calculate Pega's unjust enrichment of $109,502,355 and Appian's lost profits of $31,867,066 from those ninety-five opportunities.

34. Finally, the evidence will show that Pega suffered no harm. Pega repeatedly told the market that the litigation was not affecting its business, and Dr. McGahee's opinions to the contrary have all been excluded. The evidence will also show that Appian devoted minimal resources to the challenged statements, a small fraction of the more than $7 million Dr. McGahee claims is needed to counteract them. And even that opinion is fundamentally flawed. Pega has already addressed Appian's statements in the market and has adduced no evidence of any costs associated with doing so.

## II. STATEMENT OF FACTS ESTABLISHED BY THE PLEADINGS, BY ADMISSIONS, OR BY STIPULATIONS

### A. Pega's Statement of Facts Established by the Pleadings, by Admissions, or by Stipulations

35. Pega's Statement of Facts Established by the Pleadings, by Admission, or by Stipulations is attached as **Exhibit 1**.[7]

[7] Appian refused to engage in conferral about providing the Court with undisputed facts. Pega's statement includes facts that Appian has already acknowledged in the pleadings and other filings, including its summary judgment briefing and response to Pega's Statement of Undisputed Material Facts submitted in support of Pega's motion for summary judgment.

### B. Appian's Statement of Facts Established by the Pleadings, by Admissions, or by Stipulations

36. The parties have not stipulated to any facts for purposes of trial. To the extent Pega's Statement of Facts Established by the Pleadings, by Admissions, or by Stipulations describes any fact as established, Appian does not agree that the fact is established or accept Pega's characterization of it, except to the extent the fact is expressly admitted in Appian's pleadings. Appian reserves all objections to Pega's statement.

## III. FACTUAL ISSUES IN DISPUTE

37. Pega's Factual Issues in Dispute are attached as **Exhibit 2**.

38. Appian's Factual Issues in Dispute are attached as **Exhibit 3**.

## IV. JURISDICTIONAL ISSUES

### A. Pega's Statement on Jurisdictional Issues

39. Pega identifies no jurisdictional issues in dispute.

40. The Court has subject matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. § 1331 because Pega's claims involve alleged violations of the Lanham Act. The Court has supplemental jurisdiction over the state-law claims at issue under 28 U.S.C. § 1367. The Court also has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

41. Pega's understanding is that the parties do not contest personal jurisdiction or jurisdiction over the subject matter of Pega's or Appian's claims.

### B. Appian's Statement on Jurisdictional Issues

42. Appian identifies no unresolved question concerning this Court's jurisdiction.[8]

## V. ISSUES RAISED BY PENDING MOTIONS

### A. Pega's Issues Raised by Pending Motions

#### 1. Choice of Law That Applies to the Thompson "Criminality" Email (Doc. No. 892)

43. On September 29, 2026, Appian filed a motion for leave to file a second motion for partial summary judgment, or, in the alternative, for partial dismissal on *forum non conveniens* grounds as to the sole claim by Pega related to the remaining "criminality statement" – i.e., the "Thompson email." Doc. No. 836. Appian's motion raised the question of "whether English law rather than Massachusetts law governs and forecloses the remaining criminality claim, or alternatively, whether the claim should be heard in an English forum rather than in this District." *Id.* at 2. Pega filed its opposition on October 20. Doc. No. 887.

44. On October 22, the Court entered an Order denying Appian's motion for leave to file a second motion for summary judgment, as well as its motion in the alternative for partial dismissal on *forum non conveniens* grounds. Doc. No. 892. The Court found that Appian's motion "comes too late" and "[e]ven if allowed, it saves too little to justify the effort at this point" and "it would impose too great a burden on the parties as well as UK courts." *Id.* at 2. In that same Order, the Court asked the parties to brief the following issues:

1. Has Appian forfeited the right to assert that UK law applies to the Thompson "Criminality" email?

[8] Appian moved in the alternative to dismiss Pega's defamation claim as to the Thompson Email on forum non conveniens grounds. DOC. No. 836. The Court denied that request. DOC. No. 892 at 1–2. Appian respectfully maintains its position that the Thompson Email—published in the United Kingdom, by a UK author, to a UK government recipient, concerning a UK government contract—should be adjudicated in the United Kingdom, and it preserves that objection for appeal.

2. If not, must the Court apply the same law to all three categories of the allegedly defamatory statements advanced under Count I?

3. If not, should the Court apply UK law to the Thompson "Criminality" email?

4. If so, what is the UK law governing the allegedly defamatory statement?

*Id.* at 3. Appian filed its brief on October 28. Doc. No. 906. Pega's opposition was filed on November 9. Doc. No. 919. Appian may file a reply by November 12. Doc. No. 892 at 3.

**2. Pega's Motion to Modify the Protective Order (Doc. No. 916)**

45. On November 6, 2026, Pega filed a motion to modify the Massachusetts Protective Order to allow discovery material produced in this action and designated Confidential or Highly Confidential "to be disclosed to Judge Oblon, his staff, the jury, and witnesses in the upcoming retrial" of the Virginia Litigation, *Appian Corp. v. Pegasystems Inc.*, No. CL-2020-07216 (Va. Fairfax Cnty.). Doc. No. 916 at 1.

46. Pega argues that the Massachusetts Protective Order does not limit use of discovery material to this action. The Order does, however limit who may see material designated Confidential or Highly Confidential, and that group does not include Judge Oblon, his staff, or the Virginia jury. Doc. No. 917 at 2, 4. Pega relies on the August 5, 2026, order in the Virginia Litigation in which Judge Oblon, acting *sua sponte*, modified the Virginia Protective Order to permit use in this action of all discovery produced in the Virginia Litigation." *Id.* at 2, 4–5. And, in response to Appian's inquiry whether discovery produced in Massachusetts would be available in the Virginia Litigation, Judge Oblon told the parties to seek reciprocal that relief from this Court, stating "[G]ive this order to Judge Sorokin. I'm sure Judge Sorokin will exercise comity." *Id.* at 1–2, 6.

47. Pega accordingly proposes two modifications to the Massachusetts Protective Order. The first is to add a new Paragraph 10 that permits Confidential and Highly Confidential

material to be shown to Judge Oblon and the Virginia jurors and witnesses as part of the Virginia trial. The second is a revision to the deletion obligations, and states that the parties do not need to delete Massachusetts discovery material until both litigations are finally resolved. *Id.* at 9.

48. Appian bears the burden of showing good cause to keep the current restrictions in place and Appian cannot meet that burden as it will suffer no prejudice other than a loss of a perceived tactical advantage Appian appears to believe it gains in Virginia by cabining Confidential information produced in Massachusetts to Massachusetts. *Id.* 10–11. Pega understands that Appian intends to oppose this motion. Under the regular briefing schedule, Appian's opposition is due November 20, 2026.

**B. Appian's Issues Raised by Pending Motions**

49. Appian respectfully refers the Court to the following pending matters:

50. **Choice of law governing the Thompson Email (UK law)**. In its Memorandum and Order on Appian's Motion for Leave to File a Second Motion for Partial Summary Judgment or for Partial Dismissal on Forum Non Conveniens Grounds (DOC. No. 892, resolving DOC. No. 836), the Court directed further briefing on whether UK law governs Pega's claims based on the Thompson Email. The parties have submitted that briefing: Appian's Memorandum in Response to the Court's October 22, 2026 Order (DOC. Nos. 906, 907) and Pega's Supplemental Brief re: Choice of Law (DOC. Nos. 919, 920). The choice-of-law issue remains pending.

51. **Pega's Motion to Modify Protective Order** (DOC. No. 916; *see* DOC. Nos. 917, 918), filed November 6, 2026. Appian's opposition is due November 20, 2026.

52. **Motions *in limine***. The parties' respective motions *in limine*, being filed on November 11, 2026 with oppositions due on November 18, 2026, will also be pending.

## VI. ISSUES OF LAW

53. Pega's Issues of Law are attached as **Exhibit 4.**

54. Appian's Issues of Law are attached as **Exhibit 5.**

## VII. AMENDMENTS TO THE PLEADINGS

### A. Pega's Statement on Amendments to the Pleadings

55. Pega does not request amendments to the pleadings.

### B. Appian's Statement on Amendments to the Pleadings

56. Appian does not seek to amend its counterclaims.

## VIII. MATTERS TO AID IN THE DISPOSITION OF THE CASE

Pega's Position[9]

### A. Trial Time and Presentation

57. This case is currently scheduled for trial beginning on November 30, 2026. Details regarding the Court's anticipated schedule for trial are set forth in the Order on Trial Schedule (Doc No. 890). The trial will be timed, as the parties will be allocated a total number of hours in which to present their respective cases. The parties propose that the total time be split equally between Pega, on the one hand, and Appian, on the other, with an expected time of __ hours per side. Jury selection, preliminary instructions, openings, closings, and final instructions do not count against each side's trial time. Direct examination counts against the side calling the witness. Cross examination counts against the cross-examining side. Video designations are charged to the designating side. Counter designations to video designation are charged to the counter-designating

[9] Appian takes the position that the only stipulations the Parties should enter into under Doc. No. 195, ¶ 5(h), are its proposed stipulations on authenticity and trial logistics, as described in Appian's position below. Given the limited time allotted for trial and the Court's stated preference for resolving objections and disputes outside the jury's presence, Pega believes that the additional provisions it proposes are necessary for presenting disputes to the Court in an orderly way. Pega remains willing to continue conferring with Appian before the Final Pretrial Conference to try to reach agreement on authenticity and other trial logistics stipulations.

side. Sidebars count against whichever side's timer is running at that time. The Court will keep time and announce a running tally after each trial day.

58. The evidentiary portion of the jury trial shall proceed in phases. In the first phase, Pega will present its case-in-chief. In the second phase, Appian will respond to Pega's case-in-chief and will present Appian's case-in-chief. In the third phase, Pega will respond to Appian's case-in-chief.

59. For opening statements, Pega will present first, followed by Appian. There will be no rebuttals or replies to opening statements.

**B. Witnesses**

60. The parties reserve the right to call document custodians for the sole purpose of authenticating documents, if necessary. However, the parties will work cooperatively to stipulate to the authenticity of documents or identify a witness to authenticate documents, if necessary, and will make all efforts to limit the burden on witnesses associated with authenticating the documents.

61. The inclusion of a witness on a party's witness list does not require the party to call that witness to testify and does not imply or establish that the party has the power to compel the live testimony of that witness or to make that witness available to the opposing party. Any witness not properly identified by a party on its witness list will be precluded from testifying, absent good cause shown. The following shall be considered good cause: (1) one or more additional witnesses whose testimony is necessary to establish authenticity or admissibility of any trial exhibit, if the evidentiary status of that exhibit is challenged by an opposing party; and (2) any witness solely for impeachment purposes.

62. A party shall promptly notify the opposing party of any change to the identification of witnesses or the anticipated order of witnesses.

63. The parties agree that fact witnesses who have not yet testified will be sequestered for the testimony of other fact witnesses except for any fact witness identified as a corporate representative under FRE 615. Fact witnesses who have not yet testified shall not review the transcripts of the trial testimony of other fact witnesses. The parties agree that expert witnesses need not be sequestered.

64. Except by express permission of the Court, once tendered for cross-examination, no witness shall communicate with any other person regarding the substance of the witness's testimony until such time as the cross-examination is concluded. If the witness will be recalled to the stand to testify later in the trial, the witness may speak with counsel after completing the current examination and leaving the stand, and before returning to the stand for the later testimony.

65. Non-employee and non-expert witness will be called to the stand live only once during the jury trial absent order of the Court. The parties agree that should a witness be called live during the opposing party's case, the witness will be called as an adverse direct and the party whose witness it is shall be permitted to offer a direct examination not limited to the topics of the opposing party's adverse direct.

**C. Identification of Witnesses**

66. Subject to the requirements below for disclosure of deposition testimony, each side will identify by email to the opposing side the witnesses it intends to call (in the order in which the witnesses will be called)[10], and whether those witnesses will be called live or by deposition, by 8:30 a.m. two calendar days before such witness will be called to testify. For example, if the party expects to conduct the examination on Thursday, notice should be given to the opposing party by 8:30 a.m. on Tuesday. The non-offering party shall identify any objections to such

[10] The parties may call witnesses testifying by designation in any order to promote efficiency of trial.

witness(es) by 8:00 p.m. the following day, and the parties shall meet-and-confer to resolve any objections by 9:00 p.m. that same evening. To the extent the objections are not resolved through the meet-and-confer, the objecting party will email the Court's Courtroom Clerk and Docket Clerk by 11:59 p.m. the day before the witness is to be called to testify. The email will include a brief statement of that party's objection.[11] Any remaining disputes not resolved through the meet-and-confer process will be resolved before the Court the following morning, as addressed below in Section VIII.I.

67. A party shall provide reasonable notice if for any reason it does not intend to call a witness that it had previously indicated would appear live, but such notice shall be provided no later than 7:00 p.m. the day before the witness was to be called. In that event, the other party may designate and offer deposition testimony from such witness, subject to the Federal Rules of Evidence. Counter-designations and objections may also be provided. In the event that such designations cannot be completed by the times agreed to below, the parties shall work in good faith to set deadlines for the disclosure of such designations, counter-designations, counter-counter-designations,[12] and objections.

**D. Deposition Designations**

68. Any party is entitled to use deposition testimony as designated herein by the other party when a witness becomes unavailable. A party's decision not to introduce some or all of the testimony of a witness designated by that party herein shall not be commented upon by the other party at trial.

---

[11] The content of the email will be agreed as to form before it is sent, as addressed below in Section VIII.H.

[12] The parties have exchanged designations and counter-designations pursuant to Doc. No. 195, ¶¶ 2(c) and 3. The parties reserve the right to argue that any specific counter-counter designation is needed.

69. Designated deposition testimony that the parties play by video in Court or have read into the record will count against the party's trial presentation time. Specifically, any affirmative designations and counter-counter[13] designations offered by a party will count against that party's trial presentation time whereas any counter-designations by the other party will count against the party who made the counter-designations.

70. All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is read or viewed at trial.

71. When deposition designation excerpts are introduced, all admissible deposition counter-designation excerpts and counter-counter-designation excerpts, whether offered by videotape or by transcript, will be introduced in the sequence in which the testimony was originally given. The specific portions of the deposition shall be read or played in page order. If an exhibit is introduced in a deposition designation, the exhibit will be admitted into evidence if it is included on the offering party's trial exhibit list and is not otherwise objected to. By so agreeing, neither party waives an objection that the witness lacked personal knowledge to testify about the document.

72. When a witness is called to testify by deposition at trial, the party calling the witness shall provide the Court with three copies (including one for the court reporter) of the transcript of the designations, counter-designations, and counter-counter-designations that will be read or played. The parties shall provide the time to be charged to each party to the Court with the transcripts. The parties will be charged for all time that elapses from the time the witness is called until the next witness is called, according to the proportions to be provided by the parties.

[13] The parties have exchanged designations and counter-counter designations pursuant to Doc. No. 195, ¶¶ 2(c) and 3. The parties reserve the right to argue that any specific counter-counter designation is needed.

73. For those witnesses whose prior deposition or trial testimony[14] will be read or played, the parties shall be permitted to make brief transition statements to introduce the witnesses and their role in the litigation. The parties agree to exchange their proposed transition statements when such witnesses are identified under Section X of this Memorandum. The time for reading in transition statements will count against the party who initially proposes the use of the deposition testimony.

74. The above procedures regarding deposition designations do not apply to portions of deposition transcripts and/or video used for impeachment or to refresh the recollection of a witness. Any deposition testimony may be used at trial for the purpose of impeachment or to refresh the recollection of a witness, regardless of whether a party specifically identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

**E. Exhibits**

75. Subject to the remaining provisions of this Order, no party may add to its exhibit list or use at trial an exhibit not present on its list absent stipulation or order of the Court upon a showing of good cause. However, any party may use an exhibit that is listed on the other side's exhibit list, to the same effect as though it were listed on its own exhibit list, subject to all evidentiary objections. Any exhibit, once admitted, may be used equally by each party, subject to any limitations as to its admission.

---

[14] Pega's references in this Joint Pretrial Memorandum to testimony from the Virginia trial, including in its witness lists, deposition and testimony designations, and objections, are made solely to comply with Paragraph 5 of the Order (Doc. No. 195) and to preserve Pega's rights should such testimony be admitted. They are not, and should not be construed as, a concession that any such testimony is relevant or admissible, or a waiver of any argument, objection, or request for relief in Pega's motions *in limine*, all of which Pega expressly preserves. Pega reserves the right to withdraw or revise any such references depending on the Court's rulings on those motions.

76. If any party removes or otherwise withdraws an exhibit from its exhibit list, the other side may amend its exhibit list to include that same exhibit. The parties also agree that the opposing party may make objections to such exhibit, other than an objection based on untimely listing.

77. Any description of a document on an exhibit list is provided for convenience only and shall not be used as, or construed to be, an admission or evidence regarding the listed document or any other listed document.

78. Exhibits to be used solely for impeachment need not be included on the lists of trial exhibits or disclosed in advance of being used at trial. Such exhibits used solely for impeachment and not included on an exhibit list may not be admitted into evidence.

79. Complete legible copies of documents may be offered and received in evidence to the same extent as an original unless a genuine question is raised as to the authenticity of the original, or in circumstances in which it would be unfair to admit the copy in lieu of the original.

80. All exhibits shall be pre-marked with a stamp on the first page, using the following labels and containing the following prefix identifiers:

b. Pega's Exhibits: PX_MA (beginning with PX_MA-XXXX);

c. Appian's Exhibits: APP-MA (beginning with APP-MA-XXXX);

d. Joint Exhibits: JX-MA-XXXX

81. The parties will exchange stamped and paginated trial exhibits on November 23, 2026.

82. In the case of trial exhibits that have been previously marked as a deposition exhibit, to remove duplicates and improve legibility of the exhibits used at trial, the parties agree that the trial exhibit shall be treated as identical to the indicated deposition exhibit regardless of whether it bears a deposition exhibit sticker, unless a genuine question is raised as to whether the trial exhibit

and deposition exhibit are identical. The parties also agree that two exhibits that are identical (notwithstanding different Bates numbers) shall be treated as identical, unless a genuine question is raised as to whether the exhibits are identical.

83. The parties agree that a document is prima facie genuine and authentic if it is: (a) produced in this case from a party's files and on its face appears to have been authored by an employee, officer, or agent of that party; (b) produced by a third party and appears on its face to have been authored by an employee, officer, or agent of a party; or (g) produced in this case from a party's files or a third party's files that was received from a third party and on its face there are no indicia of unauthenticity. The parties reserve the right with respect to individual documents to adduce proof to the contrary or to require that the offering party provide authenticating evidence if the opposing party has a reasonable basis to believe the document is not authentic and if an appropriate objection was made by the opposing party on the exhibit lists attached to this Order. This stipulation shall not be deemed or interpreted to be a waiver of any other objections a party may have or a stipulation that any document is admissible in evidence. The parties reserve the right to object to the introduction into evidence of the documents and files referenced in the preceding paragraph (in whole or in part) on all other grounds, including the admissibility of these documents for reasons other than challenging their authenticity.

84. No exhibit will be admitted unless offered into evidence through a witness, unless otherwise agreed to by the parties or ordered by the Court. Exhibits may be introduced via video deposition testimony subject to the parties' objections and the Court's rulings on admissibility. A party may move to admit exhibits into evidence during a witness's examination and may publish them once the exhibit has been admitted. The parties may also display unobjected-to documents during video plays of deposition testimony. Should a party inadvertently fail to formally move an

exhibit into evidence at the close of the witness's testimony, the parties agree that such exhibits may be moved into evidence, subject to objection, promptly thereafter. Exhibits that are offered into evidence at trial and as to which there are no objections shall be received in evidence, without any need for further foundation testimony, provided it is used with a witness competent to testify about it. Except for exhibits used during opening statements or for impeachment, exhibits may not be published, displayed, or otherwise shown in court until after they have been admitted into evidence. Once admitted, counsel may publish exhibits without requesting to do so.

85. The listing of a document on a party's exhibit list is not an admission that such document is relevant or admissible. Each party reserves the right to object to the relevance of any evidence offered by the other party, at the time such evidence is offered, in view of the specific context in which such evidence is offered. Moreover, the parties have included certain exhibits on their lists that they may seek to introduce in rebuttal to the other side's claims or defenses. By including a document on its exhibit list, neither party concedes that the exhibit is relevant to the issues that are to be decided.

86. No party shall comment or argue to the jury that the other side had a document on its exhibit list but did not introduce it into evidence.

87. The parties acknowledge that certain anticipated trial exhibits may not be feasible to show to a witness and/or provide to the jury in paper form, including, but not limited to, voluminous spreadsheets, videos, and product samples. Such exhibits may be initially presented to a sponsoring witness via a computer display prior to a party seeking their admission and publication to the jury, and such exhibits will be provided to the jury on a laptop or USB drive.

88. With regard to voluminous spreadsheets, to facilitate review of such exhibits by the jury, the parties agree that they may under Federal Rule of Evidence 1006 create a summary of the

portions of such trial exhibits shown to the jury, which shall be given the same trial exhibit number, with the suffix "A", although the parties must agree in advance to such a summary. The parties will exchange Rule 1006 summaries no later than 5:00 p.m. on [complete].

**F. Identification of Exhibits and Demonstratives**

**1. Exhibits and Demonstratives for Opening Statements**

89. The parties shall identify any exhibits and demonstrative exhibits expected to be used during their opening statements by 2:00 p.m. the day before the first day of trial. The other party shall identify any objections to demonstrative exhibits and any objections to the admissibility of the exhibits sought to be used during opening statements by 4:30 p.m. that evening. The parties shall then meet-and-confer by 6:30 p.m. that evening regarding all objections and, to the extent the objections are not resolved through the meet-and-confer, the objecting party will email the Court's Courtroom Clerk and Docket Clerk by 9:00 p.m. the day before opening statements are to be made so that the Court can determine whether and when to hear the objection.[15] Any remaining disputes not resolved through the meet-and-confer process will be resolved before the Court the following morning, as addressed below in Section VIII.I.

**2. Exhibits**

90. The parties agree that disclosure of exhibits in accordance with the below procedure is not required for cross and adverse direct examinations. The parties will provide opposing counsel with at least two copies of any exhibits used on cross at the start of the cross or adverse direct exam.

91. A party will provide, by electronic mail or FTP, a list of trial exhibits to be used in connection with the examination of a witness, including in connection with examination of

---

[15] The content of the email will be agreed as to form before it is sent, as addressed below in Section VIII.H.

witnesses being presented as rebuttal witnesses, specifically identifying the exhibit in connection with the witness by 6:30 p.m. the day before the witness is to be called at trial, and objections will be provided no later than 8:00 p.m. the same day. For the avoidance of doubt, if a witness is to testify in both a party's case-in-chief and rebuttal, the party need not disclose documents to be used with a witness on rebuttal during the disclosure process for the witness's testimony during the case-in-chief. The parties will meet-and-confer by 9:00 p.m. that same night.

92. Physical exhibits shall be disclosed and made available for inspection by 6:30 p.m. the day before their intended use, and objections will be provided no later than 8:00 p.m. the same day. The parties will meet-and-confer by 9:00 p.m. that same night.

93. If good-faith efforts to resolve the objections fail, the party objecting to the exhibits shall bring a short, non-argumentative description of the objections to the Court's attention by emailing the Court's Courtroom Clerk and Docket Clerk by 11:59 p.m. the day before the challenged exhibit is to be offered. The email shall identify each challenged exhibit and include, for each unresolved objection, a short, non-argumentative statement of the objection, the other party's response, and a copy of the exhibit to be offered.

**3. Demonstratives and Summary Exhibits**

94. The parties agree that the demonstrative exhibits that the parties intend to use at trial do not need to be included on their respective exhibit lists that are part of this Pretrial Memorandum.

95. Pega's demonstrative exhibits will be identified with PDX numbers, starting with PDX 1.

96. Appian's demonstrative exhibits will be identified with ADX numbers, starting with ADX 1.

97. Once exchanged, the numbering on a demonstrative exhibit shall not be changed.

98. A party will provide color copies of demonstrative exhibits by electronic mail or file share to be used in connection with direct examination of witnesses being presented, including in connection with direct examination of witnesses being presented as rebuttal witnesses, by 6:30 p.m. the day before the witness is to be called at trial. For the avoidance of doubt, if a witness is to testify in both a party's case-in-chief and rebuttal, the party need not disclose demonstratives to be used with a witness on rebuttal during the disclosure process for the witness's testimony during the case-in-chief. The parties' disclosures will reflect a good-faith determination of the demonstrative that will be used with a particular witness, and reasonable efforts will be made to streamline disclosures. The parties shall provide any objections no later than 8:00 p.m. the same day. The parties will meet-and-confer at 9:00 p.m. that same night. If any of the demonstratives changes after the deadline, the party intending to use the demonstrative will promptly notify the opposing party of the change(s). To the extent the objections are not resolved by the meet-and-confer, the objecting party will email the Court's judicial administrator and Courtroom Deputy Clerk by 11:59 p.m. the day before the witness is called to testify. The email will include a brief statement of that party's objection and the other party's response, and a copy of the demonstrative to be used.[16] Any remaining disputes not resolved through the meet-and-confer process will be resolved before the Court the following morning, as addressed below in Section VIII.I.

99. The party seeking to use a demonstrative exhibit in connection with any direct examination will provide a color representation of the exhibit to the other side in PDF or PPT form. The PDF or PPT form of the demonstratives shall be in the order of intended use. For irregularly

---

[16] The content of the email will be agreed as to form before it is sent, as addressed below in Section VIII.H.

sized physical demonstratives, the party seeking to use the demonstrative will provide, by electronic means, a legible color representation as a PDF of 8.5” x 11” copies of the demonstrative.

100. These provisions regarding demonstrative exhibits do not apply to demonstratives to be used for cross-examination, which need not be provided to the other side in advance of their use. In addition, blow-ups or highlights of exhibits or parts of exhibits or testimony without more are not required to be provided to the other side in advance of their use.

101. A party that creates a demonstrative live in the courtroom during opening statements, examination, or closing arguments must provide the other party with a photograph or other electronic file of the demonstrative by 9:00 p.m. the day it was created. This does not apply to blow-ups or highlights of exhibits or parts of exhibits or testimony.

102. Parties may make reasonable, non-substantive edits or corrections of typographical and similar errors to a demonstrative, but the party must promptly notify the opposing party of the change(s) to provide the opposing party with reasonable notice of the changes before the demonstrative exhibit is presented in court.

103. No party may use any of the other party’s disclosed demonstrative exhibits before the disclosing party has used it.

**4. Admissions Read Into the Record**

104. A party shall provide any statement by a party opponent in any pleading, request for admission response, interrogatory response, previous sworn testimony, or the statement of facts established by the pleadings, by admissions, or by stipulations; that it intends to have read into the record by 6:30 p.m. the day before such statement’s intended use. The statement shall be provided in the form of its intended use (e.g., any excerption or redaction applied). The parties shall provide any objections no later than 8:00 p.m. the same day. The parties shall meet-and-confer regarding any objections by 9:00 p.m. the same day. To the extent the objections are not resolved through

the meet-and-confer, the objecting party will email the Court's Courtroom Clerk and Docket Clerk by 11:59 p.m. that same night. The email will include a brief statement of that party's objection and the other party's response, and a copy of the statement to be offered along with the other party's objections and any proposed modifications.

#### 5. Exhibits and Demonstratives for Closing Arguments

105. The parties agree that any exhibit that has been admitted into evidence during the course of trial can be used in closing argument and that the parties need not disclose the intent to use any admitted exhibit prior to closing arguments. The parties will not exchange demonstrative exhibits to be used in closing arguments.

### G. Identification of Deposition Testimony and Exhibits

106. Unless otherwise agreed between the parties, the party offering deposition testimony (other than for impeachment purposes) shall identify the deposition testimony it intends to offer from previously exchanged designations by 6:30 p.m. at least two calendar days before the testimony is offered into the record. A party must also identify any exhibits it wishes to introduce via the deposition testimony. A party may choose not to introduce deposition testimony designated in this Pretrial Order. The party receiving the designations shall inform the designating party of any objections (to both the testimony and exhibits) and any specific pages and lines from that deposition to counter-designate by 8:00 p.m. two calendar days prior to the testimony being offered into the record. To the extent necessary, the designating party will provide the opposing party with any objections to the opposing party's counter-designations and any counter-counter designations by 8:30 p.m. two calendar days prior to the testimony being offered. The parties will thereafter meet-and-confer by 9:00 p.m. two calendar days prior to the testimony being offered.[17]

---

[17] Pega reserves the right after the deposition designations are exchanged to revise or modify this procedure to promote efficiency at trial.

If there are objections that remain to be resolved, the party calling the witness shall, no later than 11:59 p.m. two calendar days before the witness is to be called at trial, submit to the Court's Courtroom Clerk and Docket Clerk, on behalf of all parties: (i) a copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, counter-counter-designations, and pending objections; and (ii) a cover letter clearly identifying the pending objections as well as a brief description (i.e., no more than one sentence per objection) of the basis for the objection and the offering party's response to it.

107. If deposition testimony is to be presented by video (other than for impeachment purposes), then the party playing the designated testimony shall also provide the other party with electronic video clips of all testimony to be played by 9:00 p.m. the calendar day before the witness is to be called at trial. The party offering the witness by deposition will be responsible for cutting video clips that contain both the deposition designation, counter-designations, and counter-counter-designations, and will provide a clip report of the designated testimony. All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is read or played at trial. If a party does not offer video testimony, that party need not offer video of the other party's counter-designations.

108. A designation and any corresponding counter-designations will be read or played by video in the order of questioning at deposition, unless the parties agree to a different order for a particular clip or witness.

109. The party offering testimony by deposition may elect to introduce less than all of the testimony it designated in connection with this Pretrial Order, and the opposing party may elect to introduce less than all of the testimony it counter-designated or any testimony previously designated by the offering party.

110. Regardless of whether deposition testimony is read or played by video, the time available for each party's trial presentation shall be reduced by the length of its designations and counter-designations that are read or played for the jury. For video depositions, the parties will allocate the time attributable to each party according to the times in the clip reports. In the event of any dispute, the parties shall promptly meet-and-confer concerning the amount of time attributable to each party's designations and counter-designations and shall inform the Court of the allocation of the time.

111. If an exhibit is introduced through a deposition designation, the exhibit may be moved into evidence if it is on a party's trial exhibit list, the offering party moves it into evidence, and the exhibit is not subject to objection or the Court overrules any objection. If an exhibit is not objected to, it may be displayed during the video clip and the parties may move the exhibit into evidence at the end of the deposition testimony. Once an exhibit is moved into evidence, the designating party may display the exhibit to the jury alongside the video and highlight or enlarge portions of the exhibit on the screen as if the exhibit were being shown to a live testifying witness. The introducing party shall formally move exhibits into evidence either prior to or at the conclusion of the testimony.

**H. Emails to the Court Containing Nightly Disputes**

112. The parties will work together in good faith to resolve disputes regarding witnesses, demonstratives, exhibits, and deposition designations. For issues on which the parties cannot reach agreement, the parties will jointly prepare an email to the Court's Courtroom Clerk and Docket Clerk, as detailed above. Any issues (1) raised during the meet and confer process and not included in the joint email to the Court are waived; and (2) the parties may not raise issues that should have been covered during the nightly meet and confer process to the Court prior to meeting and

conferring (this does not apply to objections during live testimony). The parties will agree during the nightly meet-and-confer which party will send the email to the court.

113. The template email will generally take the following format:

Dear Judge Sorokin's Chambers,

The parties respectfully submit the following disputes for resolution tomorrow morning:

Dispute Regarding John Doe Demonstrative (PDX1.10-15)

Pega's position:

Appian's position:

Dispute Regarding Jane Doe Deposition (4:10-27, 6:5-19)

Pega's position:

Appian's position:

Etc.

114. Each side will prepare its own short written position statements for inclusion in the email. By 11:00 p.m., the party that is not submitting the email to the Court (i.e., Appian during Pega's case-in-chief), shall provide its positions in the template email. The party submitting the email to the Court will then paste in its positions without editing its positions in response and send the email to the Court's judicial administrator, with appropriate attachments as detailed above.

**I. Resolution of Disputes**

115. The parties will meet with the Court at 8:30am or earlier each day to address that day's evidentiary issues, and may ask to meet earlier if needed.

**J. Set Up of Electronic Equipment**

116. The parties may access the Courtroom on [**to be completed with Court's input**], to set up electronic and computer devices to be used during the trial.

**K. Confidentiality**

117. The Court has entered a Stipulated Protective Order (Doc. No. 65) to safeguard the confidentiality of certain of the parties' business and technical information, as well as that of third parties. All outside counsel shall handle such protected information in accordance with the terms of the Protective Order and shall not disclose Confidential or Highly Confidential Information to persons not authorized to view such information under the terms of the Protective Order.

118. It is agreed that any party or non-party whose information is subject to the Protective Order may request that testimony or an exhibit subject to the Protective Order be placed under seal and handled in accordance with the Protective Order (including through closing the Courtroom as described below). With the Court's permission, the parties may request that demonstrative exhibits or evidence potentially reflecting confidential information not be made available to the public upon a party demonstrating that it has met the standard set forth in *Bradford & Bigelow, Inc. v. Richardson*, 109 F. Supp. 3d 445, 447-48 (D. Mass. 2015).

119. Notwithstanding any statement to the contrary in the Protective Order, the parties have agreed that in-house counsel, agreed to by the parties, may attend any sealed portion of the trial.

**L. Jury Notebooks**

120. Subject to the Court's permission, the parties shall be allowed to provide a joint jury notebook to each of the jurors, which shall contain (i) a glossary of terms; (ii) a picture of each witness who may testify (with name, party affiliation, and title), and (3) a table of the remaining claims and challenged statements. The jury will be permitted to bring these notebooks and handwritten notes into the deliberation room. Jury notebooks will be destroyed after the verdict is read. Pega will provide a copy of the proposed jury notebook to Appian on November 24, 2026 and Appian will respond on November 25, 2026.

**M. Witness Binders**

121. To the extent a party prepares a binder of trial or demonstrative exhibits for a witness, the party will provide at least two copies to the opposing party at the same time the binder is presented to the witness. The offering party will simultaneously provide a copy for the Court, the Court's clerks, and the court reporter.

**N. Post-Trial Status Report and Motions**

122. Within seven days of the jury returning a verdict, the parties shall jointly submit a form of order to enter judgment on the verdict, and at the same time, will submit a joint status report indicating how the case should proceed and listing any post-trial motions each party intends to file. The parties will coordinate with the Court to propose a post-trial briefing schedule.

**O. Other Stipulations**

123. Motions for judgment as a matter of law under Rule 50(a) ("JMOL") at the close of a party's case or after the close of all evidence may be made to the Court orally. The parties request that the Court then decide, based on the motions presented orally, whether to entertain argument.

124. The parties will not introduce evidence, testimony, or argument regarding the Court's summary judgment rulings.

125. The parties will not introduce evidence, testimony, or argument regarding the Court's rulings on Rule 702 motions.

126. The parties will not reference or offer in front of the jury any expert testimony that has been excluded or rendered moot by this Court.

127. The parties will not introduce evidence, testimony, or argument regarding the number of law firms or lawyers that are currently representing or have previously represented any party in this case or any other litigation.

128. The parties will not introduce evidence, testimony, or argument regarding religion, political beliefs, race, ethnicity, gender, national origin, sexual orientation, or health of party, witness, attorney, or firm.

129. The parties will not introduce evidence, testimony, or argument regarding the role or presence of jury consultants or shadow jurors or use of focus group or mock proceedings to assist with trial prep, jury selection, or trial.

130. The parties will not introduce evidence, testimony, or argument suggesting the District of Massachusetts is an improper or inconvenient venue.

131. The parties will not offer any expert testimony on opinions outside the parameters of a respective expert's report.

**P. Court's Preference**

132. The parties request the Court's preference as to the following:

- whether experts may be used to admit pre-authenticated documents into evidence
- impeachment of witnesses
- whether the Court has any objection to the parties setting up a "check" or "foot" monitor in the well
- the use of deposition transcripts or clips of deposition testimony in opening statements
- whether the Court has any objection to a party presenting testimony of an officer, director, managing agent, or designee under Rule 30(b)(6) of an opposing party by deposition (transcript or video)
- How to treat the use of confidential information during the presentation of evidence (e.g., whether such presentation shall take place in open court or whether, subject to a party's request and the Court's agreement, the courtroom shall be closed to the public during presentation of certain portions of the evidence)

Appian's Position

133. The parties are not presently in agreement on stipulations to govern authenticity or additional trial procedures. Appian will endeavor to continue discussions with Pega to see if any agreements can be reached and recognizes that in the absence of agreement the parties will need to establish authenticity and proceed without any disclosures or other procedures other than those required by the Federal or local rules. Appian briefly sets forth its positions here to the extent that the Court wishes to assess the current status of the parties' discussions.

134. Appian respectfully submits that Pega's proposal is more detailed than this trial requires. Over more than twenty pages, it prescribes process for matters that need none. It would, for example, attach objection, meet-and-confer, and clerk-email deadlines to nearly every conceivable disclosure. Appian is concerned that a protocol this detailed will generate more disputes than it resolves. The trial should instead be governed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules, the Court's orders and practices governing this action (*see*, *e.g.*, DOC. No. 195), and customary professional courtesy among experienced trial counsel. Those rules should be supplemented only by simple and discrete procedures that streamline the trial and genuinely aid in the disposition of this matter. As discussed below, Appian has proposed two such sets of procedures, one addressing trial logistics and one addressing authenticity.

*Appian's Proposed Trial Procedures: Logistics and Authenticity*

135. Appian proposed to Pega two streamlined sets of procedures to govern trial logistics and authenticity. Pega has accepted parts of Appian's proposed procedures, as noted below, but not the rest. Appian's proposed procedures are set out below:

Appian's Proposed Trial Logistics Procedures

1. The identity of all witnesses to be called on a particular day, including live witnesses and those called by deposition, in the anticipated order that they will be called, will be disclosed by 8:30 am on the day that is two calendar days before the witness(es) will testify.

2. Documents intended to be used on direct examination of a live, non-adverse witness will be identified by 8:00 pm on the calendar day prior to the day that the witness is expected to be called to testify.

3. Demonstratives intended to be used during direct examination of any live and non-adverse witness will be disclosed by 8:00 pm on the calendar day prior to the day that they will be used.

4. Demonstratives intended to be used during opening statements will be disclosed by 8:30 am on the day that they will be used.

5. Demonstratives intended to be used during closing statements will be disclosed by 8:30 am on the day that they will be used.

6. Paragraphs 3 through 5 do not encompass materials generated in court during witness examination or argument, or that reflect only the content of documents that will be or have been offered into evidence.

7. The parties will keep each other informed as to when they expect to conclude their respective presentations of evidence.

8. All references to dates in this stipulation are calendar days, not business days.

Nothing in this stipulation extends or otherwise alters any existing disclosure deadlines.

Appian's Proposed Authenticity Procedures

1. Absent a good faith basis to believe that a document, item of electronically stored information ("ESI"), or thing is not what the proponent claims that it is, each Party agrees that it will not contest the authenticity of any document, item of ESI, or thing in its custody or legal control that it has produced with Bates numbers for purposes of Rule 901 of the Federal Rules of Evidence ("Rule 901"); provided, however, that:

a. as to any document, item of ESI, or thing in a producing Party's files or otherwise produced by a Party that the producing Party received from a third party, the foregoing shall extend only to agreement that the material is a genuine copy of the material as received by the producing Party, with each Party reserving the right to contest the underlying authenticity of the material as originally authored or produced by the third party; and

b. as to any email record containing multiple emails, at least one of which was sent by a third party (an "external email"), the foregoing shall extend only to agreement that (i) emails sent by the producing Party are authentic for the purposes of Rule 901 and (ii) any external emails contained in the thread are genuine copies of the external emails in the form stored in the producing Party's records, with each Party reserving the right to contest the authenticity of those external emails.

2. Each Party retains the right to object to the use or admission of any document, item of ESI, or thing in this action on all grounds permitted by law other than authenticity. Objections based on authenticity will be governed by Paragraph 1 above.

3. This Stipulation is limited to questions of authenticity under Rule 901 and shall not be construed as a concession by any Party as to the admissibility of any item.

4. This Stipulation and Order may be amended only by a subsequent written stipulation among the Parties and upon order of the Court.

*Why Appian's Proposed Trial Procedures Are Superior*

136. The parties agree on certain points, including witness identification and, in part, authenticity. Where the parties' proposals diverge, Appian's proposal is superior, particularly in consideration of the following:

137. **Witness identification**. Both proposals require that witnesses to be called on a given day, live or by deposition and in anticipated order, be disclosed by 8:30 a.m. two calendar days before they testify. Appian's Proposed Trial Logistics Procedures ¶ 1; § VIII.C, ¶ 66. The parties differ in that Pega adds objection, meet-and-confer, and clerk-email deadlines for each witness, which Appian respectfully submits are unnecessary. Pega's proposed nightly cycle of objections, conferences, and emails to chambers (§ VIII.C, ¶ 66) would take counsel's time away from trial preparation every night of trial. And under Pega's proposal, any issue not included in the joint email is waived (§ VIII.H, ¶ 112), so each party would have an incentive to lodge every conceivable objection rather than risk forfeiting it.

138. **Direct examination**. Documents and demonstratives for the direct examination of a live, non-adverse witness are disclosed by 8:00 p.m. on the calendar day before the witness is called. Appian's Proposed Trial Logistics Procedures ¶¶ 2–3. Pega proposes 6:30 p.m., plus additional objection, meet-and-confer, and email deadlines (§§ VIII.F.2–3, ¶¶ 91, 98). The same concerns apply here given Pega's added objection, conferral, and email steps would produce several overlapping sets of disputes each night of trial.

139. **Openings and closings**. Demonstratives for openings and closings are disclosed by 8:30 a.m. on the day of use. *Id.* ¶¶ 4–5. Pega proposes a day-before deadline for openings (§ VIII.F.1, ¶ 89) and no exchange at all for closings (§ VIII.F.5, ¶ 105). Pega's proposal is inconsistent: it requires a full day's notice and a three-step objection process for openings, which

precede any evidence, but no notice at all for closing demonstratives, which characterize the evidence admitted. The same rule should govern both. Appian's day-of-use deadline does so.

140. **Authenticity, in part**. Appian's proposal eliminates unnecessary foundation disputes without requiring either party to vouch for materials created by third parties. Both proposals provide that documents a party produced from its own files, and that on their face were authored by that party's personnel, will be treated as authentic absent a basis to believe otherwise. Both also preserve all objections other than authenticity. Appian's Proposed Authenticity Procedures ¶¶ 1–3; § VIII.E, ¶ 83. The proposals differ as to how far that concession should extend and whether legitimate challenges should be foreclosed.

141. First, Appian's proposal draws a necessary distinction between confirming that a document is a genuine copy of what a party received and conceding that it was actually created by its purported author. For third-party materials, including external emails within a produced thread, Appian agrees to the former while preserving challenges to the latter. Appian's Proposed Authenticity Procedures ¶ 1(a)–(b). A party's receipt, retention, and production of a third-party document do not necessarily establish its underlying authorship. Pega nevertheless would deem such a document authentic whenever it bears "no indicia of unauthenticity." § VIII.E, ¶ 83. That approach substitutes the absence of an apparent defect for the proponent's showing under Rule 901(a). A document need not look suspicious for its attribution to require support. Appian's proposal simply avoids making discovery production a blanket concession of third-party authorship.

142. Second, Appian's proposal permits a party to contest authenticity whenever it has a good-faith basis to do so, while Pega's requires both a reasonable basis and an objection already recorded on the exhibit lists. Appian's Proposed Authenticity Procedures ¶ 1; § VIII.E, ¶ 83. Pega's

formulation does not accommodate grounds that emerge after those lists are exchanged. That rigidity risks foreclosing legitimate objections while encouraging precautionary objections to avoid waiver. Appian's good-faith requirement already guards against tactical disputes without requiring the parties to anticipate facts they do not yet know.

143. Appian's procedures thus appropriately balance the Federal Rules' protections against the need for an efficient trial. They secure the principal efficiency both sides seek, dispensing with routine authentication of the parties' own documents, while preserving a fair means to resolve genuine disputes about third-party materials.

*Trial Time*

144. Additionally, Appian respectfully submits that the trial time should not be split equally. Appian proposes that it receive 65% of the allotted trial time and Pega 35%, because Appian is the net plaintiff in this case. Following summary judgment, Appian will try counterclaims concerning four categories of challenged Pega statements: the Petronio, Widely Available, Free Trials, and Financial Strength statements. DOC. No. 804 at 97–98. Three of those four categories address the extensive misconduct underlying the Virginia litigation, including Zou's hiring and work, Pega employees' access to Appian trials under false identities, and Pega leadership's knowledge of, participation in, and direction of that conduct. *Id.* at 66–74. Proving them requires a comprehensive account of events spanning 2012 to 2022. *Id.* at 8, 66–67. Pega's remaining claims, by contrast, concern the Thompson Email, Appian's Viability Statements, and the Trefler Statements. *Id.* at 20–34, 98. Two of these three focus on the narrower period after the Virginia verdict. *See id.* at 3. The allocation of time should therefore reflect where the bulk of the evidence lies.

145. Consistent with the Court's remarks at the October 29, 2026 hearing, Appian understands that only jury selection, preliminary instructions, and opening statements will not be charged against the parties' time allotments. Oct. 29, 2026 Hr'g Tr. ("Hr'g Tr.") at 113. Appian also understands that the Court will keep time and report a running tally. *Id*. at 113–114.

*Order of Presentation*

146. Appian also disagrees with Pega's proposed order of presentation. Pega's three-phase structure (§ VIII.A, ¶ 58) would deprive Appian of any rebuttal on the counterclaims on which Appian bears the burden of proof. Each party should have the last word on the claims it must prove. Appian therefore proposes a single addition to Pega's structure: a fourth phase in which Appian rebuts Pega's response to Appian's counterclaims. With that addition, the evidentiary presentation would proceed as follows: (i) Pega's case-in-chief on its claims; (ii) Appian's defense to Pega's claims and Appian's case-in-chief on its counterclaims; (iii) Pega's rebuttal on its case-in-chief and defense to Appian's counterclaims; and (iv) Appian's rebuttal on its counterclaims. Any time spent in rebuttal should count against the presenting party's allotment.

*Additional Matters: Exhibits and Jury Notebooks*

147. **Exhibit identification**. Appian's exhibits will be identified with the prefix APP-MA-X.

148. **Exhibit exchange**. Appian agrees to exchange stamped and paginated trial exhibits by no later than November 23, 2026. § VIII.E, ¶ 81.

149. **Jury notebooks**. Pega proposes a joint jury notebook, subject to the Court's permission (§ VIII.L, ¶ 120). Appian respectfully submits that a notebook is not necessary in this case. Jurors may take notes, and the Court's preliminary and final instructions will provide the framework the jury needs. Appian is also concerned that negotiating the notebook's contents

would add another set of disputes on the eve of trial. Should the Court wish to provide jurors with a notebook, Appian requests that it be limited to neutral materials, such as a witness list and the Court's preliminary instructions, in a form approved by the Court.

## IX. LENGTH OF TRIAL

150. Details regarding the Court's anticipated schedule for trial are set forth in the Order on Trial Schedule (Doc No. 890).

## X. WITNESSES

151. Pega's list of the names of the fact and expert witnesses that it intends to call at trial, and a statement of the qualifications of any expert witness is attached as **Exhibit 6**. Pega reserves the right to call an Appian document custodian for the sole purpose of authenticating documents, if necessary.

152. Appian's list of the names of the fact and expert witnesses that it intends to call at trial, and a statement of the qualifications of any expert witness is attached as **Exhibit 7**. Appian reserves the right to call a Pega document custodian for the sole purpose of authenticating documents, if necessary.

## XI. LIST OF UNCONTESTED EXHIBITS

153. The Parties' List of Uncontested Exhibits is attached as **Exhibit 8.** Uncontested trial exhibits will be identified with JTX numbers.

## XII. LIST OF EXHIBITS TO BE OFFERED AT TRIAL

154. Pega's List of Exhibits to be Offered at Trial is attached as **Exhibit 9**. Pega's List of Provisionally Designated Exhibits to be Offered at Trial is attached as **Exhibit 10.** Pega's trial exhibits will be identified with PX_MA numbers.

155. Appian's List of Exhibits to be Offered at Trial is attached as **Exhibit 11**. Appian's trial exhibits will be identified with APP-MA numbers.

## XIII. <u>REMAINING OBJECTIONS TO EVIDENCE</u>

156. Pursuant to Paragraph 3 of the Court's Order Setting Case for Trial (Doc. No. 195 ¶ 3), Pega's remaining objections to the evidence identified in the pretrial disclosures required by Fed. R. Civ. P. 26(a)(3) and Local Rule 16.5(C), as well as any deposition testimony being offered, are set forth in its October 30 disclosures and presented to the Court in Pega's Trial Brief. Pega further reserves all rights to object to counter-designations served by Appian in response to Pega's deposition designations.

157. Pursuant to Paragraph 3 of the Court's Order Setting Case for Trial (DOC. No. 195 ¶ 3), Appian will file the following with its trial brief: (i) Appian's List of Objections to Pega's Exhibits; (ii) Appian's List of Objections to Pega's Provisionally-Designated Exhibits; and (iii) Appian's List of Objections to Pega's Deposition Designations. Appian further reserves all rights to object to counter-designations served by Pega in response to Appian's deposition designations.

Dated: November 11, 2026

Respectfully submitted,

PEGASYSTEMS INC.
*By its attorneys,*

*/s/ R. David Hosp* _____
R. David Hosp (BBO No. 634091)
Mark S. Puzella (BBO No. 644850)
Sheryl K. Garko (BBO No. 657735)
Matthew D. LaBrie (BBO No. 693698)
Katherine E. Kerrick (BBO No. 707966)
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, Massachusetts 02116
Tel: (617) 880-1800
Fax: (617) 880-1801
dhosp@orrick.com
mpuzella@orrick.com
sgarko@orrick.com
mlabrie@orrick.com
kkerrick@orrick.com

Peter Bicks (*pro hac vice*)
Wesley L. White (*pro hac vice*)
Paige Pavone (*pro hac vice*)
Olivia H. Clements (*pro hac vice*)
Lindsay M. Rindskopf (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W. 52nd Street
New York, New York 10019
Tel: (212) 506-3670
Fax: (212) 506-5151
pbicks@orrick.com
wwhite@orrick.com
ppavone@orrick.com
oclements@orrick.com
lrindskopf@orrick.com

Avery Cartwright (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, California 90071

APPIAN CORPORATION
*By its attorneys,*

*/s/ Adeel A. Mangi* _____
Adeel A. Mangi (*pro hac vice*)
Muhammad U. Faridi (*pro hac vice*)
Nicole E. Jerry (*pro hac vice*)
Bonita L. Robinson (*pro hac vice*)
Kendall R. Pauley (*pro hac vice*)
Nadav D. Ben Zur (*pro hac vice*)
LINKLATERS LLP
1290 Avenue of the Americas New
York, New York 10104
Telephone: 212-903-9000
Facsimile: 212-903-9100
adeel.mangi@linklaters.com
muhammad.faridi@linklaters.com
nicole.jerry@linklaters.com
bonita.robinson@linklaters.com
kendall.pauley@linklaters.com
nadav.benzur@linklaters.com

Lillian Childress (*pro hac vice*)
LINKLATERS LLP
601 Thirteenth Street N.W.
Suite 400 South
Washington, DC 20005
Telephone: 202-654-9200
lillian.childress@linklaters.com

Timothy H. Madden (BBO No. 654040)
DONNELLY, CONROY &
GELHAAR,LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
Tel: (617) 720-2880
Fax: (617) 720-3554
thm@dcglaw.com

acartwright@orrick.com

Amanda E. Lack (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
353 N. Clark Street, Suite 3600
Chicago, Illinois 60654
alack@orrick.com

Aaron Brecher (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
Tel: (206) 839-4300
Fax: (206) 839-4301
abrecher@orrick.com

Brendan McGuire (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037
Tel: (202) 339-8400
Fax: (202) 339-8500
bmcguire@orrick.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 11, 2026, a copy of the foregoing document was electronically filed through the DOC. system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

Dated: November 11, 2026

*/s/ R. David Hosp*

R. David Hosp